SANDRA KETNER, ESQ.
Nevada Bar No. 8527
SKetner@SHJNevada.com
SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, Nevada 89511
Telephone: (775) 785-0088
Fax: (775) 785-0087

*Attorneys for Defendant Renown Health*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| LUCERO SANCHEZ, | Case No.:   3:21-cv-00352-MMD-CSD |
| Plaintiff, | |
| vs. | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| RENOWN HEALTH, a non-profit Nevada Corporation, and DOES 1-20, inclusive, | |
| Defendant. | |

Defendant Renown Health ("Defendant" or "Renown"), by and through its counsel of record, hereby moves for summary judgment in its favor on all claims asserted by Plaintiff Lucero Sanchez ("Plaintiff" or "Sanchez").  Specifically, Defendant seeks summary judgment on Plaintiff's claims for: (1) racial discrimination/harassment; (2) disability discrimination; (3) retaliation; and (4) intentional infliction of emotional distress ("IIED") because the undisputed material facts demonstrate that Plaintiff cannot succeed on these claims.[1]  This Motion is made and based upon

---

[1] Pursuant to the Confidentiality Agreement and Stipulation for Entry of Qualified Protective Order entered in this case (ECF No. 16), Defendant separately filed a Motion For Leave to File Exhibits in Support of Defendant's Motion for Summary Judgment Seal (ECF No. 67) seeking this Court's approval to file Exhibits 1-11 (i.e., Plaintiff's medical records and portions of deposition transcripts related to her medical records) that are referenced herein under seal.  **Ex. A (Declaration of Sandra Ketner in Support of Defendant's Motion for Summary Judgment).**

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

the following Memorandum of Points and Authorities, the exhibits attached hereto, all pleadings and papers on file herein, as well as any oral argument that this Court may entertain.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Plaintiff is currently employed and has been employed by Renown since 1993.  Plaintiff alleges that beginning in the summer of 2015, she was subjected to harassment and/or discrimination based upon her race or national origin (Mexican) by Christina Vargas, Director of the Food & Nutrition Services ("FNS") Department, and Justin Bart, FNS Manager, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and Nevada law.  (ECF No. 5 at ¶15-¶24).  Plaintiff also alleges that she was discriminated against on the basis of her disability and denied a reasonable accommodation following a work-related knee injury that she sustained on July 26, 2016, in violation of the Americans with Disabilities Act, as amended ("ADA") and Nevada law.  (ECF No. 5 at ¶28-¶42).  Finally, Plaintiff alleges that she was demoted in December 2016 in retaliation for reporting a single incident of alleged harassment more than a year earlier in July 2015 in violation of Title VII and Nevada law and she experienced emotional distress as a result of Defendant's alleged acts.  (ECF No. 5 at ¶45-¶58).  Defendant denies Plaintiff's allegations and asserts that the undisputed facts set forth below warrant the entry of judgment in Defendant's favor on all of Plaintiff's claims.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   Plaintiff's Employment with Renown

In 1993, Plaintiff commenced her employment with Renown as a housekeeper in its environmental services department at Renown Regional Medical Center ("RRMC").  **Ex. B (Deposition of Lucero Sanchez ("Sanchez Depo") at 19:7-13).**  Plaintiff held a housekeeping position for approximately 3-4 years until she transferred to the position of cashier, which she held for approximately 5 years.  **Ex. B, Sanchez Depo. at 19:14-17, 29:7-10.**  In 1998, Plaintiff transferred from RRMC to the position of wait person at Renown's newly opened South Meadows campus, whereat she has held various positions including her current position of unit clerk in the surgery department.  **Ex. B, Sanchez Depo. at 26:13-14, 29:7-21.**

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

In May 2005, Plaintiff accepted the position of Catering Coordinator/Cashier. **Ex. B, Sanchez Depo. at 30:11-31:21; Ex. C (Offer and Acceptance Letter; RENOWN000255).** In that position, Plaintiff serviced customers requesting catering or banquets at South Meadows by coordinating the events (i.e., internal meetings and outside contracted events) and performing catering duties such as setting the tables, serving the food, and cleaning up following the events. **Ex. B, Sanchez Depo. at 32:5-12, 33:3-34:21, 36:4-13; Ex. D (Catering Coordinator/Cashier Position Description; RENOWN000257-RENOWN000268).** Most of the catering events were for meetings involving Renown doctors, executives, or departments. However, the FNS Department also provided catering services for a few (less than 10) outside catering events each year. **Ex. B, Sanchez Depo. at 35:4-36:3, 36:20-37:21.**

In addition to the above duties, Plaintiff also made daily monetary deposits (to either the bank or emergency department), coded invoices for payment (spending an estimated 1-2 hours each week) and served as a cashier in the café (spending at least 5 hours each week but also covering a shift if a cashier called in). **Ex. B, Sanchez Depo. at 32:5-12, 34:22-35:3, 43:25-45:17; Ex. D.** When performing the duties of the Catering Coordinator/Cashier position, Plaintiff spent 20% of her time sitting, 20% of her time walking, 40% of her time standing, and 10% of her time lifting pans of food and cases onto carts as well as other items weighing up to 35 pounds. **Ex. B, Sanchez Depo. at 37:25-38:24; Ex. D.** Upon accepting the Catering Coordinator/Cashier position and during her remaining years in the FNS Department, Plaintiff typically worked Monday through Friday from 5:00 a.m. to 1:30 or 2:00 p.m. **Ex. B, Sanchez Depo. at 32:15-33:2.**

In 2010, the title of the Catering Coordinator/Cashier position changed to FNS Coordinator. **Ex. B, Sanchez Depo. at 46:16-19.** However, neither Plaintiff's duties nor compensation changed in any way. **Ex. B, Sanchez Depo. at 46:20-48:8; Ex. E (2010 Personnel Action Form; RENOWN000603).** In the re-titled position of FNS Coordinator, Plaintiff's continued to spend 20% of her time sitting, 40% of her time standing, 40% of her time walking (an increase from the previously title) and lifting pans of food and cases onto carts as well as other items weighing up to 35 pounds. **Ex. B, Sanchez Depo. at 48:9-51:10, 53:22-54:10; Ex. F (FNS Coordinator Position Description; RENOWN000471-RENOWN000475).** The FNS Coordinator position was not a

"desk job" but rather a position largely involving physical duties (i.e., gathering food and supplies, setting up the room, delivering the food, and serving the food) with some clerical tasks (i.e., ordering food, reconciling spending reports). **Ex. G (Deposition of Jessi Cohen at 23:1-8, 48:24-50:6); Ex. H (Deposition of Suzanne Oetjen at 25:10-14, 25:25-26:21); Ex. I (Deposition of Julie Macaluso at 9:10-19); Ex. L (Affidavit of Christina Vargas at ¶9); Ex. 8 (Deposition of Shawn Lavac (Sealed) at 19:10-20, 20:2-7).** Plaintiff knew how to perform every position in the kitchen so whenever an employee called in for his/her shift, Plaintiff covered that open position. **Ex. B, Sanchez Depo. at 57:14-58:5; Ex. H, Oetjen Depo. at 26:22-27:4.** No other Renown facility had a FNS Coordinator position and Plaintiff was the only employee to hold that title. **Ex. L, Vargas Aff. at ¶8.**

    **B.    Plaintiff's Supervisors in the FNS Department**

Plaintiff reported to German Pineda, FNS Supervisor at South Meadows, who supervised approximately 20-22 employees including cashiers, dishwashers, cooks, and food and nutrition service representatives. **Ex. B, Sanchez Depo. at 42:17-43:19.** Pineda reported to Kathy West, FNS Manager who oversaw the FNS Departments at South Meadows, the skilled nursing facility, and the rehab hospital. **Ex. B, Sanchez Depo. at 42:11-16, 62:3-7.** Christina Vargas, Director of the FNS Department, and Justin Bart, FNS Supervisor, oversaw the FNS Department at RRMC. Rather than reporting to Vargas as the Director of FNS, West reported to the Chief Nursing Officer at South Meadows. **Ex. L, Vargas Aff. at ¶3.**

In February 2015, West's employment with Renown ended due to the forgery of company records. **Ex. B, Sanchez Depo. at 80:3-12.** Thereafter, Vargas was promoted to Director overseeing the FNS Departments in all Renown facilities and Bart was promoted to FNS Manager overseeing the same. **Ex. L, Vargas Aff. at ¶5.** Upon assuming responsibility over South Meadows' FNS Department, Bart notified Vargas that South Meadows' nutrition costs were suspiciously high. **Ex. L, Vargas Aff. at ¶6.** As the FNS Supervisor, Pineda was responsible for food orders at South Meadows. **Ex. B, Sanchez Depo. at 63:6-9.** Therefore, Bart initiated an investigation into South Meadows' food costs with the assistance of Senior Human Resources

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

Business Partner Jessi Cohen (fka Russell) and Renown's outside food vendor.  **Ex. L, Vargas Aff. at ¶6.**

The investigation revealed that Pineda made an inordinately high number of orders outside of the standard order schedule and ordered unusually expensive items such as large quantities of shrimp, prime rib, salmon and other higher priced items.  **Ex. L, Vargas Aff. at ¶6, ¶10.**  Renown strongly suspected that Pineda, who operated his own personal catering company outside of his employment with Renown, was ordering products through Renown's vendor accounts but using the products for his own catering business.  **Ex. L, Vargas Aff. at ¶10; Ex. B, Sanchez Depo. at 68:4-7; Ex. J (Deposition of Armando Hernandez-Guerrero at 17:10-18:10).**  Additionally, it was reported that Pineda yelled at employees and called them names in violation of Renown's policies.  **Ex. L, Vargas Aff. at ¶23.**  Therefore, on June 29, 2015, Renown terminated Pineda's employment noting his communication and leadership deficiencies as well as the questionable food orders which he placed.  **Ex. L, Vargas Aff. at ¶11; Ex. N (Deposition of German Pineda at 27:16-28:14); Ex. O (Pineda Termination Notice; RENOWN006442-RENOWN006443).**  Cohen and Bart notified Pineda that his termination was due to suspected theft in which Plaintiff was believed to have some involvement, which Pineda denied.  **Ex. N, Pineda Depo. at 26:14-16, 28:16-25.**

Immediately following his termination, Pineda called Plaintiff to notify her that he had been fired and told her to "be careful."  **Ex. B, Sanchez Depo. at 64:8-18.**  Plaintiff was admittedly very close with and loyal to both Pineda and West.  **Ex. B, Sanchez Depo. at 66:5-18, 80:13-23.**  In fact, Plaintiff was described as Pineda's "right hand woman" and believed to have at least knowledge of or some involvement in Pineda's suspected theft because she assisted with processing the food orders, including the will call orders.  **Ex. B, Sanchez Depo. at 74:24-75:4; Ex. I, Macaluso Depo. at 9:20-23, 17:6-9, 25:20-25, 42:11-43:1; Ex. J, Hernandez-Guerrero Depo. at 17:24-18:17.**  However, rather than terminate Plaintiff at the same time as her supervisor, Renown decided to continue its investigation to determine the extent, if any, of Plaintiff's involvement in the matter.  **Ex. L, Vargas Aff. at ¶12.**

C.   **Plaintiff's Allegations of Discrimination and Harassment**

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

Plaintiff claims that she was subjected to harassment and discrimination by Vargas, Bart and Kristin Foley,[2] which began "right after" Pineda was fired. **Ex. B, Sanchez Depo. at 83:2-7.**[3] However, Plaintiff admitted that it was her affiliation with Pineda and West that caused her to come under suspicion and that any alleged mistreatment that she experienced was because of that affiliation (not her race or national origin). **Ex. B, Sanchez Depo. at 81:11-15, 264:25-265:16.**

Shortly before Pineda was terminated, Plaintiff began keeping a notebook diary for the purpose of documenting alleged incidents of discrimination or harassment. **Ex. B, Sanchez Depo. at 136:7-14.** Plaintiff carried the diary with her to work every day, made entries in the diary after the end of her shift, and documented "the most important things" that she claims to have experienced in her workplace. **Ex. B, Sanchez Depo. at 136:21-138:5, 139:21-140:2; Ex. P (Handwritten Diary; SANCHEZ001436-SANCHEZ001474).** Plaintiff later converted the handwritten diary entries into a typewritten document. **Ex. B, Sanchez Depo. at 142:8-143:18; Ex. Q (Typed Diary; SANCHEZ001266-SANCHEZ001276).** The alleged harassment documented in Plaintiff's diary consists of incidents such as: Bart saying, "don't hold onto the floor too hard" and "don't look too bored"; Bart and Vargas inquiring about the financial reports and the safe; Vargas poking at Plaintiff's hand for Plaintiff to give Vargas the keys to the safe; Bart instructing Plaintiff to schedule herself in an open position; Bart notifying Plaintiff that she had to do more than just answer patient calls during the workday; and Bart asking Plaintiff where the department's Christmas tree was stored. **Exs. P-Q.** The incidents described by Plaintiff in her diary clearly reflect management's concerns over financial matters directly related to Pineda's termination and Plaintiff's close relationship with Pineda and West. ***Id.***

In her diary, Plaintiff also documented an incident in which she was asked to check her car after security received a report that Pineda, who was prohibited from being on property following his termination, was seen entering Plaintiff's vehicle located in the parking lot. **Ex. H, Oetjen**

---

[2] Following Pineda's termination, Plaintiff reported to Bart until Rhonda Tu assumed the position of FNS Supervisor at South Meadows. **Ex. B, Sanchez Depo. at 82:5-21.** Tu subsequently transferred to a different department and Foley assumed the FNS Supervisor position in the fall of 2016. **Ex. B, Sanchez Depo. at 155:8-12; Ex. P at SANCHEZ-001457, SANCHEZ001473.**

**Depo. at 51:24-52:18, 53:5-12; Ex. M (Affidavit of Ryan Clarke).** Notably, Suzanne Oetjen, Director of Human Resources Business Partners, told Plaintiff at the outset of the event that Plaintiff was not in trouble. **Ex. P at SANCHEZ001448-SANCHEZ001451; Ex. Q at SANCHEZ001268-SANCHEZ001269**. Oetjen explained that the Security Department received a report that someone had left a package in Plaintiff's vehicle and they "just wanted to make sure [she was] ok." *Id.* Oetjen and Ryan Clarke, Director of Security, asked Plaintiff if she would voluntarily allow Clarke to inspect her vehicle – to which Plaintiff had no objection. **Ex. H, Oetjen Depo. 52:19-21; Ex. M.** Upon inspection, nothing unusual was found in Plaintiff's vehicle; however, Plaintiff was instructed to register her vehicle through the Security Department, which was required of all employees parking their vehicles in the parking lot. **Ex. M.** Plaintiff completely disregarded Clarke's instructions, failed to register her vehicle as required, and was issued a non-disciplinary coaching, which Plaintiff executed without protest. **Ex. P at SANCHEZ001459-SANCHEZ001460; Ex. Q at SANCHEZ001269, SANCHEZ001271; Ex. CC (Coaching; SANCHEZ000911-SANCHEZ000912).**

After Pineda's termination, Bart instructed Plaintiff to schedule herself to work in open positions (such as dishwasher or cashier) so that she was away from her office while management continued its investigation. **Ex. B, Sanchez Depo. at 101:14-102:2, 106:6-10, 116:10-22; Ex. L, Vargas Aff. at ¶13.** It was at this time that Plaintiff began primarily performing cashier duties, which also included cleaning and stocking responsibilities. **Ex. B, Sanchez Depo. at 116:10-22; Ex. K (Deposition of Guadalupe Aguilar at 62:22-63:7).** If the café was not busy or if there were 2 cashiers on duty, Plaintiff was instructed to clean or stock shelves in order to stay busy. **Ex. B, Sanchez Depo. at 116:10-22; Ex. J, Hernandez-Guerrero Depo. at 31:6-9.** Plaintiff admitted that Vargas and Bart had the authority to direct her as needed. **Ex. B, Sanchez Depo. at 103:11-104:9.**

While Plaintiff was away from her office, Bart accessed the office to gather and review the invoices and financial reports that Plaintiff prepared under Pineda's direction and supervision in order to determine whether to pursue criminal charges against Pineda. **Ex. L, Vargas Aff. at ¶13.** Plaintiff even acknowledged that the purpose of management entering her office was to look

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

through paperwork related to Pineda's suspected theft. **Ex. B, Sanchez Depo. at 100:3-101:12.** Plaintiff admittedly never asked Vargas or Bart how she was expected to perform her other job duties (such as coding invoices and preparing financial reports) if she was unable to access her office because she was "scared." **Ex. B, Sanchez Depo. at 102:3-22, 104:18-23.** Despite knowing that management did not want her to access her office, Plaintiff snuck into her office every day on her half hour break to do paperwork (which she estimated as taking only 1.5-2 hours each week to complete). **Ex. B, Sanchez Depo. at 105:12-106:10, 118:5-9.** Plaintiff also continued to take the bank deposit to the emergency department and go to the bank for change during this time. **Ex. B, Sanchez Depo. at 116:23-118:4.**

Plaintiff contends that Vargas' insistence of having access to the safe located in Plaintiff's office constituted harassment. **Ex. B, Sanchez Depo. at 107:12-111:1.** Plaintiff also contends that Vargas did not speak to her unless she needed to or Plaintiff was otherwise "in trouble." However, Plaintiff was never written up or disciplined by Vargas. **Ex. B, Sanchez Depo. at 112:7-12, 114:19-116:9.** Plaintiff admitted that Vargas was pleasant and respectful to the other cashier, Lupe Aguilar, who is also Hispanic and whose family is from Mexico. **Ex. B, Sanchez Depo. at 112:22-113:6; Ex. K, Aguilar Depo. at 132:24-133:24.**[4]

Plaintiff never heard Bart make any comments regarding her national origin, Mexicans or Hispanics. **Ex. B, Sanchez Depo. at 96:2-10.** Likewise, Plaintiff never heard Vargas make any comments about her national origin or Hispanics. **Ex B., Sanchez Depo. at 96:11-20.** Importantly, Vargas' ethnicity is Hispanic Latina as her father was born in Costa Rica and her mother born in Mexico. **Ex. L, Vargas Aff. at ¶2.** Moreover, Vargas is fluent in Spanish and holds dual citizenship in the United States and Costa Rica. ***Id.*** However, Plaintiff does not consider Vargas to be Hispanic because Vargas was born in the United States. **Ex. B, Sanchez Depo. at 97:4-12.** Plaintiff admitted that she has no evidence to support her speculation that any of Bart's or Vargas'

---

[4] Plaintiff does not consider Aguilar to be Hispanic because, even though Aguilar's mother is from Mexico and Aguilar looks to be Hispanic, Aguilar was born in Texas. Plaintiff never told Vargas where she was born and Plaintiff has no evidence demonstrating that Vargas knew Plaintiff was born in Mexico. **Ex. B, Sanchez Depo. at 113:5-114:7.**

alleged conduct was based upon her race or national origin. **Ex. B, Sanchez Depo. at 144:9-145:17.** Moreover, no other witnesses offered evidence to support Plaintiff's allegation that that she was discriminated against or harassed on the basis of her national origin or race. **Ex. I, Macaluso Depo. at 58:18-61:8; Ex. J, Hernandez-Guerrero Depo. at 20:12-19, 37:18-38:4; Ex. K, Aguilar Depo. at 136:25-137:16, 139:12-141:21.**

Plaintiff admitted that the alleged harassment ended when Vargas resigned from her employment with Renown in May 2017. **Ex. P at SANCHEZ001472.[5]** Plaintiff further admitted that the "alleged hostile environment" was due to her affiliation with Pineda and West who were both terminated for misconduct (i.e., suspected theft and forgery of company records). **Ex. B, Sanchez Depo. at 79:21-80:2.** In fact, Plaintiff wrote in her diary that she felt uncomfortable with the way she was being treated "because [she] had a close working relationship with Kathy West and German." **Ex. P at SANCHEZ001439.**

Plaintiff's IIED claim is based upon Vargas poking her hand for the keys to the safe, Oetjen asking if she would allow Clarke to inspect her vehicle (to which Plaintiff had no objection and voluntarily agreed), Vargas yelling about Plaintiff's unregistered vehicle being parked in the roundabout, being ignored by Vargas and Bart, Vargas telling Plaintiff to "shut up" when she was talking to a co-worker during a department meeting, and being asked by a security officer what she did because he was instructed to watch her. **Ex. 1, Sanchez Depo. (Sealed) at 242:23-247:10.**

D.      **Renown's Policies Prohibiting Discrimination, Harassment and Retaliation**

Renown has policies prohibiting harassment and discrimination on the basis of a person's protected class (including but not limited to race, national origin and disability) as well as policies prohibiting retaliation, which Plaintiff had access to in 2015. **Ex. B, Sanchez Depo. at 145:21-147:6; Ex. R (Harassment Policy; SANCHEZ000742-SANCHEZ000747); Ex. S (Non-**

---

[5] While Renown received complaints from employees that Vargas was mean, unkind, spoke in a condescending tone, and was not a nice boss or leader, Renown did not receive any substantiated complaints of discrimination or unlawful harassment concerning Vargas. **Ex. G, Cohen Depo. at 10:11-11:4, 15:25-16:16, 43:11-24, 47:9-23; Ex. H, Oetjen Depo. at 15:4-7, 22:25-23:12, 48:1-23.** Vargas' employment with Renown ended because there was no observed change in Vargas' behavior after these issues were brought to her attention. **Ex. H, Oetjen Depo. at 24:8-16.**

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

1    **Discrimination Notice; SANCHEZ001048).**  Plaintiff received training regarding these policies

2    on an annual basis.  **Ex. B, Sanchez Depo. at 121:2-9, 123:2-4, 125:11-13; 126:5-127:3; Ex. T**

3    **(Training; SANCHEZ001060-SANCHEZ001067).**  Per the training, Plaintiff was instructed to

4    immediately notify a supervisor if she witnessed or experienced harassment. **Ex. B, Sanchez Depo.**

5    **at 127:4-9.**  Plaintiff was aware that Renown had a 24/7 hotline for reporting complaints, reports

6    could be made anonymously, and she could report a complaint to her supervisor's leader or to

7    human resources. **Ex. B, Sanchez Depo. at 127:10-23, 149:19-150:10; Ex. T.**

8         During the entirety of her employment with Renown, Plaintiff made one single report of

9    alleged harassment. **Ex. B, Sanchez Depo. at 127:24-128:15.** Specifically, Plaintiff reported to

10   Oetjen that Vargas told Plaintiff to give her the keys to the safe and poked Plaintiff's hand holding

11   the keys. **Ex. B, Sanchez Depo. at 129:20-130:16; Ex. H, Oetjen Depo. at 16:8-21.**  Plaintiff's

12   diary entries describe the alleged hand poking incident on July 7, 2015, and Plaintiff's meeting with

13   Oetjen on July 10, 2015.  **Ex. P at SANCHEZ001440-SANCHEZ001441, SANCHEZ001444-**

14   **SANCHEZ001445; Ex. Q at SANCHEZ001266-SANCHEZ001267.**  According to Plaintiff's

15   diary, the only incident that Plaintiff reported to Oetjen was the hand poking incident by Vargas,

16   which was corroborated by Oetjen's deposition testimony. **Ex. H, Oetjen Depo. at 16:8-21.**  When

17   reporting the alleged mistreatment by Vargas to Oetjen, Plaintiff never mentioned her national

18   origin or race. **Ex. B, Sanchez Depo. at 141:13-142:1.** In response, Oetjen explained to Plaintiff

19   that Vargas and Bart had newly assumed responsibility over South Meadows' FNS Department and

20   had every right to demand access to the safe. **Ex. P-Q.**  Oetjen subsequently relayed to Vargas how

21   she made Plaintiff feel and advised Vargas to act professionally.  **Ex. H, Oetjen Depo. at 18:10-**

22   **22.**

23        While Plaintiff testified that she also told Oetjen that her office was given to Foley as an

24   example of unlawful harassment, Plaintiff's diary entries indicate that Foley did not assume that

25   office until January 2016 (i.e., 6 months after Plaintiff's meeting with Oetjen). **Ex. B, Sanchez**

26   **Depo. at 130:17-131:3; Ex. P at SANCHEZ001463; Ex. Q at SANCHEZ001272.**  Additionally,

27   Plaintiff testified that she reported to Oetjen that Vargas told her to "shut up" and that she overheard

28   Vargas say, "I don't like Mexicans." **Ex. B, Sanchez Depo. at 131:17-132:5, 134:4-13.** Plaintiff's

typewritten diary describes an incident on or about November 4, 2015, in which Plaintiff was talking to another employee and Vargas said, "Luz will you shut up!"  **Ex. Q at SANCHEZ001271.** However, there is absolutely no mention of Vargas' so-called comment about not liking Mexicans documented anywhere in either Plaintiff's handwritten or typewritten diary entries - even though Plaintiff's entire purpose of keeping the diary was to document the alleged incidents of harassment, she carried the diary with her to work every day, made entries in the diary after the end of her shift, and documented "the most important things" that she claims to have happened to her.  **Ex. B, Sanchez Depo. at 136:7-138:9, 139:21-140:2; Exs. P-Q.** Plaintiff testified that there were no additional incidents of alleged harassment or discrimination that were not discussed during her deposition or included in her diary.  **Ex. B, Sanchez Depo. at 239:7-20, 254:16-21.**

**E.**     **Changes in the FNS Department**

During the investigation into Pineda's actions, management discovered documents in Plaintiff's office indicating that Pineda or West had assigned duties to Plaintiff related to employee compensation, performance, and schedules.  **Ex. L, Vargas Aff. at ¶9.**  Management determined that such duties as well as cash handling responsibilities were more properly performed at a leadership or supervisor level.  **Ex. L, Vargas Aff. at ¶14; Ex. G, Cohen Depo. at 23:1-14.** Therefore, those duties were removed from Plaintiff and performed by Bart until the FNS Supervisor position was filled. ***Id.***

By all accounts, the number of catering events at South Meadows declined significantly following Pineda's termination.  **Ex. I, Macaluso Depo. at 46:19-22, 47:1-7, 51:12-22; Ex. J, Hernandez-Guerrero Depo. at 19:2-8; Ex. K, Aguilar Depo. at 84:25-85:8, 91:21-92:11.** Obviously, there was no paperwork to be done for catering events that were no longer being held. **Ex. I, Macaluso Depo. at 47:8-11; Ex. J, Hernandez-Guerrero Depo. at 19:14-18.**  To the extent that a few catering events were still held, the FNS Supervisor handled those duties while Plaintiff was directed to cashier (which she had previously performed) or fill other positions so she did not experience a reduction in her work hours.  **Ex. I, Macaluso Depo. at 47:12-22; Ex. J, Hernandez-Guerrero Depo. at 19:20-20:6, 34:9-14; Ex. Q at SANCHEZ001276; Ex. L, Vargas Aff. at ¶16.**

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

In early 2016, Plaintiff applied for a 12-week leave of absence and as a result, Tu assumed sole responsibility during Plaintiff's absence for coding invoices, making deposits, and completing other paperwork duties that had been previously assigned to Plaintiff.  **Ex. 1, Sanchez Depo. (Sealed) at 167:11-25, 168:20-169:13; Ex. P at SANCHEZ001463-SANCHEZ001465; Ex. Q at SANCHEZ001272.**  When Plaintiff returned from leave, Tu continued to perform all of the duties related to the paperwork as Plaintiff performed only cashiering and catering duties (i.e., setting up and serving at the catering events).  **Ex. 1, Sanchez Depo. (Sealed) at 169:14-170:2.**

Plaintiff consistently testified that she began primarily performing cashier duties immediately after Pineda's termination in June 2015.  **Ex. B, Sanchez Depo. at 116:10-22; Ex. 1, Sanchez Depo. (Sealed) at 178:14-16; Ex. P at SANCHEZ001467-SANCHEZ001469; Ex. Q at SANCHEZ001273.**  As previously stated, the number of catering events held at South Meadows had declined significantly and administrative-type duties were assigned to management.  **Ex. I, Macaluso Depo. at 46:19-22, 47:1-7, 51:12-22; Ex. J, Hernandez-Guerrero Depo. at 19:2-8; Ex. K Aguilar Depo. at 84:25-85:8, 91:21-92:11; Ex. H, Oetjen Depo. at 33:22-34:2; Ex. L, Vargas Aff. at ¶¶14-16.**  Therefore, after a review of the positions in the FNS Department, Renown decided to eliminate the FNS Coordinator position formally transferred Plaintiff to the cashier position effective January 16, 2017.  **Ex. G, Cohen Depo. at 29:12-30:5; Ex. H, Oetjen Depo. at 30:25-31:14, 33:22-34:2; Ex. W (Personnel Action Notice; RENOWN000686); Ex. L, Vargas Aff. at ¶¶17-18; Ex. BB (Declaration of Justin Bart; RENOWN00886-RENOWN00887).[6]**

Prior to the transfer, Russell and Vargas informed Plaintiff that the transfer was made for the purpose of aligning Plaintiff's position and title with the duties that she was actually performing (i.e., cashier) and Plaintiff agreed.  **Ex. 1, Sanchez Depo. (Sealed) at 179:10-16; Ex. W.**  Upon formally transferring to the position of cashier, Plaintiff's rate of pay changed but her duties did not

---

[6] When Plaintiff held the Catering Coordinator/Cashier position, she initially shared an office with a food and nutrition rep and later shared an office with Pineda.  **Ex. B, Sanchez Depo. at 58:25-60:6.** In 2010, Plaintiff stopped sharing the office with Pineda and received her own office on the second floor of the facility.  **Ex. B, Sanchez Depo. at 95:12-14, 95:24-96:1.**  However, as the duties of the FNS Coordinator were reduced as the number of catering events declined, Plaintiff shared the office with Foley until the FNS Coordinator position was eliminated entirely.  **Ex. BB.**

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

change in any way as she had been performing those exact same duties since at least early 2016 if not longer. **Ex. 1, Sanchez Depo. (Sealed) at 257:25-258:19.** The change in Plaintiff's compensation was not related in any way to her workplace injury. **Ex. H, Oetjen Depo. at 35:14-36:4.** In fact, human resources believed that Plaintiff's workers compensation claim was closed and that Plaintiff was released to full duty at the time of her transfer to the cashier position. **Ex. G, Cohen Depo. at 32:4-19.** Renown's human resources subsequently realized that Plaintiff's workers compensation claim remained opened and Plaintiff was entitled to receive workers compensation benefits paid at the FNS Coordinator position's higher rate of pay (rather than the cashier rate of pay) because workers compensation benefits are paid at the employee's rate of pay at the time of injury. **Ex. 8, Lavac Depo. (Sealed) at 43:12-44:12.** Therefore, Renown paid Plaintiff backpay covering the time period between August 1, 2016 through August 27, 2017 to remedy the miscalculation of Plaintiff's workers compensation benefits during that time period. **Ex. B, Sanchez Depo. at 240:14-241:19; Ex. Z (9/18/17 Letter; SANCHEZ000786-SANCHEZ000787).** Renown's decision to issue backpay for the miscalculation of Plaintiff's workers compensation benefits was based completely on workers compensation statutory requirements and entirely unrelated to any ADA issue. **Ex. 8, Lavac Depo. (Sealed) at 44:19-45:6.** Plaintiff remained in the cashier position earning the lower rate of pay for any non-light duty hours actually worked in the cashier position. **Ex. G, Cohen Depo. at 37:24-38:15; Ex. H, Oetjen Depo. at 40:15-41:9, 42:6-10, 42:18-22.**[7]

While Plaintiff contends that her duties as FNS Coordinator were mostly administrative, the job duties for the non-exempt position reflect otherwise. **Ex. F.** Moreover, Plaintiff testified that she spent only a small portion of her time (i.e., 1.5-2 hours each week) completing paperwork when she held the FNS Coordinator position. **Ex. B, Sanchez Depo. at 105:12-106:10, 118:5-9.** To

---

[7] Plaintiff's first annual performance evaluation after formally transferring to the cashier position was positive as she was rated as exceeding expectations in all areas. **Ex. B, Sanchez Depo. at 236:12-238:7; Ex. X (Evaluation; RENOWN00768-RENOWN000775).** The evaluation, which was slightly delayed in order to allow Foley to observe Plaintiff formally in the role, was completed by Foley and approved by Bart. ***Id.***

date, the FNS Coordinator position has not been re-filled. **Ex. K, Aguilar Depo. at 92:12-15; Ex. BB.**

      F.      **Plaintiff's Work-Related Knee Injury**

On July 26, 2016, Plaintiff fell on her knees after tripping on a cord at work. **Ex. 1, Sanchez Depo. (Sealed) at 159:20-160:4, 160:17-20.** Plaintiff received treatment the following day after her co-worker reported the accident. **Ex. 1, Sanchez Depo. (Sealed) at 160:21-161:2, 161:9-18; Ex. 2 (Renown Occupational Health Records at RENOWN006590-RENOWN006591).** Plaintiff's x-rays did not reveal any fractures and she was released to work with temporary restrictions to sit down every 2 hours and not lift more than 10 pounds. **Ex. 2 at RENOWN006590-RENOWN006591.** Plaintiff had told the provider that carrying heavy boxes increased her knee pain, so the provider explicitly instructed her to ask for assistance lifting heavy objects that exceeded her lifting restrictions. **Ex 1, Sanchez Depo. (Sealed) at 163:2-12, 164:5-8; Ex. 2 at SANCHEZ000526-SANCHEZ000527.** Additionally, Plaintiff had previously taken an online class in 2013 entitled "Lifting and Protecting the Back" and was admittedly instructed during her employment with Renown to not lift an object if she believed it was too heavy. **Ex. B, Sanchez Depo. at 156:14-157:14.**

Shortly thereafter, Renown extended a light duty job offer to Plaintiff in compliance with NRS 616C.475(8).[8] **Ex. 1, Sanchez Depo. (Sealed) at 164:12-22; Ex. 3 (Light Duty Job Offer; SANCHEZ000877).** Specifically, Plaintiff, who held the title of FNS Coordinator but had been primarily performing cashier duties for the last year, was provided with a chair in which to sit while she was cashiering. **Ex. 1, Sanchez Depo. (Sealed) at 166:1-167:1; Ex. J, Hernandez-Guerrero Depo. at 32:5-16; Ex. 8, Lavac Depo. (Sealed) at 18:19-19:2, 20:22-21:1.** From the time that Plaintiff accepted the light duty job offer until she transferred to a different department, this chair

---

[8] NRS 616C.475 allows an employer to extend a temporary light duty job offer to meet an employee's temporary physical restrictions in order to avoid payment of temporary total disability ("TTD") benefits which are paid at 66 2/3% of an employee's average monthly wage. **Ex. 8, Lavac Depo. (Sealed) at 15:4-16:3.** A temporary light duty job is not required to be in the employee's current position or otherwise related to the performance of the employee's regular essential functions. Rather, it can be any job that meets the employee's temporary restrictions. **Ex. 8, Lavac Depo. (Sealed) at 29:15-22.**

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

1  remained located behind the cash register for Plaintiff's use.  **Ex. 1, Sanchez Depo. (Sealed) at**

2  **175:1-19; Ex. K, Aguilar Depo at 121:15-122:14.**

3  The light duty job offer which Plaintiff accepted explicitly states, "[t]emporary light duty

4  employment is contingent on your compliance as well as your attendance."  **Ex. 3.**  If an employee

5  feels that restrictions are not being complied with, the employee is required to notify Renown's

6  workers' compensation manager.  **Ex. 8, Lavac Depo. (Sealed) at 20:22-21:9, 60:6:14, 61:4-11.**

7  While Plaintiff claims that she was unable to use the chair, she never asked for any assistance from

8  her co-workers and never reported the matter to management for well over a year after her injury.

9  **Ex. 1, Sanchez Depo. (Sealed) at 175:7-177:12; Ex. AA (Deposition of Rhonda Tu at 14:3-14).**

10  Further, witnesses reported seeing Plaintiff both use the chair and seemingly not use the chair on

11  purpose at times.  **Ex. K, Aguilar Depo. at 124:8-14; Ex. J, Hernandez-Guerrero at 35:13-36:4.**

12  Separately, Renown's Reasonable Accommodation Policy directs employees to contact

13  human resources if they need reasonable accommodation in order to perform the essential functions

14  of their job.  **Ex. B, Sanchez Depo. at 150:11-151:10; Ex. U (Reasonable Accommodation**

15  **Policy; SANCHEZ000761-SANCHEZ000763).**  While Plaintiff was fully aware of the procedure

16  for requesting reasonable accommodation through human resources, she admittedly never did so.

17  **Ex. B, Sanchez Depo. at 153:3-25.**  Instead, Plaintiff gave her doctor's notes to her supervisors

18  (Tu or Foley) but never said a single word to them about working outside of her restrictions for

19  more than a year.  **Ex. B, Sanchez Depo. at 152:11-153:2, 261:5-7; Ex. 1, Sanchez Depo. (Sealed)**

20  **at 172:8-20, 173:1-14, 173:18-174:1, 174:9-25, 212:19-213:2, 213:18-214:4.**

21  Likewise, Plaintiff was aware of Renown's Open Door Policy and had received training

22  regarding Renown's chain of command.  **Ex. B, Sanchez Depo. at 150:11-151:10, 154:21-155:1;**

23  **Ex. V (Open Door Policy; SANCHEZ000764-SANCHEZ000765).**  Plaintiff was instructed:

24  So you go first, if something is happening, you go first to your
supervisor. If nothing happens with your supervisor you go to the
25  manager, and if nothing happens you, you know, keep going up to the
director until you actually go to Human Resources.
26

27

28

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

1   **Ex. B, Sanchez Depo. at 155:2-7.** However, Plaintiff never reported or even tried to report to either

2   Bart or Vargas that she was working outside of her restrictions. **Ex. 1, Sanchez Depo. (Sealed) at**

3   **175:23-176:19.**

4          Over the next 3 months, Plaintiff continued to receive treatment for her knee injury from

5   Renown Occupational Health.  On August 4, 2016 (10 days after her initial visit), Plaintiff's

6   temporary 10 pound lifting restriction was extended and she was advised to sit for 75% of the time

7   and be allowed breaks every 2 hours to sit with her legs elevated for 15 minutes. **Ex. 2 at**

8   **RENOWN006592-RENOWN006593.** However, 1 week later, Plaintiff was released to full duty

9   at her request. **Ex. 1, Sanchez Depo. (Sealed) at 179:20-180:2, 181:12-15, 181:20-23; Ex. 2 at**

10  **RENOWN006594-RENOWN006595.** At her next visit on August 18, 2016, Plaintiff reported

11  experiencing pain following her full duty release so the provider reinstituted the temporary

12  restrictions for Plaintiff to sit for 75% of the time and be allowed breaks every 2 hours but did not

13  restrict Plaintiff's lifting capacity. **Ex. 1, Sanchez Depo. (Sealed) at 182:1-13, 182:19-183:8; Ex.**

14  **2 at RENOWN006596-RENOWN006597.**

15         At her next two visits on August 25 and September 15, 2016, Plaintiff's temporary sitting

16  restrictions remained the same but she was not restricted from lifting any weight. **Ex. 2 at**

17  **RENOWN006598-RENOWN006601.** At her visit on October 4, 2016, an MRI was ordered and

18  Plaintiff's restrictions were reduced to sitting 50% of the time but she continued to be unrestricted

19  in her lifting capacity. **Ex. 2 at RENOWN006602-RENOWN006603.** Because Plaintiff's MRI

20  revealed moderate to severe osteoarthritis, she was referred to an orthopedic specialist, Dr. James

21  Sobiek. **Ex. 2 at RENOWN006607-RENOWN006608.** Nevertheless, Plaintiff's work restrictions

22  remained temporary, there was no finding of a permanent disability, and she was not restricted from

23  lifting any weight. **Ex. 2.**

24         When Plaintiff first saw Dr. Sobiek on November 28, 2016, he did not impose <u>any</u> restrictions

25  upon Plaintiff's ability to sit, stand or lift and did not believe that she had a permanent disability.

26  **Ex. 1, Sanchez Depo. at 193:25-194:12; Ex. 4 (Tahoe Fracture Records at RENOWN001547);**

27  **Ex. 9 (Deposition of James Sobiek, M.D. (Sealed) at 11:24-12:14, 16:18-17:12).** Likewise, Dr.

28  Sobiek did not impose <u>any</u> restrictions on Plaintiff when she saw him 1 month later. **Ex. 1, Sanchez**

**Depo. (Sealed) at 194:13-195:21; Ex. 4 at RENOWN001549, SANCHEZ000864; Ex. 9, Dr. Sobiek Depo. (Sealed) at 20:19-25.** In fact, Dr. Sobiek did not impose any restrictions upon Plaintiff until after she underwent and was recovering from surgery to her right knee (as is typical post-surgery), which was paid for in its entirety by Renown. **Ex. 1, Sanchez Depo. at 195:22-25, 196:12-197:13, 240:1-9; Ex. 8, Lavac Depo. (Sealed) at 9:23-10:8; Ex. 9, Dr. Sobiek Depo. (Sealed) at 24:5-13, 77:11-21.** Dr. Sobiek did not believe that Plaintiff had a permanent disability at the time of surgery. **Ex. 9, Dr. Sobiek Depo. (Sealed) at 23:24-24:4.**

When Plaintiff returned to work following her knee surgery in mid-March 2017, she was released to light duty consisting of 50% sedentary work but remained unrestricted from lifting. **Ex. 1, Sanchez Depo. at 198:6-15, 199:25-200:15; Ex. 4 at RENOWN001553, RENOWN001583.** While Dr. Sobiek did not believe that Plaintiff could stand for an entire day at 2 months post-surgery, he also believed that Plaintiff would fully recover and be released to full duty, which is typically the result for that type of surgery. **Ex. 9, Dr. Sobiek Depo. (Sealed) at 29:13-31:7; Ex. 10 (Deposition of Dr. Sanjai Shukla (Sealed) at 61:9-24).** Therefore, Plaintiff continued to use the chair behind the cash register that was provided by Renown for support, which Dr. Sobiek confirmed was an acceptable accommodation. **Ex. 1, Sanchez Depo. (Sealed) at 198:1-15, 198:25-199:12; Ex. 9, Dr. Sobiek Depo. (Sealed) at 33:6-22; Ex. 5 (Photo; SANCHEZ000039-SANCHEZ000040).** However, Plaintiff's restrictions changed as she continued to treat. **Ex. 8, Lavac Depo. (Sealed) at 63:14-22.** At her appointment 1 month later, Dr. Sobiek continued to restrict Plaintiff from sitting 50% of the time and imposed new restrictions of no stooping or lifting more than 10 pounds. **Ex. 1, Sanchez Depo. (Sealed) at 200:16-25, 202:1-18; Ex. 4 at RENOWN001554, SANCHEZ000869.** Nevertheless, Dr. Sobiek believed that he would release Plaintiff to full duty at her next appointment the following month. **Ex. 9, Dr. Sobiek Depo. (Sealed) at 35:23-37:6; Ex. 4 at RENOWN001554.** Importantly, Plaintiff had not been restricted in her lifting capacity since early August 2016. **Ex. 2 at RENOWN006592-RENOWN006593.**

Dr. Sobiek continued Plaintiff's 50% sedentary and 10 pound lifting restrictions through May and June 2017. **Ex. 4 at RENOWN001555, RENOWN001540, RENOWN001556, RENOWN001541.** On July 5, 2017, Dr. Sobiek considered releasing Plaintiff to full duty but

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

instead issued permanent restrictions for "minimal sitting as needed as her only restriction."  **Ex. 1 Sanchez Depo. (Sealed) at 204:11-17, 204:24-205:1; Ex. 4 at RENOWN001557, RENOWN001542.** Importantly, Plaintiff did not have <u>any</u> lifting restrictions imposed on a permanent basis by Dr. Sobiek who did not feel that lifting restrictions were necessary and who released Plaintiff from his care for her right knee treatment. **Ex. 1, Sanchez Depo. (Sealed) at 204:11-20; Ex. 9, Dr. Sobiek Depo. (Sealed) at 47:8-11.**  In accordance with Dr. Sobiek's directive, Renown extended to Plaintiff a reasonable accommodation offer to sit as needed, which Plaintiff accepted on or about July 21, 2017. **Ex. 1, Sanchez Depo. (Sealed) at 205:6-206:8; Ex. 6 (Reasonable Accommodation Offer; SANCHEZ001096-SANCHEZ001097); Ex. 9, Dr. Sobiek Depo. (Sealed) at 50:16-51:10.**

When Plaintiff returned to Dr. Sobiek in August 2017 for treatment related to her left knee, Dr. Sobiek did not impose any restrictions at that time or at her next visit in September 2017 as there appeared no medical need for any restrictions. **Ex. 1, Sanchez Depo. (Sealed) at 208:17-209:17, 209:20-210:14; Ex. 4 at RENOWN001558, RENOWN001543, RENOWN001559, RENOWN001544; Ex. 10, Dr. Shukla Depo. (Sealed) at 69:18-70:6.** During this time, the only restriction upon Plaintiff was to sit as needed. **Ex. 4 at RENOWN001557, RENOWN001542.** However, on October 4, 2017, Dr. Sobiek restricted Plaintiff from stooping, climbing, and lifting more than 20 pounds, and recommended sitting 75% of the time. **Ex. 4 at RENOWN001560, RENOWN001545.** Because the FNS Department determined at this time that it could not accommodate a restriction requiring 75% sedentary work, Plaintiff was removed from that position and remained off work but nevertheless receiving TTD benefits until another position within those restrictions was identified. **Ex. G, Cohen Depo. at 27:22-28:4; Ex. 8, Lavac Depo. (Sealed) at 62:8-63:13, 64:16-65:3.** Plaintiff last worked as a cashier in the FNS Department on October 13, 2017, when Renown determined that it could not accommodate Plaintiff's restrictions. **Ex. 1, Sanchez Depo. (Sealed) at 216:20-23, 240:10-13.**

Shortly after Plaintiff received the October 4th restrictions for her left knee, she spoke to Foley for the first time about working outside of her restrictions. **Ex. 1 (Sanchez Depo. (Sealed) at 173:18-174:1, 174:9-25, 212:19-213:2, 213:18-214:4.** Also around this time, Plaintiff's legal

counsel told Renown's workers compensation manager that Plaintiff was working outside of her restrictions.  In light of this information reported for the first time more than a year after Plaintiff's injury, the workers compensation department observed Plaintiff in the performance of her duties as cashier one morning and noted that it appeared Plaintiff was unable to sit or take breaks during the hours observed (7:00 a.m.-10:00 a.m.).  **Ex. 8, Lavac Depo. (Sealed) at 59:6-60:14, 72:2-9.** Renown's workers compensation manager then emailed human resources and FNS leadership to loop everyone in as to what was observed.  **Id.**

After Dr. Sobiek issued permanent restrictions for Plaintiff's left knee, Renown extended and Plaintiff accepted a reasonable accommodation/light duty offer for a desk position within her restrictions.  **Ex. 1, Sanchez Depo. (Sealed) at 217:1-25, 218:8-219:9; Ex. 7 (Reasonable Accommodation Offer; RENOWN001164).**  Since November 2017, Plaintiff has worked a sedentary position which allows her to sit for 75% of the time.  **Ex. 1, Sanchez Depo. at 220:10-13.** Plaintiff subsequently received a permanent partial disability rating and payment, which was reduced by 75% due to the pre-existing nature of her knee condition.  **Ex. 1, Sanchez Depo. (Sealed) 225:9-11, 225:20-23.**  On March 26, 2018, Plaintiff applied for and received a disabled persons' license plate through the Nevada Department of Motor Vehicles.  **Ex. 1, Sanchez Depo. (Sealed) at 228:22-229:15, 229:19-23.**  Plaintiff did not consider herself to be disabled prior to that date.  **Ex. 1, Sanchez Depo. (Sealed) at 229:16-18.**

Plaintiff claims that Renown caused further injury to her knees by failing to accommodate her light duty restrictions.  **Ex. 1, Sanchez Depo. (Sealed) at 262:11-15.**  Specifically, Plaintiff claims she was scheduled to work by herself between 6:00 am and 10:00 am during which she time she had to walk back and forth from the cash register to the kitchen in order to get the food orders, clean or stock the salad bar, refrigerator and merchandise, and lift heavy boxes.  **Ex. 1, Sanchez Depo. (Sealed) 175:7-19, 188:12-17, 262:18-22.**  However, Dr. Sobiek did not see any evidence of an aggravation or acceleration of Plaintiff's underlying knee condition as the result of Plaintiff allegedly working outside of the restrictions.  **Ex. 9, Dr. Sobiek Depo. (Sealed) at 79:16-80:5.** Moreover, neither of Plaintiff's knee surgeons (Dr. Sobiek nor Dr. Shukla, who subsequently performed a total right knee replacement on Plaintiff), believed that Plaintiff's work duties at the

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

café caused Plaintiff's condition that led to her subsequent surgeries - even if such duties exceeded her physical restrictions. **Ex. 9, Dr. Sobiek Depo. at 73:18-74:4; Ex. 10, Dr. Shukla Depo. (Sealed) at 63:19-65:6, 66:21-67:2, 74:5-14.**

### G.     NERC Investigation

In January 2018, Plaintiff filed a Charge of Discrimination with the Nevada Equal Rights Commission ("NERC") alleging that she was discriminated against on the basis of her national origin (Hispanic), age, and disability, denied a reasonable accommodation, and subjected to retaliation. **Ex. B, Sanchez Depo. at 157:20-158:12; Ex. Y (Charge of Discrimination; SANCHEZ0000890-SANCHEZ000891).** While Plaintiff alleged under penalty of perjury that she took her concerns to Oetjen "several times," Plaintiff admittedly had only a single conversation with Oetjen about alleged mistreatment in July 2015 during which time she never mentioned her race or national origin. **Ex. Y; Ex. B, Sanchez Depo. at 127:24-128:15, 141:13-142:1.**

Additionally, Plaintiff alleged under penalty of perjury that she was placed on light duty and not permitted to lift more than 10 pounds but was "continuously required" to work outside of her restrictions "from the summer of 2016 to the fall of 2017." **Ex. Y.** However, Plaintiff's medical records unequivocally contradict her claim that she had a 10 pound lifting restriction between the summer of 2016 and fall of 2017. **Exs. 2, 4.** Instead, Plaintiff's medical records reflect that she had a 10 pound lifting restriction temporarily imposed for only the first 2 weeks after her injury. **Ex. 2.** Plaintiff was not restricted from lifting 10 pounds again until 8 months later in April 2017, and was then ONLY restricted from doing so for a limited period of only 3 months. **Ex. 4.**

Indeed, NERC Investigator Brown admitted that Plaintiff did not have <u>any</u> lifting restrictions between August 11, 2016-April 6, 2017, and was therefore free to lift 40-50 pounds during those time periods. **Ex. 11 (Deposition of Richard Brown (Sealed) at 23:5-8, 24:2-7, 24:16-22, 25:6-12, 27:20-22, 28:15-18, 29:10-30:1, 31:24-32:2, 33:10-12, 38:11-39:7).** Investigator Brown acknowledged that Plaintiff had lifting restrictions imposed beginning on April 6, 2017, but such lifting restrictions were removed as of July 5, 2017, and not reimposed until October 4, 2017. **Ex. 11, Brown Depo. (Sealed) at 38:24-40:8, 41:4-9, 43:1-12, 44:1-4, 44:20-46:1.** Investigator Brown readily admitted that Plaintiff did <u>not</u> in fact have 10 pound restrictions

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

1  for the year long period between the summer of 2016 and fall of 2017. **Brown Depo. (Sealed) at**

2  **68:10-17.** Moreover, Investigator Brown admitted that Plaintiff did not identify any restrictions in

3  her Charge that were allegedly not accommodated by Renown other than the 10 pound lifting

4  restriction. **Ex. 11, Brown Depo. (Sealed) at 97:24-98:4, 98:14-20.**

5  **III.   LEGAL ARGUMENT**

6      **A.   Standard for Summary Judgment**

7      The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural

8  shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure

9  the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S.

10  317, 327 (1986).   Summary judgment is proper if the pleadings, depositions, answers to

11  interrogatories, and admissions on file, together with the affidavits if any, show that there is no

12  genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

13  law. FRCP 56. Summary judgment is also appropriate where the plaintiff cannot establish an

14  essential element of his case. *Celotex Corp.*, 477 U.S. at 322-23.

15     The party opposing summary judgment must show, through admissible evidence, that a

16  genuine issue of material fact exists. *See* Fed. R. Civ. P. 56(e); *Anheuser-Busch, Inc. v. Natural*

17  *Beverage Distributors*, 69 F.3d 337, 345 n.4 (9th Cir. 1995).   Conclusory statements cannot create

18  a genuine issue of fact. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).   Thus, "[b]y its very

19  terms, this standard provides that the mere existence of *some* alleged factual dispute between the

20  parties will not defeat an otherwise properly supported motion for summary judgment; the

21  requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*,

22  477 U.S. 242, 247-248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

23      **B.   Plaintiff Cannot Establish Race/National Origin Discrimination or Harassment**

24     To establish a claim for race or national origin discrimination, Plaintiff must show: 1) she

25  is a member of a protected class; 2) she was qualified for her position; 3) she suffered an adverse

26  employment action; and 4) similarly situated employees outside of her protected class were treated

27  more favorably. *Leong v. Potter*, 347 F.3d 1117, 1124 (9th Cir. 2003) (citing *McDonnel Douglas*

28  *Corp. v. Green*, 411 U.S. 792, 802 (1973)).   If Plaintiff meets her burden, the burden then shifts to

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

Renown to articulate a legitimate, non-discriminatory reason for its actions.  If Renown provides such a reason, the burden shifts back to Plaintiff to prove that Renown's reason is a pretext for discrimination.  Importantly, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Texas Dep't of Cmt. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

Here, Renown acknowledges that Plaintiff is Hispanic/Mexican and was transferred to the cashier position when the FNS Coordinator position was eliminated.  **Ex. W**.  However, Plaintiff cannot satisfy her initial burden by demonstrating that similarly situated employees outside of her protected class were treated more favorably because Plaintiff was the only employee to hold the FNS Coordinator position.  **Ex. L, Vargas Aff. at ¶8; Ex. 8, Lavac Depo. (Sealed) at 19:10-14.**  Moreover, Renown's decision to eliminate the FNS Coordinator position and transfer Plaintiff to the cashier position is based upon legitimate and non-discriminatory reasons which have not been disputed in this case.  **Ex. G, Cohen Depo. at 29:12-30:5; Ex. H, Oetjen Depo. at 30:25-31:14, 33:22-34:2; Ex. BB.**  Specifically, the evidence unequivocally reflects that the number of catering events significantly declined following Pineda's termination thereby eliminating the purpose of the FNS Coordinator position.  **Ex. I, Macaluso Depo. at 46:19-22, 47:1-11, 51:12-22; Ex. J, Hernandez-Guerrero Depo. at 19:2-8, 19:14-18; Ex. K, Aguilar Depo. at 84:25-85:8, 91:21-92:11; Ex. H, Oetjen Depo. at 33:22-34:2; Ex. L, Vargas Aff. at ¶¶14-16.**  Additionally, Renown determined that Plaintiff's other duties (such as cash handling and financial reporting) were more appropriately assigned at the leadership or supervisor level.  **Ex. L, Vargas Aff. at ¶14.**  As a result, Plaintiff's only remaining duty was serving as a cashier, which she admittedly had been primarily performing since immediately after Pineda's termination.  **Ex. B, Sanchez Depo. at 116:10-22.**  Thus, Plaintiff's transfer to the cashier position is strongly supported by legitimate business reasons and Plaintiff has no evidence of pretext to overcome such valid reasons for the action.  Accordingly, Plaintiff cannot establish a claim for discrimination in violation of Title VII.

Likewise, Plaintiff cannot establish a hostile work environment claim which requires Plaintiff to show: (1) she was subjected to verbal or physical conduct related to her race/national origin; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to

alter the conditions of her employment and create an abusive work environment. *Galdamez v. Potter*, 415 F.3d 1015, 1023 (9th Cir. 2005). To determine whether conduct was sufficiently severe or pervasive to violate Title VII, the court considers "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark Co. Sch. Dist. v. Breeden,* 532 U.S. 268, 270-71 (2001). Additionally, "[t]he working environment must both subjectively and objectively be perceived as abusive." *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)).

Here, with the exception of the comment "I don't like Mexicans" that Plaintiff attributes to Vargas under dubious circumstances, none of the alleged conduct of which Plaintiff claims to be harassment is related to her race. Plaintiff admitted that she has no evidence to relate the alleged treatment by Vargas and Bart to her race or national origin. **Ex. B, Sanchez Depo. at 144:9-145:17.** Moreover, no other witnesses offered evidence to support Plaintiff's allegation that that she was discriminated against or harassed on the basis of her national origin or race. **Ex. I, Macaluso Depo. at 58:18-61:8; Ex. J, Hernandez-Guerrero Depo. at 20:12-19, 37:18-38:4; Ex. K, Aguilar Depo. at 136:25-137:16, 139:12-141:21.** Indeed, Vargas was pleasant, friendly and respectful to Aguilar, who shares the same race as Plaintiff and appears to be Hispanic. **Ex. B, Sanchez Depo. at 112:22-113:6; Ex. K, Aguilar Depo. at 132:24-133:24.**

Moreover, the alleged conduct is not sufficiently severe or pervasive to constitute a cognizable claim for harassment. *See, Nagar v. Foundation Health Systems, Inc.*, 57 Fed. Appx. 304, 306 (9th Cir. 2003) (holding that offhand comments and isolated incidents of offensive conduct are insufficiently severe or pervasive to alter the terms and conditions of employment and to create an actionable hostile work environment claim based upon allegations of national origin harassment); *Stallop v. Kaiser Foundation Hospitals*, 820 F.2d 1044, 1050-51 (9th Cir. 1987) (stating that derogatory ethnic statements, unless excessive and opprobrious, are insufficient to establish a case of national origin discrimination). Accordingly, Plaintiff cannot establish a viable

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

claim for unlawful harassment and as a result, summary judgment should be entered in Renown's favor.

### C.  **Plaintiff Cannot Establish A Violation of the ADA**

As an initial matter, the only restriction which Plaintiff identified in her Charge and alleged to have not been accommodated was a 10 pound lifting restriction. **Ex. 11, Brown Depo. (Sealed) at 97:24-98:4, 98:14-20; Ex. Y.** This restriction was temporarily imposed during the first 2 weeks after Plaintiff's work-related accident and not reinstituted until 8 months later in April 2017. **Exs. 2, 4.** When Dr. Sobiek imposed a lifting restriction in April 2017, Plaintiff was restricted from lifting more than 10 pounds for a mere 3 month period until Dr. Sobiek eliminated that restriction in July 2017. A temporary restriction of this limited nature does not equate to a substantial limitation under the ADA as explained recently by the U.S. Court of Appeals for the Ninth Circuit. *See Shields v. Credit One Bank, N.A.*, 32 F.4th 1218 (9th Cir. 2022).

In *Shields*, the Court explained that "although the 'duration of an impairment' remains 'one factor that is relevant in determining whether the impairment substantially limits a major life activity,' there is no categorical rule excluding short-term impairments, which 'may be covered if sufficiently severe.'" *Shields*, 32 F.4th at 1225. The Court further explained that a temporary impairment that impedes the performance of a major life activity for several months may qualify as substantially limiting within the meaning of the ADA. *Id.* at 1227. However here, Plaintiff's lifting restriction was imposed for a mere 3 months and then eliminated because Dr. Sobiek did not believe that the extension of the lifting restriction was necessary. **Ex. 9, Dr. Sobiek Depo. (Sealed) at 47:8-11. Ex. 9, Dr. Sobiek Depo. (Sealed) at 47:8-11.** Because Plaintiff's lifting restriction was not substantially limiting so as to qualify as a disability under the ADA, Plaintiff cannot utilize the temporary lifting restriction to establish a violation of the ADA.

Plaintiff's standing and walking restrictions would be analyzed similarly but for Plaintiff's failure to exhaust her administrative remedies regarding those restrictions. "The jurisdictional scope of the plaintiff's court action depends on the scope of the EEOC charge and investigation." *Leong v. Potter*, 347 F.3d 1117, 1122 (9th Cir. 2003). Thus, "the specific claims made in district court ordinarily must be presented to the EEOC." *Id.* In general, allegations are not considered exhausted

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

unless they "fell within the scope of either the EEOC's actual investigation or an EEOC investigation which can reasonably be expected to grow out of a charge of discrimination." *Brooks v. ATC/VANCOM, Inc.*, 2007 WL 1063059, at *3 (D. Nev., April 4, 2007).  Because Plaintiff did not identify in her Charge any other restrictions for which she was allegedly denied an accommodation, Plaintiff is barred from pursuing a cause of action alleging disability discrimination or failure to accommodate based upon unexhausted claims.

Nevertheless, Plaintiff's sedentary restrictions were temporary and not substantially limiting until nearly a year after her injury.  Renown acknowledges that Plaintiff had sedentary restrictions when she initially received treatment for her injury from Renown Occupation Health.  **Ex. 2.** However, those restrictions were lifted when Plaintiff initiated treated with an orthopedic specialist, Dr. Sobiek, who believed that Plaintiff could return to full duty.[9]  Dr. Sobiek did not impose any sedentary restrictions on Plaintiff until *after* she was recovering from her knee surgery.  **Ex. 9, Dr. Sobiek Depo. (Sealed) at 24:5-13, 77:11-21.**

While Dr. Sobiek did not believe that Plaintiff could stand for an entire day at 2 months post-surgery, he also believed that Plaintiff would fully recover and be released to full duty, which is typically the result for that type of surgery.  **Ex. 9, Dr. Sobiek Depo. (Sealed) at 29:13-31:7; Ex. 10, Dr. Shukla Depo. (Sealed) at 61:9-24.** It is undisputed that Plaintiff had use of a chair that was placed behind the cashier register from the onset of her injury until she transferred to a different department, which Dr. Sobiek confirmed was an acceptable accommodation.  **Ex. 1, Sanchez Depo. (Sealed) at 175:1-19, 198:1-15, 198:25-199:12; Ex. 9, Dr. Sobiek Depo. (Sealed) at 33:6-22; Ex.**

---

[9] In determining whether an individual is a qualified individual under the ADA, the employer is entitled to rely upon the most up to date medical documentation. *See Allen v. Pac. Bell*, 348 F.3d 1113, 1115 (9th Cir. 2003) (observing that relying upon the medical documentation as to determining whether plaintiff was a qualified individual was "appropriate."); *Kaplan v. City of N. Las Vegas*, 323 F.3d 1226, 1230 (9th Cir. 2003) (relying upon the "uncontroverted medical evidence. . . ." to find an employee was not a qualified individual).  Indeed, this is the expectation of the EEOC's enforcement guidance that expressly permits an employer to "require that the documentation about the disability and the functional limitations come from an appropriate health care or rehabilitation professional." EEOC, Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA (Oct. 17, 2002), https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada.  Indeed, where an employer "had no reason to doubt the doctor's assessment . . . [and] when given an opportunity to respond to the assessment at the time, [plaintiff] did not dispute it or inform the county he was trying to contact the doctor because he believed it was in error" an employer properly relies upon the medical evidence in making employment determinations. *Lezama v. Clark Cnty.*, 817 F. App'x 341, 344 (9th Cir. 2020).

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

**5.**  Therefore, the evidence reflects that Renown accommodated Plaintiff's sedentary restrictions which were initially temporary but varied through the course of her treatment.  Furthermore, the undisputed evidence reflects that Plaintiff had use of the chair upon Dr. Sobiek's issuance of permanent restrictions to "sit as needed" in July 2017. **Exs. 5-6.**

If Plaintiff was unable to use the chair during her workday, she should have notified management or Renown's workers compensation manager – but she chose to remain completely silent until more than a year after her injury. **Ex. 8, Lavac Depo. (Sealed) at 20:22-21:9, 60:6:14, 61:4-11; Ex. 3** (stating "[t]emporary light duty employment is contingent on your compliance as well as your attendance."). **Ex. B, Sanchez Depo. at 152:11-153:2, 261:5-7; Ex. 1, Sanchez Depo. (Sealed) at 172:8-20, 173:1-14, 173:18-174:1, 174:9-25, 212:19-213:2, 213:18-214:4.**  In fact, Plaintiff did not bring the issue to her supervisor's attention until October 2017. **Ex. 1 (Sanchez Depo. (Sealed) at 173:18-174:1, 174:9-25, 212:19-213:2, 213:18-214:4.**  Further, witnesses reported seeing Plaintiff both use the chair and seemingly not use the chair on purpose at times. **Ex. K, Aguilar Depo. at 124:8-14; Ex. J, Hernandez-Guerrero at 35:13-36:4.**  Plaintiff should not be permitted to benefit from her intentional silence and failure (or albeit intentional refusal) to follow Renown's Reasonable Accommodation Policy, Open Door Policy, and her understanding of how to bring issues to management's attention through the chain of command.  Thus, summary judgment should be entered in favor of Renown on Plaintiff's ADA claim.

**D.  <u>Plaintiff Cannot Establish A Viable Claim for Retaliation</u>**

To establish a *prima facie case* for retaliation under *McDonnell Douglas*, Plaintiff must show that: (1) she was engaged in a protected activity; (2) she was subsequently subjected to an adverse employment action; and (3) there is a causal link between the activity and the adverse action. *Hashimoto v. Dalton*, 118 F. 3d 671, 679 (9th Cir. 1997)  If she can do so, the burden then shifts to Renown to articulate a legitimate non-retaliatory basis for the alleged adverse employment action. *See Payne v. Northwest Corp.,* 113 F.3d 1079 (9th Cir. 1997).  Once this burden of production is met, the burden shifts back to Plaintiff to demonstrate pretext. *Miller v. Fairchild Industries, Inc.,* 797 F.2d 727, 730-31 (9th Cir. 1986) (applying the burden shifting structure of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) to retaliation claims).

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

1    Despite being aware of Renown's policies and its chain of command reporting structure,

2  Plaintiff complained about Vargas and Bart only once and related her complaint to Vargas'

3  insistence on obtaining the keys to the safe.  **Ex. B, Sanchez Depo. at 127:24-128:15, 129:20-**

4  **130:16; Ex. H, Oetjen Depo. at 16:8-21; Ex. P at SANCHEZ001444-SANCHEZ001445; Ex.**

5  **Q at SANCHEZ001267.**  Plaintiff admittedly never mentioned her national origin or race when

6  relaying her concerns to Oetjen.  **Ex. B, Sanchez Depo. at 141:13-142:1.**  Therefore, Plaintiff did

7  not engage in protected activity under Title VII and cannot meet the first element of a retaliation

8  claim.

9    Moreover, Plaintiff cannot establish a causal connection between her July 2015 complaint

10  to Oetjen and her transfer to the cashier position nearly 18 months later.  Furthermore, Renown's

11  decision to transfer Plaintiff to the cashier position was based upon legitimate and non-retaliatory

12  reasons set forth in detail above (i.e., significant decline in catering events following Pineda's

13  termination and the reassignment of cash handling and financial reporting duties to management).

14  Again, Plaintiff has no evidence of pretext to contradict or question Renown's valid reasons for her

15  transfer.  Accordingly, the undisputed facts demonstrate that Plaintiff cannot satisfy the requisite

16  elements of a claim for retaliation and therefore, cannot survive summary judgment.

17    **E.    Plaintiff Cannot Succeed on Her Claim for IIED**

18    To establish a claim for IIED, Plaintiff must demonstrate: 1) that Defendant's conduct was

19  extreme and outrageous; 2) Defendant's conduct was non-privileged; 3) Defendant acted with the

20  intention to cause Plaintiff emotional distress or with reckless disregard for the probability of causing

21  such distress; 4) Plaintiff actually suffered severe or extreme emotional distress; and 5) Defendant's

22  conduct actually or proximately caused the emotional distress.  *Alam v. Reno Hilton Corp.*, 819 F.

23  Supp. 905, 911 (D. Nev. 1993).  In the employment context, a claim for IIED is particularly unusual

24  because "termination of employees, even in the context of a discriminatory policy, does not in itself

25  amount to extreme and outrageous conduct actionable under an intentional infliction of emotional

26  distress theory." *Hirschhorn v. Sizzler Restaurants Int'l*, 913 F. Supp. 1393, 1401 (D. Nev. 1995).

27  A plaintiff in an employment action must, therefore, allege facts beyond the ordinary conduct that

28  would be expected from the termination of his employment, even if the alleged actions are

discriminatory or retaliatory.  *See Welder v. Univ. of Southern Nevada*, 833 F. Supp. 2d 1240, 1245 (D. Nev. 2011) (reasoning that personnel management activity such as hiring, firing, project assignments, promotions and demotions, performance evaluations and other similar acts are insufficient to support a claim for IIED).

Here, Plaintiff's IIED claim is based upon Vargas poking her hand for the keys to the safe, Oetjen asking if she would allow Clarke to inspect her vehicle (to which Plaintiff had no objection and voluntarily agreed), Vargas yelling about Plaintiff's unregistered vehicle being parked in the roundabout, being ignored by Vargas and Bart, Vargas telling Plaintiff to "shut up" when she was talking to a co-worker during a department meeting, and being asked by a security officer what she did because he was instructed to watch her.  **Ex. 1, Sanchez Depo. (Sealed) at 242:23-247:10.** Clearly, these incidents, even if true, do not rise to the level of extreme or outrageous conduct necessary to give rise to an IIED claim.  Restatement (Second) of Torts § 46 comment d (1965) (stating that the conduct must go beyond all possible bounds of decency, is atrocious and utterly intolerable).  Moreover, Plaintiff's IIED claim is based upon the exact same conduct on which her unlawful harassment claim is based.  Because Plaintiff has an adequate statutory remedy in Title VII, her IIED claims fails for this additional reason.  *Salehian v. Nev. State Treasurer's Office*, 2022 WL 3030710 *12 (Aug. 1, 2022).  Accordingly, judgment should be entered in Renown's favor on Plaintiff's IIED claim.

## IV.    <u>CONCLUSION</u>

Based upon the foregoing, Renown respectfully requests that this Court enter summary judgment in its favor on all of Plaintiff's claims.

DATED:  August 11, 2023

 /s/Sandra Ketner
SANDRA KETNER, ESQ.
SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, Nevada 89511

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

**SIMONS HALL JOHNSTON PC**
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

# CERTIFICATE OF SERVICE

Pursuant to NRCP 5(b), I certify that I am an employee of SIMONS HALL JOHNSTON PC, over 18 years of age, and that on this date I caused to be served a true copy of the foregoing **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** on all parties to this action by the method(s) indicated below:

X      I hereby certify that on the date below, I electronically filed the foregoing with the Clerk of the Court by using the ECF system which served the following registered parties electronically:

Luke Busby, Esq.
316 California Ave., #82
Reno, Nevada 89509
luke@lukeandrewbusbyltd.com

*Attorneys for Plaintiff*

I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true and correct, and that this declaration was executed on August 11, 2023

_____/s/Kelly Lee_____
An Employee of Simons Hall Johnston PC