# EXHIBIT B

# EXHIBIT B

1

2

3

4                    UNITED STATES DISTRICT COURT

5                         DISTRICT OF NEVADA

6                              -o0o-

7
    LUCERO SANCHEZ,                    Case No. 3:20-cv-00317-MMD-CSD
8
              Plaintiff,
9    vs.

10   RENOWN HEALTH, a non-profit
     Nevada Corporation, and DOES
11   1-20, inclusive,

12            Defendants.
     _____/
13

14

15

16

17                    VIDEOTAPED DEPOSITION OF

18                         LUCERO SANCHEZ

19                        AUGUST 17, 2022

20                         RENO, NEVADA

21

22

23

24   REPORTED BY:        CORRIE L. WOLDEN, NV CSR #194, RPR, CP

25                       JOB NO. 899940

LUCERO SANCHEZ - 08/17/2022

Page 19

```
 1      Q     Why did you, why did your employment with the
 2   Nugget end?
 3      A     I was looking for something, a better job for me,
 4   yes.
 5      Q     Did you find one?
 6      A     I started at Renown.
 7      Q     What year did you start at Renown?
 8      A     1993.
 9      Q     Do you recall how old you were then?
10      A     19, I believe.
11      Q     What position did you first hold at Renown?
12      A     Housekeeping or EVS.  I don't know what they call
13   it, but it's housekeeping.
14      Q     Okay.  Do you know how long you held a
15   housekeeping position there?
16      A     Maybe it was, I can't recall, but maybe three or
17   four years and then transferred to cashier.
18      Q     Okay.  I saw in your answers to the Defendants'
19   First Set of Interrogatories that you listed a couple of
20   other jobs that you've had over the years, Silver Legacy.
21   Do you recall working at the Silver Legacy?
22      A     Yes.
23      Q     What position did you hold?
24      A     It was in the kitchen and pan -- it's called
25   pantry.  Serving cakes at the buffet.
```

LUCERO SANCHEZ - 08/17/2022

Page 26

1   your employment with Renown?

2       A    Not at the moment.

3       Q    Are you a participant in Renown's 401k plan?

4       A    Yes, I, I am.  I, I had a little bit in there, but

5   I haven't signed.  I don't know if that counts.  I withdrew

6   most of what I had at Renown and I'm not putting any more in

7   there, so.

8       Q    Okay.  As it stands right now do you have feelings

9   like that you want to retire at the age of 55 or you want to

10  retire, you want to keep working until you are 65?  What

11  are, what are your thoughts right now?

12      A    I haven't really thought about that, so.

13      Q    What position do you currently hold at Renown?

14      A    Unit clerk for surgery.

15      Q    How do you like that position?

16      A    I like it.  It's a good learning.

17      Q    What hours do you work?

18      A    12 hour shifts from 5:00 a.m. to 5:30 p.m.,

19  Wednesdays, Thursdays, and Fridays.

20      Q    How long have you had, how long have you worked

21  that specific shift?

22      A    Since 2019.

23      Q    Who's your current supervisor?

24      A    Her name is, I forgot her name, Danielle Mathews.

25      Q    For how long has she supervised you?

LUCERO SANCHEZ – 08/17/2022

Page 28

```
 1            MR. BUSBY:  I'm going to object to the form.  Go
 2   ahead.
 3   BY MS. KETNER:
 4       Q    So your lawsuit against Renown alleges that you
 5   have been subjected to harassment and discrimination and
 6   retaliation?
 7       A    Yes.
 8       Q    Okay.  Do you allege that Danielle Mathews has
 9   engaged in harassment, retaliation or discrimination against
10   you?
11       A    No.
12       Q    Do you allege that Melissa Peterson has engaged in
13   harassment, discrimination or retaliation against you?
14       A    No.
15       Q    So has the alleged harassment, discrimination
16   and/or retaliation ended since you were transferred to the
17   unit clerk position?
18       A    Yes.
19       Q    Okay.  That cuts out a whole line of questioning
20   and probably some documents, so thanks.  I'm glad we got it
21   out of the way.
22            So you said that you first held a housekeeper
23   position with Renown; is that correct?
24       A    Yes.
25       Q    Okay.  And you held that for a couple of years
```

1   until you became a wait person did you say or cashier?

2       A   Cashier.

3       Q   Okay.

4       A   In the cafeteria.

5       Q   Okay.  Did you work at Regional or South Meadows?

6       A   Regional.

7       Q   How long did you hold the cashier position?

8       A   So I -- maybe for 5 years, not exactly sure.  I

9   transferred to South Meadows in 1998 when it first opened.

10  I think it was November when it opened.

11      Q   And your duties have been performed at the South

12  Meadows location ever since?

13      A   Yes.

14      Q   So how, how long did you hold the cashier

15  position?

16      A   So it was about maybe four or five years and then

17  it ended.  I transferred to South Meadows in 1998, so about

18  maybe four, four and a half years.

19      Q   When you transferred to the South Meadows location

20  what position did you hold?

21      A   Wait person.  It was, it was wait person.

22      Q   And is that a position in the cafe?

23      A   So we used to have a, a restaurant in there, so

24  and then the cafeteria for the employees altogether, so I

25  used to serve employees and serve people at the, like I

LUCERO SANCHEZ - 08/17/2022

Page 30

```
 1  said, down restaurant and cashier as well.
 2      Q    What was the name of the restaurant?
 3      A    Carmella's Cafe it was called.
 4      Q    Has it since closed?
 5      A    No.  It's still open.  The, the name is different.
 6      Q    How long did you hold the wait person position?
 7      A    I can't remember.  I believe until -- I'm not
 8  quite sure, but I believe it was until 2010 or 2011 when I
 9  got the catering coordinator position.  I'm not exactly
10  sure.
11           MS. KETNER:  Okay.  I'm going to show you what we
12  will mark as Exhibit 1.
13           (Exhibit Number 1 was marked for identification.)
14
15  BY MS. KETNER:
16      Q    Ms. Sanchez, we are going to be going through a
17  lot of documents today, so when I, when the court reporter
18  hands you a document, I just want you to take a moment and
19  review the document so that you understand, you know, what
20  we are talking about.  And, you know, if you can just look
21  up after you have had a chance to review it and either
22  recognize what it is or recognize that you don't know what
23  it is and I can start asking you questions about it, okay?
24      A    Okay.
25      Q    Okay.  So do you recognize what we've marked as
```

LUCERO SANCHEZ - 08/17/2022

1    Exhibit 1?

2        A    Yes.

3        Q    What is it?

4        A    Catering coordinator.

5        Q    Okay.  So this appears to be at the time Renown

6    Health was known as Washoe Health?

7        A    Right.

8        Q    Yes, but this is, it appears to be an offer of

9    employment to you as the catering coordinator/cashier

10   position at Washoe Med?

11       A    Yes.

12       Q    Okay.  And is that your signature at the bottom of

13   the page?

14       A    It is.

15       Q    Okay.  So you accepted the offer for the catering

16   coordinator/cashier position at the South Meadows location,

17   correct?

18       A    Yes.

19       Q    Okay.  And you began in that position on or about

20   May 23rd of 2005.  Does that sound accurate?

21       A    Yes.

22       Q    Okay.  Who did you report to in this catering

23   coordinator/cashier position?

24       A    I can't remember who the supervisor -- I think it

25   was Kathy West.  I'm not sure.  It's been too long.

LUCERO SANCHEZ – 08/17/2022

1      Q     Do you recall what position Kathy West held at

2   that time?

3      A     She was the, I believe the supervisor or manager

4   for South Meadows for the kitchen.

5      Q     What were your duties as the catering

6   coordinator/cashier?

7      A     So my duties were coordinating all of the events,

8   like meet -- all of the meetings and doctors' meetings for

9   the whole facility.  It included making deposits everyday,

10   coding invoices so all of the bills would get paid, go to

11   the bank everyday to get change for the cashiers, break,

12   give all of the cashiers their breaks.

13      Q     How many cashiers worked at the restaurant?

14      A     There was two at a time.

15      Q     What hours or what schedule did you first work

16   when you first assumed the position of catering

17   coordinator/cashier?

18      A     5:00 a.m. to 2:30, so 5:00 a.m. to 1:30 it was,

19   yeah, 5:00 a.m. to 1:30 and sometimes it was 5:30 to, what

20   did I say, 5:30 to 2:00.

21      Q     Okay.  And have you pretty much always worked that

22   schedule those hours when you were in the food and nutrition

23   services department at the South Meadows location?

24      A     Yes.

25      Q     Okay.  Did you work Monday through Friday or what

Page 33

1  days of the week did you work?

2     A     Monday through Friday.

3           MS. KETNER:  Okay.  I'm going to show you what we

4  will mark as Exhibit 2.

5

6           (Exhibit Number 2 was marked for identification.)

7  BY MS. KETNER:

8     Q     Okay.  Ms. Sanchez, I just handed you what we will

9  mark as Exhibit 2.  It is a document that's Bate stamped

10 Renown 000257 to Renown 000268.

11          Do you recognize that document, Ms. Sanchez?

12    A     Yes.

13    Q     Is that your handwriting on the top right corner

14 of the document, of the first page of the document?

15    A     Yes.

16    Q     Okay.  And is that also your handwriting with the

17 date written 5/26/05?

18    A     Yes.

19    Q     Okay.  What is the document that we have marked as

20 Exhibit 2?

21    A     That is an eval.  They were called evaluation.

22 That's what it's called.  I recognize it as an eval.

23    Q     Do you know why you signed the top right corner of

24 the first page of the document?

25    A     I can't remember why I signed on the top.  It's

1  been too long, but I'm assuming that I had read and

2  everything in there was correct to, to the job I was

3  performing.

4      Q    Okay.  So as, you know, we read through the

5  document, there is a section of the document entitled

6  Position Purpose.  Does that paragraph accurately describe

7  the duties that you performed when you held the catering

8  coordinator/cashier position?  Do you see at the bottom --

9  I'm sorry, on the first page --

10      A    Yeah.

11      Q    -- at the very bottom?

12      A    Yes.

13      Q    Okay.  So it says, "The position is accountable

14  for providing individualized service to all customers

15  requesting a catering or banquet at Washoe Medical Center

16  South Meadows, along with assisting Finance Manager as

17  needed."  Do you see where I'm reading that?

18      A    Yes.

19      Q    Okay.  Did you perform those duties when you held

20  the catering coordinator/cashier position?

21      A    Yes.

22      Q    Okay.  And the very last sentence states that,

23  "The incumbent's primary function is to take in monies and

24  make change for food items purchased."  Do you see that?

25  Oh, it's the very last sentence of the first paragraph.

Page 35

```
 1     A    Yes.
 2     Q    Okay.  So did, did you also act as the cashier?
 3     A    Yes.
 4     Q    Okay.  And in the middle of that paragraph it
 5   talks about special events being held to include the Washoe
 6   Medical Foundation and outside contracted private events.
 7   Do you see that part?
 8     A    Yes.
 9     Q    Okay.  What kind of outside contracted private
10   events did you, did you provide service for?
11     A    So it was, we didn't have very many, but it was
12   mostly meetings that they had.  Like I said, most of them
13   were, most all of the caterings were performed in, in the
14   building, so we did not -- we did a few outside, but not a
15   lot, so just like meetings, birthday parties.
16     Q    Okay.  So let's talk about the outside catering
17   events that you assisted with.
18     A    Yes.
19     Q    Would there be like one a year or like 10 a year
20   when you first started, when you first started in the
21   position in 2005?
22     A    I would not remember, maybe between 1 and maybe 8,
23   not very many.
24     Q    Between 1 and 8?
25     A    Caterings maybe.
```

Page 36

1    Q    Per --

2    A    So a year, I would say about 8 caterings a year in

3    outside events.

4    **Q    And when you had to work those events, what did**

5    **you end up actually doing?  Like were you serving food, were**

6    **you --**

7    A    It's serving food, preparing -- first is preparing

8    the food, making sure everything is correct and to bring the

9    food to, if we had like a place, you know, like where it's

10   going to be set up, just make sure we carry the food, you

11   know, like right temperatures and all that.  I would set the

12   tables, food serve, food serve -- serve food and also clean

13   after the events are over.

14   **Q    Did those events take place outside of your**

15   **typical work hours of 5:00 a.m. to 1:00 or 2:00?**

16   A    Some of them, yes.

17   **Q    When did they typically take place?**

18   A    It would be between 5:00 for dinner, 5:00 to

19   whatever hours, three, four hours.

20   **Q    Where were the events held?  What location at**

21   **South Meadows, like where at South Meadows?**

22   A    So, for example, like at rehab, we will do, we

23   will, they will have a meeting at rehab and so we, they

24   order food from us and we will take, we catered for them

25   or --

1      Q     Let me stop you for a second.  So if rehab was

2    having an event --

3      A     Yes.

4      Q     -- or a meeting, that would be an internal

5    catering event, right?

6      A     That we had to transport, yeah, transport the

7    food.  So mostly it was Renown's caterings that we did, but

8    it was places outside Reno.

9      Q     So it sounds like most of the events that you

10   assisted with the catering were internal meetings held --

11     A     Yeah.

12     Q     Okay.  So they were Renown doctors or Renown

13   departments?

14     A     Yes.  And one of the caterings that I remember

15   that we did is a lady, I don't -- I can't remember.  I don't

16   remember her name, but she had, her daughter had a wedding

17   and so they asked me if we could cater for like a wedding

18   and that was at her house.  It was a Renown employee.

19     Q     Okay.

20     A     So it's little things like, you know, like that

21   that we did, but mostly Renown's meetings.

22     Q     Okay.  If you turn to the fourth, fifth page of

23   the document.

24     A     Uh-huh.

25     Q     Do you see at the top of the page it says sit 20%,

Page 38

 1  stand 40%, walk 20%?  Page 5 of the document.

 2      A    Okay.

 3      Q    It's Bate stamped Renown --

 4      A    Yes.

 5      Q    Okay.

 6      A    I see it.

 7      Q    Okay.  Does that accurately describe the physical

 8  requirements of the position of catering coordinator/cashier

 9  when you held that position?

10      A    Yeah.  Yes.

11      Q    Okay.  And if you turn to the next page, on page 6

12  nearly towards the bottom there is a section that says

13  Lifting and Carrying.  Do you see where I'm referring to?

14      A    Yes.

15      Q    Okay.  It says, "Lifts pans of food and cases onto

16  carts, frequently carries trays with hot food, coffee,

17  coffeepots, serving utensils, bus tubs, banquet tables,

18  chairs and floral displays at waist level weighing up to

19  35 pounds."  Do you see where I read that?

20      A    Yes.

21      Q    Okay.  Does that accurately describe the duties

22  that you performed, the lifting and carrying duties that you

23  performed when you held the catering coordinator/cashier --

24      A    Yes.

25      Q    -- position?

LUCERO SANCHEZ - 08/17/2022

Page 42

1    A    So he supervised all of the employees.  He did all

2    of the schedules for the employees.  He supervised that, all

3    of the food that came in.  You know, make sure that

4    everything was okay.  Make sure that the three meals for the

5    patients were on time.

6            He supervised all of the nood and -- food and

7    nutrition service reps.  They serve the food for the

8    patients.  Dishwashers, he supervises dishwasher, cashiers.

9    Make, he make sure that the cafeteria was running good for

10   all of the employees, so he supervise mostly everything.

11   **Q    Do you know who Mr. Pineda reported to?**

12   A    Kathy West.

13   **Q    And did -- do you know the title that Kathy West**

14   **held?**

15   A    So I think it was just manager, manager of food

16   and nutrition services.

17   **Q    Okay.  How many employees do you estimate**

18   **Mr. Pineda supervised?  Because you said he supervised all**

19   **of the employees.**

20   A    So maybe 20, 22, not quite sure.

21   **Q    You mentioned the cashiers.  That was a position**

22   **that he supervised; is that correct?**

23   A    Yes.

24   **Q    And you mentioned dishwashers?**

25   A    Yes.

Page 43

| | | |
|---|---|---|
| 1 | Q | How many dishwashers were there? |
| 2 | A | At the time I believe three. |
| 3 | Q | Did he supervise any cooks? |
| 4 | A | The cooks, yes. |
| 5 | Q | How many cooks were there? |
| 6 | A | Maybe six or seven. |
| 7 | Q | And did he supervise the food and nutrition |

8  service reps?

9  A  Yes.

10  Q  How many food and nutrition service reps were

11  there?

12  A  So I know, I know all of them, but I would say

13  about six to eight.

14  Q  Are there any other positions that you can recall

15  that you believe Mr. Pineda supervised?

16  A  So the rest cooks, food prep, I believe there is

17  one food prep or two, the cashiers, dishwashers.

18  Q  How many cashiers were there?

19  A  There was two, two cashiers.

20  Q  Okay.  So when you were talking about the duties

21  that you performed as the coordinate, coordinate -- the

22  catering coordinator/cashier, you said that you would help

23  coordinate the events and the doctor meetings, right?

24  A  Uh-huh.

25  Q  And you would make deposits?

LUCERO SANCHEZ - 08/17/2022

Page 44

1      A     Yes.

2      **Q     When did you go to the bank to make deposits?  How**

3   **often and when?**

4      A     So the bank deposits were not to the bank.  They

5   were -- I would take it to the emergency room.  They had the

6   safe where Loomis got, came and got that everyday, so I did

7   that around 10:00 everyday, deposits.

8            Then to go get change for the cashiers, it

9   depended on how much they use, so sometimes I go everyday to

10  the bank or every other day, depend, depended on how busy it

11  was.

12     **Q     Okay.  And you also testified that you would, you**

13  **would code invoices to get bills paid?**

14     A     Yes.

15     **Q     When did you do that?**

16     A     So I did not have a specific hour.  I did when I

17  was not busy with, you know, doing caterings or breaking

18  cashiers, so I, whenever I had the time I would do those,

19  but I did them everyday, or it depended on how busy it was,

20  maybe every other day.

21     **Q     Okay.**

22     A     When -- so deliveries, you know, depended on when

23  the deliveries came in, too.

24     **Q     And approximately how many hours each week would**

25  **you spend doing that portion of your job duties?**

Page 45

```
1      A    Maybe an hour and a half to two hours.
2      Q    Each week?
3      A    Yes.
4      Q    Okay.
5      A    I had to, I had to code the invoices.  Then I had
6  to put it in the spreadsheet, all the invoices.
7      Q    How many hours each week do you estimate you spent
8  breaking the cashiers?
9      A    So that would be an hour a day.  Five hours a
10  week, I think.
11      Q    Were you ever required to serve as a cashier
12  during the full shift?
13      A    Yes.  Sometimes somebody will call in and I will
14  cover.
15      Q    Were you --
16      A    And sometimes they had other duties, cashiers.
17  Though I wasn't cashiering, I would take over.
18      Q    How many hours each week do you estimate you spent
19  coordinating the events, the catering events?
20      A    So it was something that you really didn't know,
21  so sometimes there was one meeting a day and sometimes there
22  was two or three, so it all depends on the day.  There was
23  not something like set just specifically to do that.
24      Q    Okay.  So the number of catering events --
25      A    Yes.
```

LUCERO SANCHEZ - 08/17/2022

Page 46

1      Q      -- fluctuated each day?

2      A      Uh-huh.

3      Q      Were there some days that you just didn't have

4   anything to do because there weren't many catering events?

5      A      No.  It was always, because the job was catering,

6   it was, you know, involved a lot of -- And the position is

7   not just catering.  So it was named catering coordinator,

8   but basically it was, you know, I did all this other work

9   besides the catering coordinator.

10      Q      Okay.  The stuff that we talked about?

11      A      Uh-huh.

12      Q      Coding the invoices?

13      A      Invoices.

14      Q      Getting cash?

15      A      Breaking cashiers, you know.

16      Q      Okay.  And the catering coordinator/cashier

17   position title was later changed to FNS coordinator; is that

18   correct?

19      A      Yes.

20      Q      I will hand you what we will mark as Exhibit 4.

21   It's Bate stamped Renown 000603.

22

23              (Exhibit Number 4 was marked for identification.)

24   BY MS. KETNER:

25      Q      Ms. Sanchez, have you ever seen the document that

Page 47

```
1    we have marked as Exhibit 4?

2         A    Yes.

3         Q    What is it?

4         A    This is the, when they offer me the job to, they

5    changed the name to food and nutrition service coordinator.

6         Q    Okay.  So the initials FNS stands for food and

7    nutrition services?

8         A    Services, yes.

9         Q    Okay.  So in the comment section of the document

10   we've marked as Exhibit 4 it states, "No req needed, just

11   changed title of job."  Do you see that?

12        A    Yes.

13        Q    Okay.  And is that true from your perspective,

14   that your duties did not change in any way, that they just

15   changed the title from --

16        A    (Nods head).

17        Q    You have to wait until I finish my question,

18   sorry.  Is it -- based upon your recollection it's true that

19   the company changed the position, the title of catering

20   coordinator/cashier to FNS coordinator?

21        A    Yes.

22        Q    Okay.  But your duties did not change in any way;

23   is that correct?

24        A    Yes.

25        Q    Okay.  And there was no change in pay; is that
```

LUCERO SANCHEZ - 08/17/2022

Page 48

```
 1   correct?

 2       A    Yes.

 3       Q    Okay.  And the title changed, it looks like the

 4   effective date of that was September 20th of 2010?

 5       A    2010, yes.

 6       Q    Okay.  And that seems accurate based upon your

 7   recollection?

 8       A    Yes.

 9       Q    Okay.  I'm going to hand you what we will mark as

10   Exhibit 5.  It is entitled Position Description FNS

11   Coordinator and it's Bate stamped Renown 000471 to Renown

12   000475.

13            (Exhibit Number 5 was marked for identification.)

14

15            THE WITNESS:  Okay.

16   BY MS. KETNER:

17       Q    Ms. Sanchez, do you recognize the document that

18   we've marked as Exhibit 5?

19       A    Yes.

20       Q    What is it?

21       A    It's the job description for the F -- food and

22   nutrition services coordinator.

23       Q    Okay.  And in the top part of the first page it

24   says the Position Purpose.  "This position is accountable

25   for providing exceptional service to all its customers and
```

LUCERO SANCHEZ – 08/17/2022

Page 49

1   assisting in the coordination of workflow for other cafe

2   employees as needed."  Do you see that?

3       A    Yes.

4       Q    Okay.  Is that an accurate description of the, the

5   purpose of the FNS coordinator position when you held it?

6       A    Yes.

7       Q    Do you see that the next sentence states, "This

8   incumbent is responsible and accountable for the cash and

9   material flow through the cafe, including the generation of

10  standardized financial reports for the cafe and the

11  department."

12      A    Yes.

13      Q    Is that an accurate description of the purpose of

14  the FNS coordinator position when you held it?

15      A    Yes.

16      Q    Okay.  And finally it states, "The FNS coordinator

17  will work as a cashier during peak hours or help with other

18  positions as needed."  Do you see that?

19      A    Yes.

20      Q    Okay.  And is that an accurate description of the

21  purpose of the FNS coordinator position when you held it?

22      A    Yes.

23      Q    Okay.  If we can turn to the next page, page 2,

24  about an inch down the page there is a Physical Activity

25  section.  Do you see where I'm referring to?

Page 50

```
 1      A    Yes.

 2      Q    Okay.  And this states that the physical activity

 3  requirements of the FNS position includes sitting 20 percent

 4  of the time.  Do you see that?

 5      A    Yes.

 6      Q    Okay.  And is that an accurate reflection of the

 7  amount of time that you sat when you held the FNS

 8  coordinator position?

 9      A    Yes.

10      Q    Okay.  Do you see where it says you are required

11  to stand 40 percent of the time?

12      A    Yes.

13      Q    Is that an accurate reflection of the time that

14  you spent standing in the FNS coordinator position when you

15  held it?

16      A    Yeah.

17      Q    Okay.  And how about the walking estimate, it

18  states that the position was required to walk about

19  20 percent of the time.  Is that an accurate reflection of

20  the time you spent walking when you held the FNS coordinator

21  position?

22      A    It says 20 percent.  I did walk maybe 40 percent,

23  yeah, of the time.

24      Q    Okay.  So how would you change the percentages of

25  these physical activities to add up to 100 percent if you
```

LUCERO SANCHEZ - 08/17/2022

Page 51

1  were increasing the walking from --

2      A    Yeah.

3      Q    -- 20 percent to 40 percent?

4      A    I don't know.

5      Q    Okay.  Is the walking that you increased it to,

6  you doubled the amount of walking, is that related to

7  walking to the emergency department?

8      A    Walking to like say the emergency department,

9  walking to where I was setting the caterings, and depending

10 on how much catering there was and serving.

11     Q    Was there a specific location that the internal

12 Renown catering events took place at the South Meadows

13 location?

14     A    So we had the conference rooms on the first floor,

15 second floor where I served, and sometimes there would be by

16 the second and third floors, you know, they had like a

17 waiting area that they would do some caterings sometimes, so

18 it all depended on where, where it was.

19     Q    Okay.  So I think you testified that there were

20 conference rooms on the first and second floors; is that

21 correct?

22     A    Yes.

23     Q    Okay.  And there were also waiting areas on the

24 second and third floors?

25     A    Yes.

Page 53

1      Q    Okay.  So I think what you are testifying to is

2   that each month there would be about 3 executive meetings

3   and those meetings would be held between 5:00 and 6:00 p.m.?

4      A    Yes.

5      Q    Okay.  And it was fairly standard that there were

6   three of those --

7      A    Yes.

8      Q    -- executive-type meetings each month?

9      A    Yes.

10     Q    Okay.  Did you have to stick around and work?

11     A    No.  So sometimes I leave early and then I come

12   back around 4:00 --

13     Q    Did you --

14     A    -- to set up the meetings.

15     Q    Okay.  So you would just end your shift, or your

16   shift earlier?

17     A    And then come back later.

18     Q    Okay.  Did you ever work overtime?

19     A    Yes.

20     Q    Okay.  Were you paid overtime?

21     A    Yes.

22     Q    Okay.  If you can go down a little further on that

23   second page, do you see the Lifting and Carrying section?

24     A    Yes.

25     Q    Okay.  At the bottom of the Lifting and Carrying

LUCERO SANCHEZ – 08/17/2022

Page 54

```
1    section it states, "Lifts pans of food and cases onto carts,

2    frequently carries trays with hot food, coffee, coffeepots,

3    serving utensils, bus tubs, banquets tables, chairs and

4    floral displays at waist level weighing up to 35 pounds."

5            Do you see that?

6     A    Yes.

7     Q    Okay.  Does that accurately describe the lifting

8    and carrying requirements that you performed when you held

9    the FNS coordinator position?

10    A    Yes.

11    Q    Okay.  So what positions did you work with the

12   most when you held the FNS coordinator position?

13    A    With the billing.

14    Q    Who in billing?

15    A    Well, doing the, coding the invoices, doing all of

16   the paperwork, once a month I had to turn in a report to

17   finance.

18    Q    Did you turn that report in by e-mail?

19    A    No.  We send it through mail, inside mail.

20    Q    Did you ever have any personal meetings with the

21   Finance Department?

22    A    No.

23    Q    So what other, like when you went in to work at

24   5:00 in the morning --

25    A    Yes.
```

1    A    Okay.  So I say this is the kitchen.  The entrance

2    is right here.  The office is right here for the nutrition

3    rep.  This is the prep table and this will be the food line.

4    It's in the middle of the kitchen.

5         And then we have the cafeteria, it's called

6    Carmella's right here, but it extends to the restaurant and

7    it would be just an open space after here.  There would be

8    just like open space where the employees have their meals.

9    **Q    Okay.  Got it.**

10

11        (Exhibit Number 6 was marked for identification.)

12

13   BY MS. KETNER:

14   **Q    Okay.  Thank you.  So where would you start to**

15   **perform your duties when you arrived for your shift at**

16   **5:00 a.m. or 5:30 a.m.?**

17   A    I just -- it depends on the day.  I could start

18   anywhere.  I, I knew every single position for the kitchen.

19   So whenever anybody called in, I was there to cover that

20   position.

21        We had caterings, you know, meetings in the

22   morning that had to be set up, and so I, I came in at 5:00

23   to set up for like 6:30 or 7:00 a.m. meetings or any event

24   that there was in the morning, so it all depended on the

25   catering events.

LUCERO SANCHEZ - 08/17/2022

Page 58

1       It's not like a set, we didn't have like a set

2   schedule for caterings, so I started in the cafeteria

3   setting up, making coffee, making sure everything is ready,

4   and if a nutrition rep calls in, I will fill out, fill in

5   that position.

6       Q    Would you also fill in for a cook or dishwasher if

7   they called in?

8       A    I did not have to fill in for a cook, but I did,

9   had to do food --

10      Q    Prep?

11      A    Prep, uh-huh.

12      Q    Okay.  And dishwasher?

13      A    Dishwasher, too.  The dishwasher, when I had this

14  position, I did not really do dishwashing.  I did all of the

15  other, but I really never did a dishwasher in this position,

16  but I did know every single position, how it worked and how

17  I would cover.

18      Q    Okay.  So did you have to fill in, if a dishwasher

19  called in would you have to fill in for that person?

20      A    Not, not for dishwashing.

21      Q    Okay.  Just food prep?

22      A    Prep and, yeah.  Because of the serving food there

23  is a lot of policies.  Serving food and being near the dish

24  room is cross-contamination, so.

25      Q    Got it.  Did you ever perform your job in an

LUCERO SANCHEZ - 08/17/2022

Page 59

```
 1   office area?

 2        A    Yes.

 3        Q    When did you start performing your job duties in

 4   an office area?

 5        A    So I think in 2005 when I held the position, I was

 6   sharing an office downstairs across, from this office across

 7   the hallway, so it would be right over here and just like,

 8   just across the hallway.  It was a small office where I was

 9   doing my paperwork.

10        Q    Who did you share the office with?

11        A    Her name was Maricol Garcia.

12        Q    Maricel?

13        A    Maricol.

14        Q    M-a-r-i-c-e-l?

15        A    O-l.

16        Q    O-l, Garcia.  And what position did she hold?

17        A    She holds back then the food and nutrition rep

18   lead.

19        Q    How long did you hold or share the office with

20   her?

21        A    Not quite sure.  She got laid off and I don't

22   remember when that was.

23        Q    Do you recall if Mr. Pineda was still working

24   there when she was laid off?

25        A    Yes.
```

Page 60

1    Q    After she was laid off did you then share the

2  office with anyone else?

3    A    I shared the office with Herman Pineda.

4    Q    Did you each have a desk or --

5    A    No.  There was just one desk, one computer, and we

6  took turns on when to use it.

7    Q    What hours did Mr. Pineda work?  You know, if you

8  worked typically 5:00 a.m. to 2:00 p.m., what hours did you

9  see Mr. Pineda typically work?

10    A    He worked from 5:00 to 1:30.

11    Q    So you and Mr. Pineda typically worked the same

12  shift?

13    A    Same shift, yeah.

14    Q    Did it ever become crowded in the office?  How did

15  you each, if you each had office work or paperwork or

16  computer functions to do, how did you do that?

17    A    Come in occasions, so I would tell him I didn't,

18  you know, like we set the, not schedule, but I would do the

19  paperwork when the food would come in, maybe deliveries will

20  be Monday, Wednesdays, and Friday, and then we communicate

21  on, you know, when I did my billing and then when he could

22  go in and do his menus and stuff, so.

23    Q    Did you use the office everyday?

24    A    Yes.

25    Q    So you had an e-mail account with Renown, through

Page 62

1  requested an office for herself, but prior to that she used

2  that office, too.

3      Q    Okay.  And I understand that Kathy West had

4  responsibility for more than just the South Meadows

5  location?

6      A    Yeah.  She was managing skilled nursing and was

7  managing rehab.

8      Q    How often would Kathy West be at the South Meadows

9  location each week?

10     A    Maybe once or twice, if she needed.  Most of the

11 time she needed to spend more time at skilled nursing and

12 rehab.

13     Q    Did it appear to you that she typically spent more

14 time at skilled nursing and rehab than South Meadows?

15     A    Yeah, she did.  I, I don't know if she had a

16 supervisor at skilled nursing.  All I know that she needed

17 to be there more than South Meadows.

18     Q    Was the skilled nursing location near South

19 Meadows?

20     A    No.

21     Q    Where was that location?

22     A    Skilled nursing is where Kmart used to be, I

23 believe.  I don't go that way much, but it's like where

24 Kmart in Sparks used to be, like in that area, somewhere in

25 that area.

Page 63

1      Q     Okay.  And the Renown rehab hospital is right on

2  Mill Street?

3      A     On Mill Street.

4      Q     Near Regional?

5      A     Yes.

6      Q     Okay.  Did Mr. Pineda, is it your understanding

7  that Mr. Pineda had the authority to place food orders?

8      A     Yes.  He was the person in charge of placing

9  orders.

10     Q     Do you know whether or not he placed those orders

11  through the computer that you and he shared in that office

12  that we were just talking about?

13     A     He -- no, there was a rep from US Foods that come

14  in and put in the order for him, and when the rep did not

15  come in, I think he will use the computer to put in the

16  order, but most of the time a rep from US Foods was there.

17     Q     Okay.  I'm going to hand you back Exhibit 6, and I

18  would just like you to differentiate.  Right now you have

19  office.

20     A     Uh-huh.

21     Q     Can you write FNS rep office there because it --

22  and then also draw for me the office that you and Mr. Pineda

23  shared.

24           Thanks.  Do you see that, Luke?

25           MR. BUSBY:  Okay.

Page 64

1   BY MS. KETNER:

2        Q      Thank you.  Is Mr. Pineda still employed by
3   Renown?

4        A      No.

5        Q      Do you know why he is not employed by Renown?

6        A      Exactly I did not, I don't know why he was not, he
7   is not employed.  I just know he was fired.

8        Q      How did you first learn that Mr. Pineda was fired
9   by Renown?

10       A      I learned the same day when he said he was going,
11   he told me he was going to a meeting to Regional to take
12   care of, you know, like if, make sure that the food go
13   upstairs to the rooms, and so I didn't see him after that.
14   So about maybe an hour and a half he called me and said that
15   he was fired, just to be careful.

16       Q      Did he tell you why?

17       A      No, did not talk to him at all, just all he said
18   is I got fired, just be really careful.  That was his words.

19       Q      How did you respond?

20       A      I did not know.  I was in shock.

21       Q      You didn't ask him why he was telling you to be
22   careful?

23       A      No, not that time.

24       Q      Did you later ask him, or did you later have any
25   conversations with him about his termination?

LUCERO SANCHEZ - 08/17/2022

Page 66

1    BY MS. KETNER:

2       Q    You had an opportunity to review the document that

3    we marked as Exhibit 7?

4       A    Yes.

5       Q    Okay.  So now you reported to Mr. Pineda.  He was

6    your supervisor for about 7 years, right?

7       A    Yes.

8       Q    Okay.  Would you say that you worked closely with

9    Mr. Pineda?

10      A    Yes.

11      Q    Okay.  Were you personal friends with Mr. Pineda?

12      A    Not personal friends, but friends at work.  Out of

13   work we never talked.  We never texted or anything.  Inside

14   work, yes.

15      Q    Okay.  Were you, would you say that you were close

16   with him, worked -- when you worked with him you were a

17   close co-worker of his?

18      A    Close co-worker, yes.

19      Q    Okay.  So in this corrective action it states that

20   there had been ongoing concerns with Mr. Pineda's leadership

21   and communication style with his staff.  Did you ever, did

22   Mr. Pineda ever tell you that there were concerns regarding

23   his communication style with his staff?

24      A    No.

25      Q    Okay.  Did he ever tell you that he had a meeting

LUCERO SANCHEZ - 08/17/2022

Page 68

```
 1     A    No.

 2     Q    -- tell employees not to go to human resources?

 3     A    No.

 4     Q    Okay.  Were you aware that Mr. Pineda had operated

 5  a catering company, outside of his employment with Renown

 6  that he had a personal catering company?

 7     A    Yes.

 8     Q    Okay.  How did you become aware of that?

 9     A    I think just talking to him he told me he was

10  catering, you know, he was doing dinners, catering for his

11  business.

12     Q    Do you know when he started his --

13     A    No.

14     Q    Oh, you have to wait until I -- I know.

15     A    Yes.

16     Q    It's going to get harder as we go on, but it's

17  going to make it a lot easier for the court reporter if we

18  wait.

19          So you don't know when he started operating the

20  personal catering company?

21     A    No.

22     Q    Okay.  Do you know for how many years he had it in

23  operation?

24     A    No.

25     Q    Do you know if it's still in operation?
```

1   residents, the 40 residents, senior residents that lived

2   there.

3           And then he would put in like special order

4   everyday in the cafeteria, which we fed about 400 employees

5   a day in the cafeteria, and we only, we only had that budget

6   to do everything, so we only were given the budget just, and

7   we were given the budget only for, for the patients and he

8   managed to feed all of these other people with that budget,

9   so.

10      Q    Okay.  Were will call orders more expensive than

11  regularly placed orders?

12      A    No.  It was maybe if he was missing say lettuce,

13  he will put in a call in and he will go pick up or he sent

14  somebody.  It was not only him that went to US Foods.

15          Or if he was, he had a special dinner, say a

16  meeting, when we had one of those meetings that would be the

17  VP meeting that we call, he will offer shrimp, steak and

18  stuff.  If he didn't have it, he will order it and pick up

19  and things like that.

20      Q    Did you ever make will call orders?

21      A    No.

22      Q    Did you ever pick up will call orders?

23      A    No.

24      Q    Did you ever do the coding of the invoices for

25  will call orders?

LUCERO SANCHEZ - 08/17/2022

Page 75

```
 1      A    Yes.
 2      Q    Okay.  How often -- was that part of your regular
 3  job responsibilities?
 4      A    Yes.  Coding the invoices, yes.
 5      Q    Okay.  Did anyone ever question the number of will
 6  call orders that Mr. Pineda was making?
 7      A    No.  And the other thing I was going to mention is
 8  he, he asked the cooks to make the order for, you know, not
 9  for him, but tell him what he needed so he will place that
10  order, and a lot of the times the cooks will not tell him
11  what they needed for the week and so he had placed already
12  the order, so the next thing he can do is put the will call
13  to pick up the food so we didn't miss, you know, he didn't
14  miss.
15      Q    Did anyone ever voice any concerns that Mr., to
16  you that Mr. Pineda was using his purchasing authority with
17  Renown to order food products that he was then using for his
18  personal catering company?
19      A    No.
20      Q    You never heard that?
21      A    No.
22      Q    Did anybody ever tell you that they suspected
23  Mr. Pineda was taking equipment from Renown's kitchen home
24  and using it for his personal catering --
25      A    No.
```

LUCERO SANCHEZ - 08/17/2022

1  BY MS. KETNER:

2      Q    Okay.  Do you recognize the documents that we've

3  marked as Exhibit 10?

4      A    Yes, and that's an e-mail from him to me.

5      Q    Okay.  And what's the e-mail about?

6      A    I had talked -- I think that's one of my

7  conversations with him, and when I was getting all my

8  information for the discrimination, I talked to him about if

9  he will do, you know, be my witness that, you know, for what

10  was said in the, in the meeting.

11      Q    Okay.  So you did have other conversations with

12  Mr. Pineda about his termination meeting?

13      A    Not termination meeting.  I don't -- he called me

14  and he said just to be careful.

15      Q    Why did you think that that related to your

16  discrimination claim?

17      A    I, I think they were doing, doing like a really

18  hostile environment for me, so I think that's, I just, I

19  don't know.  I just wanted to have something, you know, to

20  prove that it was something that it was said towards me.

21      Q    And do you think that the hostile environment was

22  because of your affiliation with Mr. Pineda?

23      A    Yes.

24      Q    Okay.

25      A    And I, that's the reason I stopped talking to him

Page 80

1  or Kathy.  I didn't know about them, because I thought a lot

2  of the stuff was because of them that I was paying for.

3      Q     Because Kathy West got fired, too, right?

4      A     Yes.

5      Q     Do you know why Kathy West got fired?

6      A     Not exactly sure.  I know she got fired over some

7  paperwork temperatures that were forged or something like

8  that.  I have no, I have no other idea, just something like

9  that, I think.

10     Q     Yeah, fraudulent, forged temperature logs, company

11  documents, right?

12     A     I think so.

13     Q     Okay.  So you were close with Kathy West during,

14  at the time that both of you worked at Renown, right?

15     A     Yes.

16     Q     And would you say that you were loyal to

17  Kathy West during that time?

18     A     Yes.

19     Q     Okay.  And would you say that you were also loyal

20  to Mr. Pineda --

21     A     Yes.

22     Q     -- during the time that you worked with him?

23     A     Yes.

24     Q     Okay.  And both of them were both fired under

25  suspicion that they were engaging in misconduct, right?

LUCERO SANCHEZ - 08/17/2022

Page 81

```
 1      A    Yes.
 2      Q    Okay.  That Kathy West was forging company
 3  records, right?
 4      A    Yeah.
 5      Q    And Mr. Pineda was stealing from Renown, right?
 6      A    Yes.
 7      Q    Okay.  And --
 8           MR. BUSBY:  Somebody's phone is buzzing.
 9           MS. KETNER:  It's mine, sorry.
10  BY MS. KETNER:
11      Q    And you believe that after their terminations that
12  you were then under suspicion as a result of your
13  affiliations or relationships with each of Mr. Pineda and
14  Kathy West?
15      A    Yes.
16           MS. KETNER:  Okay.  Let's take a quick break and
17  then we will come back for an hour or so.  Okay.
18           THE VIDEOGRAPHER:  We are going off the video
19  record.  The time is approximately 11:03.
20
21  (Whereupon a break was taken from 11:03 a.m. to 11:08 a.m.)
22
23           THE VIDEOGRAPHER:  We are back on the video
24  record.  The time is 11:08.
25  ///
```

LUCERO SANCHEZ - 08/17/2022

Page 82

```
 1   BY MS. KETNER:
 2       Q    Okay.  Ms. Sanchez, do you understand that you are
 3   still under oath?
 4       A    Yes.
 5       Q    Okay.  So who assumed Mr. Pineda's position or
 6   duties following his termination?
 7       A    So her name was Rhonda Tu.
 8       Q    Do you know what the title of the position that
 9   she held was?
10       A    Supervisor for the food and nutrition service.
11       Q    Do you know how long after Mr. Pineda was fired
12   that Rhonda Tu assumed the position of FNS supervisor?
13       A    I'm not quite sure, but she was only in the
14   position for months, not, not, not even a year.
15       Q    Okay.  So it looks like Mr. Pineda was fired on
16   June 29th of 2015?  Is --
17       A    Right.
18       Q    -- that, okay.
19       A    So they didn't have a supervisor.  Justin Bart was
20   the manager or supervisor for me, so, and we reported to him
21   until they hired Rhonda Tu.
22       Q    What position did Mr. Bart hold during that time
23   period?
24       A    I don't quite sure.  I don't know if he was a
25   supervisor or manager.  I think he had just been a manager,
```

Page 83

1    but not quite sure.

2        Q    Okay.  So when do you believe the alleged

3    harassment and discrimination that you experienced began?

4        A    Right after German was fired.

5        Q    Okay.  And who do you claim engaged in the

6    harassment and discrimination against you?

7        A    Christina Vargas, Justin Bart, and Kristin Foley.

8        Q    What position did Kristin Foley hold?

9        A    I don't know because she was a South Regional's

10   employee.  She didn't have a position at South Meadows.  She

11   was at South Meadows, she was always with Christina Vargas,

12   but her position was for main hospital and I don't know what

13   position she, she held.

14       Q    What do you mean her position was for the main

15   hospital?

16       A    So because Kristin and Christina were friends,

17   Kristin held a position at Regional, not at South Meadows,

18   but she still worked at South Meadows.  I don't know if it

19   makes sense, but --

20       Q    How do you know that Christina and Kristin were

21   friends?

22       A    Many times when I was working in the cafeteria as

23   cashier, there was this time where I was making coffee and I

24   was, my back was towards the door for Carmella's, and

25   Christina just came behind me and just like jumped, you

LUCERO SANCHEZ - 08/17/2022

1   for a few, few hours a day, maybe four or five hours a day.

2       Q   And how many days a week?

3       A   Five.

4       Q   So Mr. Bart -- so after Mr. Pineda's termination

5   Mr. Bart was at the South Meadows location for four or

6   five hours each day five days a week?

7       A   Yes.

8       Q   Okay.  And where did Mr. Bart perform his job

9   duties at the South Meadows location?

10      A   I believe he was using the office that German was

11  occupying.

12      Q   Did you then continue to use that office?

13      A   No.  So I stopped using that office like in 2011.

14  I got my own office on the second floor.

15      Q   Okay.

16      A   2010, 2000, what was it, 2011 when they renamed

17  the position, then I got my own office.

18      Q   They renamed it what?

19      A   They renamed the position, my position to food and

20  nutrition service.

21      Q   Okay.  That was in 2010?

22      A   Yeah, and I got, that's when I started using my

23  own office.

24      Q   Okay.  And you did not use the shared office with

25  Mr. Pineda after 2010?

Page 96

1    A    2010, yeah.

2    Q    Okay.  Okay.  Did Mr. Bart ever make any comments

3    to you about your national origin?

4    A    No.

5    Q    Did Mr. Bart ever make any comments that you

6    overheard about Mexicans?

7    A    No.

8    Q    Did Mr. Bart ever make any comments that you

9    overheard about Hispanics?

10   A    No.

11   Q    Did Christina Vargas ever make any, excuse me, did

12   Christina Vargas ever make any comments to you about your

13   national origin?

14   A    No.

15   Q    Did Christina Vargas ever make any comments about

16   Mexicans that you overheard?

17   A    No.

18   Q    Did Christina Vargas ever make any comments about

19   Hispanics that you overheard?

20   A    No.

21   Q    You claim that Christina Vargas is non-Hispanic.

22   What evidence do you have to support that?

23   A    She told me she was, when she came and introduced

24   herself when she first got hired, she introduced herself and

25   she said she was from Costa Rica, I believe.  I'm not quite

1  sure.  She introduced herself as her parents being from

2  Costa Rica and she being born here, that her parents was

3  from Costa Rica.  I am not sure.

4  **Q  Okay.  So would you consider someone whose lineage**

5  **and parents were born in Costa Rica to be Hispanic?**

6  A    Parents can, and I don't believe they are

7  Hispanic.  They are American if they were, were born here.

8  **Q    Okay.  Do you consider her, her race to be**

9  **Hispanic?**

10  A    No.

11  **Q    Okay.**

12  A    More American.

13  **Q    Okay.  So do you consider your children to be**

14  **American, not Hispanic?**

15  A    Not Hispanic, right.

16  **Q    Okay.  And you consider your children to be**

17  **American, not Mexican?**

18  A    Yes.

19  **Q    Okay.  Do you know whether Christina Vargas is**

20  **fluent in Spanish?**

21  A    She spoke very little Spanish.  She did not, she

22  said she didn't speak a lot of Spanish.  She knew a little

23  bit.

24  **Q    Okay.**

25  A    And when she spoke, she spoke to us in English.

Page 100

1    Mr. Pineda was fired?

2        A    No.

3        Q    Okay.  So then what happened next?

4        A    So it was close to going home, so I, I was in

5    shock still, you know, for the news.  And then German had

6    already called and told me, you know, just be careful, so I

7    was kind of in like, kind of in shock.

8             So I went home, and the next day I came in and my

9    office was, it seemed like somebody had been going through

10   everything in my office.

11       Q    Okay.

12       A    And apparently Christina and Kristin and Justin

13   were in the office just looking at everything, at all of the

14   paperwork --

15       Q    Okay.

16       A    -- and everything that I had there, yeah.

17       Q    And what position did Christina Vargas hold?

18       A    Director of food and nutrition services for the,

19   for whole Renown.

20       Q    Okay.  So she was the head of the department?

21       A    Uh-huh.

22       Q    Okay.  Do you know why they were in your office --

23       A    No.

24       Q    -- looking around?  Do you suspect that it was

25   because they suspected that you had documents in there that

1   related to the suspicions against Mr. Pineda stealing from

2   the company?

3           MR. BUSBY:  Object to the form.  Go ahead.

4           THE WITNESS:  At that time, I did not.  Now I

5   know, yes.

6   BY MS. KETNER:

7       Q    Okay.  So you believe that Christina and Justin

8   were in your office the day after Mr. Pineda's termination

9   looking for paperwork that may have related to the

10  suspicions against Mr. Pineda stealing from the company?

11          MR. BUSBY:  Object to the form.  Go ahead.

12          THE WITNESS:  Yes.

13  BY MS. KETNER:

14      Q    Okay.  What happened next?

15      A    So after that I could not perform my job.

16      Q    Why?  Were you nervous?

17      A    No.  So I was e-mailed by Justin to schedule

18  myself in open positions, so I couldn't do my office work.

19  I couldn't -- I, I did the catering, did the cashier, but I

20  could not go into my office and do paperwork, so he was, he

21  asked me to schedule myself in open positions.

22          I helped him to do the schedules for maybe a

23  month.  He asked me to help him do the scheduling, and then

24  if there was an open position to schedule myself, and the

25  only open positions was dishwasher, so he told me if that,

Page 102

1    if that was the only one I could schedule myself doing

2    dishes.

3        Q    Did you say to Mr. Bart, well, Mr. Bart, how am I

4    going to do the paperwork that I'm required to do if you are

5    making me be the dishwasher?

6        A    Couldn't talk to them really.  They would not talk

7    to me, so.

8        Q    So when Mr. Bart was telling you to schedule

9    yourself in the open positions was he telling you in person

10   or was he telling you by phone or was he telling you --

11       A    Both.  I --

12       Q    You got to wait.  Was he telling you in person, by

13   phone or by e-mail?

14       A    So by e-mail and in person.

15       Q    Okay.  So why couldn't you respond by e-mail and

16   tell, say to Mr. Bart how am I going to get my other job

17   responsibilities done, i.e., the paperwork, if you are

18   making me wash dishes?

19       A    No.

20       Q    Why?

21       A    I don't know.  I couldn't go to my office and I

22   guess sit down without being scared and performing.

23       Q    Were you scared because you were concerned that

24   they were going to find a link between you --

25       A    No.

LUCERO SANCHEZ - 08/17/2022

Page 103

1      Q     -- and Mr. Pineda stealing from the company?

2      A     No.  I was scared --

3            MR. BUSBY:  Hang on.  I'm going to object to the

4      form of that question.  Go ahead.

5            THE WITNESS:  I was scared that any -- I can't

6      say, I couldn't talk to them, because I couldn't, how would

7      I say?  They wouldn't talk to me, so I couldn't talk to

8      them.  Only to tell me you do this, do that, but, yeah, I

9      never e-mailed him.

10     BY MS. KETNER:

11     Q     And they were your supervisors, right?

12     A     Right.

13     Q     Okay.  Christina Vargas was the director of the --

14     A     Yes.

15     Q     She was the director of the department, right?

16     A     Yes.

17     Q     Okay.  And was Justin Bart pretty much the number

18     two?

19     A     Yes.

20     Q     Okay.  So they had authority to tell you to do

21     whatever was necessary, right?

22     A     Right.

23     Q     Okay.  And your job description as the FNS

24     coordinator, I'm going to refer you back to exhibit, let's

25     see, it's Exhibit 5.  Okay.  Do you see on Exhibit 5 the

1    Position Purpose?  It's the very last sentence that says,

2    "The FNS coordinator will work as a cashier during peak

3    hours or help with other positions as needed."  Do you see

4    that?

5        A    Yes.

6        Q    Okay.  And you previously testified that that was

7    an accurate description of the position when you held it,

8    correct?

9        A    Right.

10       Q    Okay.  So you could have said something to them.

11   You just didn't; is that correct?  You could have asked them

12   how you were going to get your other job responsibilities

13   completed but you didn't?

14           MR. BUSBY:  Object, object to the form; asked and

15   answered.  Go ahead.

16           THE WITNESS:  Yes, I did not.

17   BY MS. KETNER:

18       Q    You did not.  Okay.  Did you ever ask them how am

19   I going to do my other paperwork when you are having me do

20   cleaning and other duties?

21       A    I didn't --

22       Q    Okay.

23       A    -- ask.

24       Q    If Mr. Pineda was no longer in the FNS supervisor

25   position did the number of catering events decrease?

LUCERO SANCHEZ - 08/17/2022

Page 105

```
 1      A    No.
 2      Q    Okay.  There were still the same number of
 3   catering?
 4      A    Yes.
 5      Q    Okay.  Who handled the catering?
 6      A    I did.
 7      Q    Okay.  So you handled setting up the catering?
 8      A    Yes.
 9      Q    And what other catering services did you handle?
10      A    I still did all of my, all of the catering.  I did
11   all of the billing.
12      Q    Well, stop, because we are talking about after
13   Mr. Pineda was terminated --
14           MR. BUSBY:  I'm gonna --
15           MS. KETNER:  -- so you said that you weren't
16   allowed in your office, so I'm trying --
17           THE WITNESS:  Okay.  We are not --
18           MR. BUSBY:  Hang on.  I'm going to object.  You
19   have got to let the witness answer the questions without
20   interrupting her as well.  Go ahead.
21           THE WITNESS:  So what I did is when I had my half
22   an hour break, I would sneak into the office to do paperwork
23   just so I can get my job done.  Everyday on my break I would
24   sneak into the office, and every time I sneak into the
25   office they will always go and track me down in the office.
```

Page 106

```
 1              So I, I still had to perform my own job and they
 2   don't want me in the office, and I still have to do all of
 3   the other stuff, catering, cashier, and whatever they put
 4   me.
 5   BY MS. KETNER:
 6        Q    How do you know they didn't want you in the
 7   office?
 8        A    I don't know.  It's just the way they had me doing
 9   all of these other things and to make sure that I didn't go
10   into the office.
11        Q    What -- do you know whether or not there was an
12   investigation that was being conducted into Mr.,
13   Mr. Pineda's activities?
14        A    I do not know.
15        Q    Okay.  So you don't know whether or not --
16        A    No.
17        Q    You got to wait until --
18             MR. BUSBY:  Yeah.
19   BY MS. KETNER:
20        Q    -- I finish the question.
21        A    I know.
22        Q    So you don't know whether or not there was an
23   internal investigation into Mr. Pineda's activities that was
24   being conducted even after his termination?
25        A    No.
```

Page 107

1              MR. BUSBY:  Object to the form.  Go ahead.

2    BY MS. KETNER:

3        Q    And you say that they didn't want you in the

4    office, but you have no evidence to support your belief in

5    that?

6              MR. BUSBY:  Object to the form.  Go ahead.

7              THE WITNESS:  Did not understand.

8    BY MS. KETNER:

9        Q    Did anybody tell you that they didn't want you to

10   be in the office?

11       A    No.

12       Q    So we were talking earlier about your

13   understanding of what a hostile work environment is.  Can

14   you, can you continue on?  I think that you said it was

15   making you feel uncomfortable?

16             MR. BUSBY:  Object to the form.  Go ahead.

17             THE WITNESS:  Yes.  So, for example, Justin and

18   Christina -- I have money from Renown.  I have a safe.  I, I

19   manage a $500 bank.

20             They took the keys away from me from the safe, but

21   I still had to -- well, what happened, we didn't have a key,

22   sorry, we didn't have the key for the, for the safe.  We

23   only had the numbers and so I, I used the numbers, never

24   asked for a key from the company.

25             So when they wanted the key for the safe, I told

LUCERO SANCHEZ - 08/17/2022

Page 108

1  them I didn't have the key, so Christina ordered a key for

2  the safe, and so when she ordered the key, she kept the key

3  and she told me continue using the, just the numbers, but

4  she never gave me the, the key.

5           So when they went into the office, every time I

6  left I think they were like looking for something.  They

7  moved the numbers from the key so I could no longer get into

8  the, into the safe.  I had the key -- It's so long.  It's

9  been so long and I can't remember everything.  One day I

10  went to, to talk to Christina.  It was like --

11  BY MS. KETNER:

12      Q    Let's, before you move on to another incident, I

13  wanted to ask you some questions about the keys and the

14  combination.  Okay.  So from what I understand, you said

15  that you managed a $500 bank?

16      A    Yes.

17      Q    Okay.  Where was that money kept?

18      A    In my office.

19      Q    Okay.  And it was kept in a safe?

20      A    Yes.

21      Q    That had a combination?

22      A    Yes.

23      Q    And you knew the combination?

24      A    Yes.

25      Q    But you didn't have the key?

LUCERO SANCHEZ - 08/17/2022

Page 109

1    A    Didn't have a key.

2    Q    So Christina ordered a key?

3    A    Yes.

4    Q    And she kept the key?

5    A    Yes.

6    Q    Did she change the combination to the safe in your

7    office?

8    A    Yeah.  I don't know.  No, she did not change the

9    combination, so they told me to continue using the, the safe

10   without the key, just the combination, but I was like really

11   afraid, because there was money there and they had the key.

12        You know, the name was signed to me and so they

13   had the key.  I can only use the safe with the combination,

14   and somehow somebody just turned the, the key.  I can't

15   remember if we lost the combination.  I have it written

16   down.  I just don't remember how the whole thing started.

17   Q    Were you ever denied access to the safe that was

18   in your office?

19   A    No.

20   Q    Okay.  So you were just afraid that someone else

21   had access to the safe?

22   A    Yes.

23   Q    And you were afraid that the director of the

24   department had ordered a key to have access to the safe?

25   A    So I'm trying -- I don't, I can't remember if when

LUCERO SANCHEZ - 08/17/2022

Page 110

1   she ordered the safe she gave me the key and changed the

2   combination.  I think that's what had happened.  So they,

3   they were not to move the numbers.

4           You know, they put, they put in the combination,

5   that's how, they put in the combination and they gave me the

6   key.  So they told me to leave the numbers, you know, like

7   the combination where you open it and I would just put in

8   the key and it would open for me, but one day when I came in

9   somebody had been in the office and I think they moved the

10  combination and so I cannot get into my safe.  That's what

11  happened.

12      **Q    Okay.  So you weren't able to get into the safe?**

13      A    Yeah, because they gave me the key, but not the

14  combination, so I could not, so somehow they moved the

15  numbers from the combination.  So it was set to open with

16  the numbers in there, so they gave me the key and when -- I

17  put in the key and I couldn't open it because they had moved

18  the combination and nobody had it.

19      **Q    Okay.  Do you, do you allege that the director of**

20  **the FNS department Christina Vargas should not have had**

21  **access to that safe?**

22      A    Yeah, I, I think she should have access telling,

23  you know, letting me know that, you know, like we were both

24  agreed to it, because then they, they had, if that money was

25  stolen or any, for example, disappear, I was responsible for

Page 111

1   that money.

2        Q    Okay.  How often did you see Christina Vargas at

3   the South Meadows location before Mr. Pineda's termination?

4        A    Before, very -- maybe once or twice a week before.

5        Q    Okay.  Now, you testified that you would see

6   Mr. Bart once or twice a week as well?

7        A    As well, yeah.

8        Q    Did you see Ms. Vargas more often or less often

9   than Mr. Bart before Mr. Pineda's termination?

10       A    I think I saw her less.

11       Q    Did you have any interaction with her when you saw

12  her at the South Meadows location before Mr. Pineda's

13  termination?

14       A    No.

15       Q    Okay.  After Mr. Pineda's termination how often

16  would you see Ms. Vargas at the South Meadows location?

17       A    Everyday.

18       Q    What did you see her doing at the South Meadows

19  location after Mr. Pineda's termination?

20       A    In her office with Kristin Foley.

21       Q    What, where was her, where was Christina Vargas'

22  office located?

23       A    In the hallway close to administration.

24       Q    Did she always have an office at that location

25  even before Mr. Pineda's termination?

Page 112

1      A     That used to be Kathy West's office, yes, and then

2   they, when Kathy was gone she took over that office.

3      Q     **What kind of things did you see Ms. Vargas doing**

4   **in her office after Mr. Pineda's termination?**

5      A     I couldn't see her.  I was downstairs working and

6   she was in closed doors inside her office.

7      Q     **Did you have any interaction with her after**

8   **Mr. Pineda's termination?**

9      A     Not -- only if I was in trouble or, you know, like

10  only if they needed to talk to me.

11     Q     **Okay.  So on a day-to-day basis your job duties**

12  **would not interact with Ms. Vargas' job duties after**

13  **Mr. Pineda's termination?**

14     A     No.

15     Q     **Is that accurate?**

16     A     I don't know how to answer, because she, she was

17  there and like I saw her when she went downstairs.  Well,

18  she didn't, first of all, she did not acknowledge that I was

19  present.  She didn't talk to me.  She talked to the other

20  cashiers, so but never talked to me, so I could not really

21  have conversation with her.

22     Q     **Was she nice to the other cashiers?**

23     A     Yes.

24     Q     **Pleasant?**

25     A     Yes.

LUCERO SANCHEZ - 08/17/2022

Page 113

1     Q     Respectful?

2     A     Yes.

3     Q     Who were the other cashiers?

4     A     Lupe was one at the time.

5     Q     And what's Lupe's last name?

6     A     Aguilar.

7     Q     Do you know whether or not she is Hispanic?

8     A     Her parents are Hispanic.  She was born in Texas.

9     Q     Okay.  So you claim that she is not Hispanic

10    because she was born in Texas?

11    A     Yes.

12    Q     Okay.  Do you know whether or not her parents are

13    from Mexico?

14    A     I believe her mom is from Mexico.  I'm not for

15    sure.

16    Q     Did you ever tell Ms. Vargas that you, where you

17    were born?

18    A     No.

19    Q     Okay.  So Ms., so if you never told Ms. Vargas

20    that you were born in Mexico, not in the United States, do

21    you have any evidence to allow you to believe that

22    Ms. Vargas knew you were born in Mexico?

23    A     No.

24    Q     Okay.  Do you know whether or not Lupe Aguilar

25    ever told Ms. Vargas that she was born in Texas, not in

Page 114

1    Mexico?

2         A    I don't know that, no.

3         Q    Would you describe Ms. Aguilar as looking

4    Hispanic?

5         A    She looks Hispanic, but her Spanish is very thick

6    accent like me with the English, you know, so she looks

7    Hispanic.

8         Q    Would you describe Ms. Aguilar as appearing to be

9    from Mexican lineage?

10        A    No.

11        Q    Why not?

12        A    For me she looks more American.

13        Q    Okay.  Who were the other cashiers other than

14   Lupe Aguilar?

15        A    So when Lupe started it was just me and her, her

16   and I.

17        Q    Did you see Ms. Vargas talk to any other cashiers?

18        A    There was, it was just Lupe.

19        Q    Okay.  So you said that they, and I'm assuming

20   when you were talking about they you were referring to

21   Ms. Vargas and Mr. Bart, they would only talk to you if you

22   were in trouble?

23        A    So like only, you know, if they wanted to talk to

24   me, like, for example, there was a catering one day and I

25   had to leave.  I was doing the work downstairs as a cashier

Page 115

1   and I was asked since I was the food and nutrition

2   coordinator to leave the catering cart ready before I went

3   home.  Even though the catering was going to be at 5:00, I

4   had to leave it ready at 2:00.

5           So the next morning when I came, first thing is I

6   saw the cart downstairs and it hadn't been taken to the

7   place that it needed to go, and then later in the day I was

8   called into Christina's office and, and told me that I did

9   not, I hadn't done the catering that they asked me to do.

10          And I said I did the, the coffee cart is

11  downstairs with the catering, and they told me I had to

12  leave it, you know, set up already since -- set it up at

13  2:00 for a 5:00 catering, so I just left it on a cart, so

14  then I got called into her office that I have done wrong.

15      Q    Who else was in her office when --

16      A    That time was Rhonda Tu.

17      Q    Was Rhonda your direct supervisor at that time?

18      A    She was a supervisor.

19      Q    Was she your direct supervisor?

20      A    Yes.

21      Q    Okay.  And did you receive any disciplinary action

22  as a result of that meeting?

23      A    No, just a verbal, you know, like just talking.

24      Q    Okay.  So you didn't receive any corrective

25  action, correct?

Page 116

```
 1     A    No.

 2     Q    Okay.  There was nothing placed in your personnel

 3   file, correct?

 4     A    No.

 5     Q    Okay.  So they just told you to do something

 6   different the next time?

 7     A    Yeah, but I was doing the cashier's, and cashier's

 8   job, and then they wanted me to do all of this extra stuff

 9   and on top my catering, I mean the catering.

10     Q    Okay.  And when did you start primarily doing the

11   cashier duties?

12     A    Right when they, German left they had me

13   cashiering.  That's when they told me, Justin told me to

14   schedule myself, or if there was a dishwasher missing,

15   Justin will come and, you know, tell me to do dishwashing.

16          Or if it wasn't too busy in the cafeteria for two

17   cashiers, he will pull me out and he would tell me to clean

18   like shelves, and there is like these racks where they put

19   the cans.  They have never been cleaned in like years and

20   they had me do, they had me doing all of this cleaning that

21   it had never been done by me, and so I did that and then I

22   had to sneak to do my paperwork in that time.

23     Q    Okay.  And after Mr. Pineda's termination did you

24   still do, did you still take the bank to the emergency

25   department?
```

Page 117

```
 1     A    Yes.

 2     Q    Okay.  Did you still do that everyday?

 3     A    I did it, I did that until I had my surgery for my

 4  knee.

 5     Q    After Mr. Pineda's termination, did you still run

 6  to the bank to get change --

 7     A    Yes.

 8     Q    -- for the cashiers?

 9     A    Yes.

10     Q    Okay.  And how long did you do that for?

11     A    After?

12     Q    Yes.

13     A    So I had my knee surgery on January 13th, 2017.

14  That's when I stopped taking the money to the bank.

15     Q    Okay.  So --

16     A    And getting money from the bank.

17     Q    Okay.  So from Mr. Pineda's termination in June

18  of 2015 until your surgery in January of 2017 --

19     A    Yes.

20     Q    -- you continued to take the bank to the ER?

21     A    Yes.

22     Q    And you continued to get change from the financial

23  institution bank --

24     A    Yes.

25     Q    -- for the cashiers?
```

LUCERO SANCHEZ - 08/17/2022

Page 118

1    A    Continued that, continued to do all of the

2    invoices and continued doing caterings and --

3    **Q    And when you --**

4    A    -- and had the job as a cashier.

5    **Q    Okay.  And you previously testified that it was**

6    **about one and a half to two hours a week to do the**

7    **paperwork.  Is that -- do you remember your testimony from**

8    **earlier today?**

9    A    Yes.

10   MS. KETNER:  Okay.  Okay.  It's about five minutes

11   to 12:00, so do you want to take an hour break?

12   MR. BUSBY:  Okay.

13   THE VIDEOGRAPHER:  Okay.  We are going off the

14   video record.  The time is 11:55.

15

16   (Whereupon a break was taken from 11:55 a.m. to 12:59 p.m.)

17

18   THE VIDEOGRAPHER:  This is the beginning of media

19   number 2 in the continuing deposition of Lucero Sanchez.  We

20   are back on the video record at 12:59.

21   BY MS. KETNER:

22   **Q    Ms. Sanchez, do you understand that your testimony**

23   **is still under oath?**

24   A    Yes.

25   **Q    Okay.  So you testified that I believe that you**

LUCERO SANCHEZ - 08/17/2022

Page 121

```
1      A    No.
2      Q    Okay.  Did you receive any training from Renown
3   throughout the years related to its policies on harassment?
4      A    We -- all the training was based on the OLA every
5   year.  It's OLA where, their learning.  It's called OLA.
6      Q    Does that stand for online --
7      A    Online --
8      Q    -- learning?
9      A    -- learning, yes.
10     Q    You have to wait until I'm finished.  Online
11  Learning Academy maybe?
12     A    Yes.  Sorry, I'm like really bad with my --
13     Q    That's okay.  I will hand you what we will mark
14  next as Exhibit 12.  It's Bate stamped Renown 006196 to
15  Renown 006255.
16          THE COURT REPORTER:  Just so you know, the Zoom is
17  not on.
18          MS. KETNER:  Okay.  Let's go off the record for a
19  second.
20          THE VIDEOGRAPHER:  Going off the record, the time
21  is 1:03 p.m.
22
23   (Whereupon a break was taken from 1:03 p.m. to 1:06 p.m.)
24
25          THE VIDEOGRAPHER:  We are back on the video
```

LUCERO SANCHEZ – 08/17/2022

```
 1      A    Yes.
 2      Q    Okay.  Do you recall attending a cultural
 3  diversity training during your employment with Renown?
 4      A    I think it was online, yes.
 5      Q    Yes.  Okay.  What do you recall learning during
 6  the cultural diversity training that you attended online?
 7      A    I could not tell you, because I, I don't remember
 8  what's in it, you know.  Like I, I trained, I did one but I
 9  don't know exactly what's contained, so.
10      Q    Do you remember attending it more than once?
11      A    Yes.  You do it every year, I think.  It's, it's
12  every year online learning.
13      Q    Okay.
14      A    Yeah.
15      Q    But you don't recall any of the things that you
16  might have learned during the annual online learning about
17  cultural diversity?
18      A    I couldn't tell you right now, because I'm
19  blocked, but I don't know what's in it.
20      Q    Okay.  Let's turn to the second page of that
21  document.  The very first entry says 2014 Renown Health:
22  Ergonomics in the Workstation.  Do you recall taking an
23  Ergonomics in the Workstation class?
24      A    Just the online.
25      Q    What do you recall learning in that online class?
```

Page 125

1   policies in Spanish?

2       A    Not back then.  I don't know now.

3       Q    Now they do?

4       A    I don't know if they do.

5       Q    Okay.

6       A    I --

7       Q    Can you turn to the next page?  Do you see the

8   second entry down it says Renown Health:  Harassment in the

9   Workplace?

10      A    Yes.

11      Q    Okay.  Do you recall taking a Harassment in the

12  Workplace training while employed at Renown?

13      A    Online learning, the same.  I did do that one.

14      Q    And what do you call -- what do you recall

15  learning during that training?

16      A    It -- like I say, I wouldn't know the whole

17  wording that's in there, but it tells you on how to protect

18  yourself or protect the employment from like harassment.

19  They tell you what things are harassment, what things are --

20  Sorry, I'm trying to think of everything.

21           So it tells you what are the things that you see

22  that would be harassment, you know, like touching and, you

23  know, like what kind of words you are using, you know, to

24  make people feel uncomfortable and harassed.  And I would

25  not remember every single thing that's in there.  I mean, I

LUCERO SANCHEZ - 08/17/2022

Page 126

1  know all of the policies.  I just do not know everything

2  that is in there.  I mean, I know it when I see it, but

3  right now that you are asking me I can't remember everything

4  that's in there.

5          MS. KETNER:  Okay.  We will mark this next

6  document as Exhibit Number 13.  It's Bate stamped Sanchez

7  001060 to Sanchez 001067.

8

9          (Exhibit Number 13 was marked for identification.)

10

11  BY MS. KETNER:

12      Q    Ms. Sanchez, let me represent to you that this is

13  a document that was produced by your counsel in this

14  lawsuit.  Do you ever recall seeing the documents that we

15  have marked as Exhibit 13?

16      A    Yes.

17      Q    Okay.  What is it?

18      A    This is the policy.

19      Q    Okay.  And this is, it's entitled Renown Health

20  Education, Safe and Healthy Workplace - Harassment?

21      A    Yes.

22      Q    Okay.  If you can take a look through it.  Do you

23  recall attending that training?

24      A    Yes.

25      Q    Okay.  So you were told -- do you recall attending

1   a training that Renown said that they were committed to a

2   workplace that was free of harassment and discrimination?

3        A    Yes.

4        Q    Okay.  What instructions did you receive in the

5   event that you witnessed or experienced harassment or

6   discrimination?  What were you told to do?

7        A    I was told to tell, let your supervisor know right

8   after, you know, like as soon as it happens.  You know, any

9   event you have to notify your leader.

10       Q    Okay.  Were you instructed to tell anybody other

11   than your leader?

12       A    If you don't have your immediate leader, then you

13   can go above your leader, and then if they don't hear you

14   or, you know, you can go to HR.

15       Q    Okay.  Were you aware that Renown has a compliance

16   hotline that operates on a 24-7 basis and --

17       A    Yes.

18       Q    Okay.  And are you aware that the hotline allows

19   individuals to report complaints anonymously?

20       A    Yes.

21       Q    Okay.  Did you ever call that hotline to report

22   any complaints of harassment or discrimination?

23       A    No.

24       Q    Did you ever report harassment or discrimination

25   to your supervisor?

Page 128

```
1      A    Not to a supervisor.  I reported to HR.
2      Q    Okay.  Who in HR did you make a report of
3   harassment or discrimination to?
4      A    Suzanne, I can't pronounce it.  Suzanne --
5      Q    Oetjen?
6      A    Oetjen.
7      Q    Okay.  It's spelled O-e-t-j-e-n, Suzanne Oetjen.
8           Okay.  Other than -- how many times did you make
9   reports of harassment or discrimination to Suzanne Oetjen?
10     A    One.
11     Q    One?
12     A    One time.
13     Q    Did you make any other reports of harassment or
14  discrimination to any other member of human resources?
15     A    No.
16     Q    Okay.  When did you make a report of harassment or
17  discrimination to Suzanne Oetjen?
18     A    I, I think it was like three or four months after
19  the, after June 29th I think it was like three or four
20  months after.  I don't remember quite the time I did, but it
21  was like three or four months later.
22     Q    After, three or four months after Mr. Pineda's
23  termination?
24     A    Yes.
25     Q    Okay.  What did you tell Suzanne?
```

1        A     So I had, because, you know, I was writing

2   everything down that there was happening, because I, you

3   know, don't remember a lot of the things, so I had my little

4   notebook where I was writing things, you know, that I

5   thought they were not -- they were doing all of those things

6   so, you know, to make me quit.

7              So when I talked to Suzanne, I know I did not talk

8   to the supervisor and I, Jessi Russell was our immediate

9   HR department, but I did not talk to her, so I just went to

10  Suzanne and I told her everything that I had experienced in

11  that little short time since German was fired.

12             But that when I came to talk to her, she said that

13  she was, there was some kind of construction and she was not

14  listening to me, and she said that she was sorry, but it

15  wasn't that she didn't want to listen to me.  It was too

16  noisy, noisy.  So, basically, I don't know if she wrote

17  anything down or if she took me seriously or not.  So I had

18  that little notebook where I told her everything that was

19  going on.

20       **Q     When you say that you told her everything that was**

21  **going on, what incidents did you relay to her?  What**

22  **incidents did you report to Suzanne Oetjen?**

23       A     Okay.  So my first one was the concern of the

24  taking away the key from my office.  I went to the --

25  actually, I went to see Christina to give her a paper

Page 130

1  because it had been Fourth of July.  It had been Fourth of

2  July and you need to fill out a paper so you can get your

3  hours from PTO so you can get your day paid.

4          So when I went to Christina's office, I saw her

5  door was open, but she was not in the office, so I just, the

6  restroom is just like a door down from where her office used

7  to be, and she was talking to somebody in the hallway.

8          So I went to the bathroom.  I came -- when as I

9  was walking out of the bathroom I opened the door and

10  Christina was outside the door with her hands crossed

11  waiting for me, literally outside the door from the

12  bathroom.

13          And, sorry, sorry, she told me to give her the

14  keys and she went like this to my hand, poking my hand.

15     Q    Were the keys in your hand?

16     A    Yes.

17     Q    Okay.

18     A    So that was one of them.  And then the other one

19  was they took my office away, too, to give it to

20  Kristin Foley.  I still had my position.  So they took the

21  keys away from me to give it to Kristin Foley, when

22  Kristin Foley had been, had her position at Regional.

23     Q    Was Kristin Foley then acting as your supervisor?

24     A    Yes.

25     Q    Okay.  So you reported to Kristin Foley?

Page 131

1        A     She was not the supervisor, but she was acting

2   like one.  She wasn't the supervisor at that time.  She was

3   just acting like one because she was with Christina.

4        Q     Okay.  Was Rhonda Tu your supervisor at that time?

5        A     So I think Rhonda came in August, and that's

6   August or September, not quite sure.  So the other one was

7   that there was a meeting for all staff, and Julie was asking

8   me a question.  The meeting hadn't started yet, and she told

9   me to shut up in front of everybody.

10       Q     Who did?

11       A     Christina.

12       Q     Okay.  So were you talking with Julie while you

13  were waiting for Christina Vargas --

14       A     For the meeting.

15       Q     You got to wait until I finish the question.

16       A     Sorry, yes.

17       Q     You were talking with Julie, a co-worker, while

18  Christina Vargas was waiting to begin a meeting; is that

19  correct?

20       A     Yes.

21       Q     Okay.  And she told you to shut up?

22       A     Yes.

23       Q     Okay.  Anything else?

24       A     I think it was in that meeting the other thing she

25  had said is that, "I don't like Mexicans.  I don't --"

Page 132

```
 1       Q    Did you, did you ever --

 2            MR. BUSBY:  Hang on.  Hang on.  I object.  Please

 3   let the witness answer the question finally before

 4   interrupting.  Go ahead.

 5            THE WITNESS:  She said, "I don't like Mexicans."

 6   BY MS. KETNER:

 7       Q    You previously testified earlier today that you

 8   never personally heard Christina Vargas say that she doesn't

 9   like Mexicans.  Are you changing your testimony right now?

10       A    No.

11       Q    Okay.  So you never personally heard --

12       A    Oh.

13       Q    -- Christina, you gotta wait.  You never

14   personally heard Christina Vargas make any statement to the

15   effect that she does not like Mexicans; is that correct?

16       A    I --

17            MR. BUSBY:  I'm going to object; compound

18   question.  Go ahead and answer.

19            THE WITNESS:  I heard her say, and we were

20   standing there when she told me to shut up and then she

21   said, you know, "I don't like Mexicans."

22   BY MS. KETNER:

23       Q    In front of the entire staff?

24       A    We were there.  I don't know who else heard it,

25   yeah.
```

LUCERO SANCHEZ - 08/17/2022

```
 1      A    About.
 2      Q    And where was Julie in relation to you?
 3      A    She was like on this side like close, close to me.
 4      Q    So Christina Vargas told you to shut up and then
 5  what?
 6      A    And just everybody laughed and I just stayed
 7  quiet, I mean.
 8      Q    And when did she allegedly then make the statement
 9  that she doesn't like Mexicans?
10      A    That was when she was walking, I think she was
11  walking away.  The meeting was done and just, I think it was
12  when she was walking out.  I mean, I don't remember the
13  whole details.
14      Q    Are you sure that you are not confusing this with
15  Kathy West's testimony that she heard a similar statement?
16      A    No.
17      Q    Okay.  Because earlier today you testified under
18  oath that you never heard Ms. Vargas make any comments about
19  Mexicans, so now you are changing that testimony, right?
20           MR. BUSBY:  Objection.  Object to the form; asked
21  and answered.  Go ahead.
22           THE WITNESS:  I, I said that, yes.  I'm under a
23  lot of --
24  BY MS. KETNER:
25      Q    Well, you are here --
```

Page 136

1      Q    Okay.  And if -- and that meeting would have been

2  documented in your, the diary that you were keeping; is that

3  correct?

4      A    Yes, it should have been there.

5      Q    Okay.  So if --

6      A    I don't know if it's there.  I don't know.

7      Q    What was the purpose of you keeping the diary?

8      A    So keeping that, I was told by a person that, you

9  know, whenever you experience any type, type of harassment

10 or discrimination, it would be very, it would be, how do you

11 say when people believe in you?  You know, like when they

12 are doing things to you and if you ever go to court unless

13 you have something in written, they are not going to believe

14 in you, and so I remember and I started doing my diary.

15     Q    Okay.  And you wrote down every incident?

16     A    Not every incident.

17     Q    Okay.  So what ones did you decide not to write

18 down or how did you decide whether or not to write it down

19 or not?

20     A    I don't know how to answer that.

21     Q    Did you keep it -- what kind of form was the diary

22 in?

23     A    It's in a notebook, like a small one.  I have the

24 original.

25     Q    Did you carry it with you when you went in to

Page 137

1   work?

2       A    Yes.

3       Q    Okay.  Did you write things down contemporaneously

4   when they happened?  When I say the word contemporaneously,

5   I mean, you know, an incident happened and then you wrote it

6   down?

7       A    No.  I didn't write it like when it's happening.

8   I had to wait until the end of my shift obviously because,

9   because of everything.  I was working.  I was doing, I was

10  not going to, you know, like sit and do my diary, so I had

11  to wait until like later in the day to write what had

12  happened during the day.

13      Q    Okay.  And did you make entries everyday or how

14  often did you make entries?

15      A    I was making everyday when -- I think it's an

16  everyday thing that I was doing.  I have my diary that's

17  pretty like in order, so the time.

18      Q    So you feel like the diary entries are pretty

19  accurate with respect to what you claim happened to you and

20  the dates that you made those entries into the diary?

21      A    Yes.  It's --

22           MS. KETNER:  Okay.  We will mark this document as

23  Exhibit 14.

24           (Exhibit Number 14 was marked for identification.)

25

LUCERO SANCHEZ - 08/17/2022

Page 138

```
 1  BY MS. KETNER:
 2      Q   Ms. Sanchez, is Exhibit 14 what we just marked,
 3  it's Bate stamped Sanchez 001436 to Sanchez 001474, is that
 4  the diary that you were just testifying about?
 5      A   Yes.
 6      Q   Okay.  In the first entry is there anything about
 7  Christina Vargas, you allegedly overhearing Christina Vargas
 8  saying that she hates Mexicans?
 9      A   No.
10      Q   Okay.
11      A   What was -- can you repeat that answer for me,
12  please?
13      Q   The first entry on the first page is dated
14  6/24/15, correct?
15      A   Yes.
16      Q   Okay.  Is there anything mentioning in there about
17  you allegedly overhearing Christina Vargas say that she
18  hates Mexicans?
19      A   Yes, I didn't hear.
20      Q   What?
21      A   I didn't hear Christina saying she hates Mexicans.
22      Q   You did not hear Christina hear -- wait.
23      A   Can you give me a minute?
24      Q   I need you to answer this question.  Did you hear
25  Christina Vargas say that she hates Mexicans?
```

Page 139

1      A    Well --

2      Q    **And let me remind you that your testimony is under**

3   **oath.**

4      A    Yes, I did not hear saying her, that she did not

5   like -- so are you asking me about what I just said that she

6   said she don't like Mexicans or --

7      Q    **Did you personally hear Christina Vargas make the**

8   **statement or to the effect "I don't like Mexicans" while she**

9   **was walking out of a staff meeting?**

10     A    Yes.

11          MR. BUSBY:  Object to the form; compound,

12   confusing.  Go ahead.

13          THE WITNESS:  Yes, I heard her say "I don't like

14   Mexicans" after she had told me to shut up, yes.

15   BY MS. KETNER:

16     Q    **You did hear that?**

17     A    Yeah, that.

18     Q    **Okay.**

19     A    I'm confusing this to the, to the, if I heard her

20   with the other "F Mexicans" when she said that, so sorry.

21     Q    **Okay.  Did you write that down in this diary?**

22   **Let's go through it page-by-page, because that seems to be a**

23   **significant event, if it indeed occurred.  It's not on the**

24   **second page, correct?**

25     A    No, it's not.  I don't know if I, because I don't

Page 140

1  know if I wrote everything.  There is like the most

2  important things that I wrote here that what happened.

3      **Q    Well, let's look at the third page.  You wrote**

4  **down here that Justin Bart walked by you and told you "Don't**

5  **look too bored" in a sarcastic manner.  Was that more**

6  **important to your national origin discrimination claim than**

7  **allegedly hearing Christina Vargas say that she hates**

8  **Mexicans?**

9          MR. BUSBY:  Okay.  For the record I'm going to

10  object on the grounds of Rule 30(d)(3).  I think the

11  questions are being asked in a manner that unreasonably

12  annoy, embarrass, and harass the witness.  If you have

13  factual questions, I'd ask that you just ask them in a

14  straightforward unaccusative and unsnarky manner.

15  BY MS. KETNER:

16      **Q    You can answer.  Go ahead.**

17      A    What was it, again?  Sorry, I'm not retaining.

18          MS. KETNER:  Could you read the question back,

19  please?

20          (The question was read by the reporter.)

21

22          THE WITNESS:  I didn't hear she hate Mexicans.  I

23  heard don't like.  It's different.  That's what I heard.

24  BY MS. KETNER:

25      **Q    Okay.  If you could please --**

Page 141

1      A    I don't know if I even wrote that meaning.  Okay.

2      Q    Okay.  Go, go through Exhibit 14 and let me know

3  if you see that entry in there that you documented that you

4  heard Christina Vargas say that she doesn't like Mexicans?

5           Yeah, and if you could please read up to the entry

6  of Friday, July 10th of 2015, so that's reading up to the

7  document Bate stamped Sanchez 001444.

8      A    Okay.  "On 7/10/15 at 8:30 a.m. I was told by

9  Justin Bart that he had e-mailed me the schedule to get it

10  done and to schedule myself in a empty position.  The only

11  empty position was dishwasher, so I had scheduled myself a

12  couple of days a week as a dishwasher."

13      Q    Okay.  I'm sorry, you misunderstood my question.

14  So do you see the next entry?  It says, "Friday, on 7/10/15

15  at 2:15 p.m. had an appointment with HR Suzanne Oetjen."

16      A    It's to talk about how I was being treated by the

17  Director Christina Vargas and Manager Justin Bart, but in no

18  way she wanted to listen to me.  Suzanne was very distracted

19  and said to me that the way the keys were taken from me was

20  not harassment nor intimidation.  That they were new bosses.

21  They thought it was the best for the company.  Everything --

22  sorry.

23      Q    Ms. Sanchez, did you ever mention your national

24  origin or race to Suzanne Oetjen when you had that meeting

25  with her?

LUCERO SANCHEZ - 08/17/2022

Page 142

1      A    No.

2           MS. KETNER:  Okay.  I want to also show you what

3    we will mark as Exhibit 16, I'm sorry, 15.

4

5           (Exhibit Number 15 was marked for identification.)

6

7    BY MS. KETNER:

8      Q    Ms. Sanchez, Exhibit 15 is a document that was

9    produced by your counsel in this case and it's Bate stamped

10   Sanchez 001266 to Sanchez 001276.  It appears to have

11   similar entries to the handwritten document that we have

12   marked as Exhibit 14.

13          Do you know how Exhibit 15 was created?  And by

14   that I'm asking did you type it, or did your counsel type it

15   or who, who created Exhibit 15?

16     A    I, I typed all this.  My daughter and I typed all

17   this.

18     Q    Okay.  And you typed Exhibit 15 based upon your

19   handwritten notes of Exhibit 14?

20     A    Yes.

21     Q    Okay.  Did you type it verbatim from your

22   handwritten notes?

23     A    Yes.

24     Q    And when did you create Exhibit 15?  And really

25   what I'm, what I'm trying to get at is did you start typing

Page 143

1   Exhibit 15 at the same time you were making the handwritten

2   entries in the notebook?

3       A    No.

4       Q    Okay.  Did you begin typing Exhibit 15 after the

5   last entry of your handwritten notebook?

6       A    I typed all that when I talked to my attorney and

7   talked to him.  I told him that I --

8            MR. BUSBY:  Hang on.  Just a sec.

9            MS. KETNER:  Oh, yeah, sorry.

10           MR. BUSBY:  Okay.  For the record, I'm going to

11   object as far as the question calls for any communication

12   between you and either Art or I or any other attorney.

13           THE WITNESS:  Okay.

14           MR. BUSBY:  So yeah.

15           THE WITNESS:  I typed it.

16   BY MS. KETNER:

17       Q    Okay.

18       A    When I did the, the report to the state.

19       Q    Okay.  So let's look at Exhibit 15, because it's

20   easier I think to read the typewritten entries.  So if you

21   go to the second entry, it's dated June 25th, 2015, and it

22   reads, "At about 12:15 p.m. Justin walked by the dietary

23   office while I was sitting in there waiting for patient

24   calls.  He made a comment that made me feel uncomfortable.

25   He said, 'Don't hold onto the floor too hard.'  15 minutes

LUCERO SANCHEZ - 08/17/2022

Page 144

1    later he walked by again and made another comment, 'Don't

2    look too bored.'"

3           Do you claim that that relates in any way to your

4    national origin or race?

5    A    Yes.

6    Q    How so?

7    A    He is making these comments so I can probably get

8    tired and leave, because I'm Hispanic.

9    Q    Why -- what evidence do you have that Justin Bart

10   made that comment because you are Hispanic?

11          MR. BUSBY:  Object to the form.  Go ahead.

12          THE WITNESS:  I don't know.

13   BY MS. KETNER:

14   Q    Do you have any evidence --

15   A    No.

16   Q    -- to support?

17   A    Just, just the comments that he did.  I don't have

18   any.

19   Q    Okay.

20   A    Everything that was said to me was said like when

21   I was by myself or they would close the door when they come

22   into the office.

23   Q    Okay.  If you look at the next entry it's dated

24   June 30th of 2015, and the last paragraph or, I'm sorry, the

25   second to last paragraph states, "At around 12:15 p.m. I was

1   in the dietary office and Justin walked by and made the same

2   comment in a sarcastic manner, don't, quote, 'Don't look too

3   bored.'"

4           "Around 12:30 Christina went to my office to try

5   to figure out the combination for the safe.  While I was in

6   there I asked what did she want to do with the financial

7   records?  She rolled her eyes and would not look at me and

8   responded 'I don't know' several times."

9           Do you claim that is an example of harassment or

10  discrimination based upon your national origin or race?

11          MR. BUSBY:  Object to the form.  Go ahead.

12          THE WITNESS:  Yes.  I think the same.  They were

13  doing that so I can get bored and I was Hispanic.  They are

14  white, so maybe they didn't want me in the office.

15  BY MS. KETNER:

16      Q    What evidence do you have?

17      A    None.

18      Q    Okay.  Do you want to take a break and then we

19  will --

20      A    No, I'm fine.

21          MS. KETNER:  Okay.  I want to mark this next

22  Exhibit 16.  It's Bate stamped 000742 to Sanchez 000747.

23

24          (Exhibit Number 16 was marked for identification.)

25

Page 146

1  BY MS. KETNER:

2      Q    Ms. Sanchez, do you recognize the document that

3  we've marked as Exhibit 16?

4      A    Yeah, conduct of harassment.

5      Q    Okay.  And the current version of this policy is

6  dated 4-15.  Do you see that at the top left-hand corner --

7  right-hand corner?

8      A    Yes.

9      Q    Okay.  And you had access to this policy in 2015,

10 correct?

11     A    Yes.

12          MS. KETNER:  Okay.  We will mark this next

13 document as Exhibit 17.  It's Bate stamped 001048.

14

15          (Exhibit Number 17 was marked for identification.)

16

17 BY MS. KETNER:

18     Q    Ms. Sanchez, let me represent to you that this

19 document was produced by your counsel in this case.  Do you

20 know what this is?

21     A    I do not know exactly, but has to do with the

22 Americans with Disabilities.

23     Q    Did you ever see this document before today?

24     A    I see it posted on the walls at Renown.

25     Q    Okay.

LUCERO SANCHEZ - 08/17/2022

Page 147

```
 1      A    About the policy.

 2      Q    Okay.  For how long has this document been posted

 3  on the walls at Renown?  Has it been posted since 2015?

 4      A    I think it's been there longer, all the time.  I

 5  wouldn't tell you because I don't pay attention to the,

 6  what's put on the boards, so sorry.

 7      Q    That's okay.  We can take a break if you need to.

 8      A    I will try.  I think it's, it was there before

 9  2015.

10      Q    Okay.  And you have seen it posted on what wall at

11  Renown?

12      A    There is a hallway that, there is the hallway and

13  I couldn't tell you exactly where, but it's there in the

14  hallway and I guess like right, if you come out of the

15  restroom you can see it just like in front, in front of the

16  wall, it's the board with this, and this and other

17  documents.

18           MS. KETNER:  Okay.  I will mark this next exhibit

19  as 18.  It's Bate stamped Sanchez 001050.

20

21           (Exhibit Number 18 was marked for identification.)

22

23  BY MS. KETNER:

24      Q    Ms. Sanchez, this has also been produced by your

25  counsel in this case.  Have you seen this document before?
```

LUCERO SANCHEZ – 08/17/2022

Page 149

1    A    The first time I saw this, yes, it was maybe when

2  I started in, in surgery.  A couple of months after I

3  started in surgery I saw this was posted on the wall, but

4  other than that I hadn't seen it before.

5    Q    Okay.  But you were aware that Renown had a

6  compliance hotline that allowed you to anonymously complain

7  to unlawful activity in the workplace 24 hours a day, 7 days

8  a week?

9    A    Yes.  I didn't see it when I, like around 2015.  I

10 saw this like two or three years when I started in surgery,

11 that's where I saw it.

12   Q    Before you started in surgery were you aware that

13 there was a compliance hotline that you could anonymously

14 report complaints to?

15   A    No.

16   Q    Okay.  So you learned of the compliance hotline

17 for the first time in 2018?

18   A    Yes.

19   Q    Okay.  The compliance -- I'm going to refer you

20 back to the training that we marked as Exhibit 13.

21   A    Uh-huh.

22   Q    Okay.  It does state that you could report

23 harassment immediately within 24 hours to your leader and or

24 Human Resources business partner at extension 4156 or the

25 compliance hotline at 1-800-611-5097.

LUCERO SANCHEZ - 08/17/2022

Page 150

```
 1      A     Yes.
 2      Q     Do you see that?
 3      A     Yeah.
 4      Q     Okay.  So in 2000 -- so earlier than 2018 you
 5   attended harassment training that provided the compliance
 6   hotline number?
 7      A     Yes.
 8      Q     Okay.  And this training is dated 2016; is that
 9   correct?
10      A     Yes.
11            MS. KETNER:  Okay.  We will mark this next
12   document as, let's do 21 and 22.
13            THE COURT REPORTER:  20 and 21.
14            MS. KETNER:  20 and 21.
15
16    (Exhibit Numbers 20 - 21 were marked for identification)
17
18            MR. BUSBY:  Which one is 20?
19            MS. KETNER:  Reasonable Accommodation.
20   BY MS. KETNER:
21      Q     Exhibit, sorry, Exhibit 20, which is Bate stamped
22   Sanchez 00761 to Sanchez 00763, as well as Exhibit 21, which
23   is Bate stamped Sanchez 00764 to Sanchez 00765 were also
24   produced by your counsel in this case.  Have you seen these
25   documents before?
```

Page 151

```
 1      A    Yes.

 2      Q    Okay.  Where have you seen them?

 3      A    Online.

 4      Q    Okay.  Do you remember when you first received

 5  access to these policies?

 6      A    I don't remember the first time.  I know that when

 7  we have the online training they always been there.

 8      Q    Okay.  So did you know back in 2015 that Renown

 9  had an open door policy?

10      A    Yes.  At least that's what I thought, yes.

11      Q    Okay.  And you were aware that you could contact

12  your supervisor if you felt that you had to discuss a

13  concern?

14      A    Yes, but in my case there was not a choice.

15      Q    Okay.  And I want to refer you to the second page

16  of the open door policy.  Do you see -- oh, I'm sorry,

17  that's the reasonable accommodation policy.

18      A    Okay.

19      Q    Do you see the Confidential Reporting Line number

20  referenced there as well?

21      A    Yes.

22      Q    Okay.  And that's the same number that is

23  referenced on Exhibit 19; is that correct?

24      A    Yes.

25      Q    Okay.  What was your understanding of what you
```

Page 152

1   needed to do to request a reasonable accommodation?

2          MR. BUSBY:  Objection; object to the form.  Go

3   ahead.

4          THE WITNESS:  In a different world where you can

5   actually come and talk to a supervisor, you know, you bring

6   them the note, doctor's medical note.  You talk to them and

7   you know, you as a supervisor and as an employee, you know

8   the employee should have the right to talk and be listened

9   to.  In my case it was not a choice.

10  BY MS. KETNER:

11       Q   What was your understanding of what you needed to

12  do in order to request a reasonable accommodation from

13  Renown?

14          MR. BUSBY:  Object to the form.  Go ahead.  Asked

15  and answered.

16          THE WITNESS:  At that point I didn't think I could

17  talk or say anything so I just worked without -- I just come

18  to work and every time I go to the doctor I will give him

19  my, whoever the supervisor was, give them my doctor's note

20  and they would just take it from me and sometimes they don't

21  even look at it and just continue like that.

22  BY MS. KETNER:

23       Q   What supervisors did you give your doctors' notes

24  to?

25       A   When I first was injured it was to Rhonda, and

LUCERO SANCHEZ - 08/17/2022

Page 153

1   then she left and Kristin Foley got the position for

2   supervisor, so then it was her.

3        Q    Okay.  Did you ever request an accommodation from

4   human resources?

5             MR. BUSBY:  Object to the form.  Go ahead.

6             THE WITNESS:  No, because I, it was Renown and I

7   couldn't, I couldn't trust them.  I couldn't trust anybody

8   and the fact that a supervisor doesn't talk to an employee.

9   BY MS. KETNER:

10       Q    I want to refer you to Exhibit 20.  It's the

11  reasonable accommodation policy.

12       A    Uh-huh.

13       Q    Okay.  Do you see on the second page --

14       A    Uh-huh.

15       Q    -- do you see number 2 there?

16       A    Yes.

17       Q    Can you read that to me, please?

18       A    "Any applicant or employee who requires an

19  accommodation in order to perform the essential functions of

20  the job should contact Human Resources and request such an

21  accommodation.  That accommodation request can be written or

22  oral."

23       Q    In 2016 were you aware that that was the procedure

24  for requesting a reasonable accommodation at Renown?

25       A    Yes.

LUCERO SANCHEZ - 08/17/2022

Page 154
1           MS. KETNER:  Okay.  Can we take a quick break?  We

2    have been going for about an hour, okay?

3           THE WITNESS:  Okay.

4           THE VIDEOGRAPHER:  We are going off the video

5    record.  The time is 1:56.

6

7    (Whereupon a break was taken from 1:56 p.m. to 2:02 p.m.)

8

9           THE VIDEOGRAPHER:  We are back on the video

10   record.  The time is 2:02.

11   BY MS. KETNER:

12       Q    Ms. Sanchez, do you want to hand me those loose

13   papers and I will put them back together so we don't get

14   them mixed up.

15           In the meanwhile I want to refer you back to

16   Exhibit 12, which is your online learning transcript.  It's

17   the big one.  Okay.  If you -- Thank you.  Okay.  If you go

18   to the page that's Bate stamped Renown 006211, do you see

19   the number is on the, yeah, it's kind of sideways.

20       A    21?

21       Q    6211.  Okay.  Do you see the first entry that says

22   2018 Renown Health Education:  Chain of Command?

23       A    Yes.

24       Q    Okay.  Do you recall taking an online training

25   class about the chain of command at Renown?

LUCERO SANCHEZ - 08/17/2022

Page 155

1      A    Yes.

**2      Q    What do you recall learning in that class?**

3      A    So you go first, if something is happening, you go

4    first to your supervisor.  If nothing happens with your

5    supervisor you go to the manager, and if nothing happens

6    you, you know, keep going up to the director until you

7    actually go to Human Resources.

**8      Q    Okay.  In 2016 I think you testified your**

**9    supervisors were Rhonda Tu and Kristin Foley?**

10     A    Yes.  So Rhonda was the, she got the position

11   after German left and then she quit, and I think she

12   transferred in 2016 and then Kristin became the supervisor.

**13     Q    Okay.  Who would you consider your manager during**

**14   that time period in terms of the chain of command?**

15     A    That time it was Justin Bart, the manager.

**16     Q    Okay.  I want to refer you to the same exhibit,**

**17   Exhibit 12, your OLA transcript, to the document Bate**

**18   stamped 6245.**

19     A    Okay.

**20     Q    Okay.  Do you see about two-thirds of the way down**

**21   there is a class called Workers Compensation?**

22     A    Yes.

**23     Q    Do you recall taking that class?**

24     A    Yes.

**25     Q    Do you -- what do you recall learning during that**

Page 156

1    class?

2        A    You learn about protecting yourself at work with,

3    you know, having accidents and all that and I don't remember

4    the whole thing of the policies.

5        Q    Okay.

6        A    I mean, I have to look at them to, especially with

7    my, I have trouble remembering everything in there.

8        Q    Yeah, and it was --

9        A    It was --

10       Q    And it was a long time ago, so I understand.  If

11   you can turn a couple more pages to the document Bate

12   stamped Renown 006247.

13       A    Okay.

14       Q    Okay.  Do you see the very last entry identifies a

15   training class entitled 2013 Renown Health:  Lifting and

16   Protecting the Back?

17       A    Yes.

18       Q    Oh, I guess it's the second to last entry.  Do you

19   recall taking that online class?

20       A    Yes.

21       Q    What do you recall learning in that class?

22       A    It, it basically tells you how to, how do you lift

23   things up from, from the floor and how to, your posture for

24   your back so you don't get hurt and stuff like that.

25       Q    Did it say what to do if there was something that

LUCERO SANCHEZ - 08/17/2022

Page 157

1  you felt was too heavy to lift?

2      A    I don't remember.  I know there is, but I don't

3  remember.

4      Q    **Did you ever receive training or instruction from**

5  **Renown?**

6      A    Personally, in person, I mean like just online.

7      Q    **Okay.  So did anyone from Renown ever tell you**

8  **that if you felt that something was too heavy don't lift it?**

9      A    Yes.

10     Q    **Okay.  Who do you think told you that?**

11     A    I don't know.  I think it's -- nobody has told me

12  that.  I think I read that on the online --

13     Q    **Did it --**

14     A    -- class.

15     Q    **Did the online class tell you what to do if you**

16  **felt something was too heavy and you weren't going to lift**

17  **it, what did you do, what were you supposed to do next?**

18  **What did they tell you to do next?**

19     A    I do not remember.

20          MS. KETNER:  Okay.  Let's see, we will mark next

21  the Charge of Discrimination in this case.

22

23          (Exhibit Number 22 was marked for identification.)

24  BY MS. KETNER:

25     Q    **Ms. Sanchez, do you recognize what we have marked**

LUCERO SANCHEZ – 08/17/2022

Page 158

1  as Exhibit 22, which is Bate stamped Sanchez 000890 to

2  Sanchez 000891?

3      A    Yes.

4      Q    Okay.  What is it?

5      A    This is a Charge of Discrimination.  This is when

6  I put a complaint in with the State of Nevada.

7      Q    Okay.  Is that your signature on the bottom left

8  corner?

9      A    Yes.

10     Q    Okay.  And you signed this under penalty of

11  perjury that the above was true and correct?

12     A    Yes.

13     Q    Okay.  You allege in here that, it's on the second

14  page, "In the summer of," it states, "In the summer of 2016

15  I suffered a workplace injury which resulted in my care

16  provider requesting that I be placed on light duty and I was

17  not lift, I was not to lift more than 10 pounds.  However,

18  the Respondent continuously required that I work outside my

19  restrictions from the summer of 2016 to the fall of 2017."

20  Do you see that?

21     A    Yes.

22     Q    Okay.  When do you believe your provider placed

23  you on light duty and restricted you from lifting more than

24  10 pounds?

25          MR. BUSBY:  Objection; object to the form.  Go

Page 236

1      Q    How did they rate your performance?  Was it a

2    positive or a negative evaluation?

3      A    I don't know how they rate it.  They put all kinds

4    of numbers in there.  They, I think it's by numbers, and I

5    think Rhonda gave me one that was not so good, too, so it

6    totally changed my evals with Rhonda and the one that

7    Kristin Foley gave me.

8      Q    Okay.  Do you recall when Christina Vargas was

9    fired?

10     A    I think it was May of 2017, I think.  I'm not

11   sure.

12          (Exhibit Number 50 was marked for identification.)

13

14   BY MS. KETNER:

15     Q    Do you recognize Exhibit 50, which is Bate stamped

16   Renown 000768 to Renown 000775?

17     A    Yes.

18     Q    Okay.  What is it?

19     A    It's an eval, evaluation.

20     Q    And this appears to be your annual evaluation when

21   you held the food services cashier position?

22     A    Yes.

23     Q    Okay.  And the first rating is an exceeds

24   expectations, correct?

25     A    Yes.

Page 237

1      Q      And the second for integrity is exceeds

2   expectations, correct?

3      A      Yes.

4      Q      The third rating for collaboration is exceeds

5   expectations, correct?

6      A      Yes.

7      Q      The fourth for excellence is exceeds expectations,

8   correct?

9      A      Yes.

10      Q      Okay.  So would you consider that to be a positive

11   or a negative performance evaluation?

12      A      This is a positive.

13      Q      Okay.  And that evaluation was completed by

14   Kristin Foley, correct?  It's the very last page.

15      A      Yeah.  So they have that they, my eval was on

16   3/16/17 and I did not get it until the end of July.  I guess

17   she was, she waited.  She told me she didn't give me my eval

18   because she wanted to give me a true and correct eval.  I

19   guess meaning that if Christina Vargas was still there, she

20   would have gave me a negative one.

21      Q      Did Kristin Foley tell you that if

22   Christina Vargas was still there you would have gotten a

23   negative one?

24      A      She just told me she waited, she waited so she can

25   see my performance.  She waited all those months so she can

Page 238

1   see my performance.

2      Q    Okay.  Because Kristin was a new supervisor,

3   correct?

4      A    Yes.

5      Q    Okay.  And Justin Bart signed this evaluation as

6   well, correct?

7      A    Yes.

8      Q    Okay.  Tell me -- going back to exhibit, your

9   diary, do you recall now any incidents with Justin Bart that

10  you allege constitute discrimination or harassment that are

11  not included in those diary entries?

12          MR. BUSBY:  I'm going to object to the form.

13  Go ahead.

14          THE WITNESS:  I don't see him.  I stopped seeing

15  him, so I haven't had any interaction with him, so I don't.

16  BY MS. KETNER:

17     Q    Okay.  So you wouldn't have had any interaction

18  with Justin Bart since November, October or November

19  of 2017?

20     A    Oh, you're -- sorry, I thought right now.  No, it

21  was just all the harassment that they, you know, with, did

22  with the key and all of the --

23     Q    In your handwritten diary entries --

24     A    I just don't remember.  It's a lot and it's a long

25  time, so going back to everything is --

Page 239

1      Q    Yes, I understand.

2           Does anyone know what exhibit the handwritten

3  diary entries are?

4           MR. BUSBY:  14.

5           MS. KETNER:  14.

6  BY MS. KETNER:

7      Q    Okay.  If you could page through there and let me

8  know if there are any additional incidents of harassment or

9  discrimination by Kristin Foley, Christina Vargas or

10  Justin Bart that are not included in your handwritten diary

11  entries?

12           MR. BUSBY:  Object to the form.  Go ahead.

13           THE WITNESS:  I don't recall.  I don't --

14  BY MS. KETNER:

15      Q    There is nothing that you can recall today that's

16  an example of alleged harassment or discrimination by any

17  employee of Renown that's not included in your diary entry

18  of Exhibit 14?

19           MR. BUSBY:  Same objection.  Go ahead.

20           THE WITNESS:  I don't recall at this moment.

21  BY MS. KETNER:

22      Q    Okay.  Now, after your work-related injury there

23  were periods of time that you were unable to work as a

24  result of that knee injury, correct?

25      A    Yes.

LUCERO SANCHEZ – 08/17/2022

Page 240

```
1       Q    And you received payment of either temporary total

2   disability benefits or temporary partial disability

3   benefits, correct?

4       A    Yes.

5       Q    Okay.  So when you were unable to work after the

6   January 13th, 2017, knee injury, did you receive payment of

7   worker's comp benefits during that time period that you were

8   unable to work?

9       A    Yes.

10      Q    Okay.  And were there other times that you were

11  unable to work that you received temporary total disability

12  benefits?

13      A    I think so, yes.

14           MS. KETNER:  Okay.  I will hand you what we will

15  mark as Exhibit --

16           THE COURT REPORTER:  51.

17

18           (Exhibit Number 51 was marked for identification.)

19

20  BY MS. KETNER

21      Q    Do you recognize the document that we've marked as

22  Exhibit 51, which is Bate stamped Sanchez 000786 to Sanchez

23  000787?

24      A    Yes.

25      Q    What is it?
```

Page 241

1     A    So when I got demoted, they cut my hourly pay by

2    over $2.  I think it was $2.40 something cents.  And when I

3    was going home early, you know, when I had the restrictions

4    of going home early, I was paid with my own time, vacation

5    time and sick time from my bank, so they were adjusting to

6    bring my pay back to what I was making as a coordinator and

7    they were paying, adjusting for all of the vacation time and

8    sick time that had been used to cover my time off that I had

9    used from my vacation time and sick time.

10    **Q    Did Renown adjust that and reimburse you for that**

11   **time?**

12    A    Yes.

13    **Q    Okay.  So you have received payments.  Do you**

14   **believe that you received all payments that were due to you**

15   **for the worker's comp claim?**

16    A    Yes.  It was a lot, I mean, at this point, yes, it

17   was a lot for me to go back and calculate, you know, and

18   then having HR calculating, so this is what they came up so

19   that's what I took, yes.

20    **Q    Okay.  And in this case you've produced some**

21   **documents related to a thumb injury that you sustained in**

22   **2015?**

23    A    Yes.

24    **Q    Did you ever file a Charge of Discrimination**

25   **related to the thumb injury?**

Page 254

1    I have to make an appointment back to Dr. Shukla.

2        **Q    Okay.  Is there any reason why you didn't go to**

3    **Dr. Shukla for the other, for the second surgery?**

4        A    I didn't feel confident anymore, because it took

5    so long to get my tendons repaired or to even find out that

6    my tendons were torn, so I just decided to go to Dr. Ries.

7        **Q    Okay.  And those surgeries were for your right**

8    **knee, correct?**

9        A    Yes.

10       **Q    Okay.  Do you have any plans to seek any surgical**

11   **treatment or intervention for your left knee?**

12       A    Not at this moment.

13       **Q    How does your left knee currently feel?**

14       A    It's painful, but with my history I would not do

15   another surgery on the other knee.

16       **Q    Okay.  Are there any incidents of discrimination,**

17   **harassment or retaliation that you can think of right now**

18   **against Renown that you are alleging were committed by**

19   **Renown's employees that we haven't previously discussed**

20   **today?**

21       A    No.

22            MS. KETNER:  Okay.  Those are all the questions

23   that I have.

24            MR. BUSBY:  Okay.  I just have a couple follow-up

25   questions.

Page 261

1   as the paperwork I showed you in Exhibit 41 after you

2   received it from Dr. Sobiek's office?

3       A    I would go to work and hand it out to Rhonda or

4   Foley.

5       Q    Okay.  Would you discuss the contents of the

6   paperwork with Rhonda or Foley?

7       A    No.

8       Q    Okay.  Did they --

9       A    There was no room for me to talk to them.

10      Q    Okay.  Did they ever discuss receiving the

11  paperwork with you?

12      A    No.

13      Q    Okay.  All right.  So you are still treating,

14  having treatments done on your right knee, right?

15      A    Yes.

16      Q    Okay.  How does your right knee feel right now?

17      A    It's really painful.  I --

18      Q    Okay.

19      A    -- have no range of motion.  It's really difficult

20  to walk.

21      Q    Okay.  Okay.

22      A    And this is my knee right now.

23      Q    Okay.  So you were asked some questions about knee

24  issues that you had before the July 26th, 27th, 2016 injury

25  you sustained at Renown.  Do you recall those questions?

Page 264

```
 1      Q    Okay.  Did you have difficulty walking back then?

 2      A    No.

 3      Q    Okay.  You didn't have difficulty walking after

 4   your injury?

 5           MS. KETNER:  Objection; leading.

 6           THE WITNESS:  After my injury?

 7   BY MR. BUSBY:

 8      Q    Yes.

 9      A    No.

10      Q    Okay.  When did you start having difficulty

11   walking?

12      A    I had difficulty after my injury.

13      Q    Okay.

14      A    That's when I started having all of my

15   difficulties.

16      Q    Okay.  So do you feel like your working

17   conditions -- or what happened to your working environment

18   after you started to complain about your injuries to your

19   knees?

20           MS. KETNER:  Object to form.

21           THE WITNESS:  I don't know what happened, but the

22   only thing I know is that they made me or tell me to do all

23   this work that is not in, it was not in my job description.

24   BY MR. BUSBY:

25      Q    Okay.  Why do you think they were asking you to do
```

Page 265

1   that kind of work?

2          MS. KETNER:  Object to form.

3          THE WITNESS:  They were doing it in the form of

4   humiliation towards me.

5   BY MR. BUSBY:

6      Q    Okay.  Why do you think that was occurring?

7      A    I think that was occurring because for some reason

8   I was paying for if Kathy West did something wrong or German

9   did something wrong, I was the only one left there to, to

10  treat the way they treated me.

11     Q    Okay.

12     A    I think they were kind of like payback --

13     Q    Okay.

14     A    -- for something.

15     Q    For what?

16     A    For whatever German and Kathy did.

17     Q    Okay.  And what do you think German and Kathy did?

18     A    I didn't think they did anything.  I think they

19  were like great employees.  Kathy worked for Renown for many

20  years and, and she was a great manager.

21         German worked for South Meadows.  He came in as a

22  temp and made, made his way up to supervisor and was a

23  really good cook and chef.  And he made, he made all of

24  these things happen to South Meadows, you know, like run the

25  whole department with only one budget making sure that all

LUCERO SANCHEZ - 08/17/2022

Page 268

```
 1   STATE OF NEVADA    )
                        )  ss.
 2   WASHOE COUNTY      )

 3            I, CORRIE L. WOLDEN, a Certified Shorthand

 4   Reporter in and for the County of Washoe, State of Nevada,

 5   do hereby certify; That on WEDNESDAY, AUGUST 17, 2022, at

 6   the hour of 9:00 A.M. of said day, at 690 Sierra Rose Dr.,

 7   Reno, Nevada, personally appeared LUCERO SANCHEZ, who was

 8   duly sworn by me to testify the truth, the whole truth and

 9   nothing but the truth, and thereupon was deposed in the

10   matter entitled herein;

11            That I am not a relative, employee or independent

12   contractor of counsel to any of the parties; or a relative,

13   employee or independent contractor of the parties involved

14   in the proceeding, or a person financially interested in the

15   proceeding;

16            That said deposition was taken in verbatim

17   stenotype notes by me, and thereafter transcribed into

18   typewriting as herein appears; That the foregoing

19   transcript, consisting of pages 1 through 268, is a full,

20   true and correct transcription of my stenotype notes of said

21   deposition.

22            DATED:  At Reno, Nevada, this 31st day of August,

23   2022.

24            _____
              CORRIE L. WOLDEN, CSR #194, RPR, CP
25
```