# EXHIBIT G

# EXHIBIT G

```
 1                    UNITED STATES DISTRICT COURT

 2                 IN AND FOR THE DISTRICT OF NEVADA

 3

 4

 5

 6  LUCERO SANCHEZ,                       )

 7          Plaintiff,                    )

 8     vs.                                ) Case No.: 3:21-cv-00352-MMD-WGC

 9  RENOWN HEALTH, a Nevada Non-Profit    )

10  Corporation, and DOES 1-20, inclusive,)

11          Defendant.                    )

12  _____ )

13

14

15

16

17            RECORDED DEPOSITION OF JESSI COHEN

18                 Taken on September 14, 2022

19                      At 8:55 a.m.

20                750 Sandhill Road, Suite 120

21                    Reno, Nevada 89521

22

23

24

25
```

```
 1  deposition of Ms. Oetjen.  I'm sorry.
 2       A.   Oetjen?  Yes.
 3       Q.   Oetjen.  Sorry, I'm mispronouncing it.
 4       A.   Everyone does.
 5       Q.   Oetjen.  Do you recall that deposition?
 6       A.   Yes.
 7       Q.   Okay.  Do you recall my asking Ms. Oetjen
 8  questions about when she received complaints about Ms.
 9  Vargas?
10       A.   Yes.
11       Q.   Okay.  Did you receive any complaints about
12  Ms. Vargas during the 2014-2015 time frame?
13            MS. KETNER:  Object to form.
14            THE WITNESS:  Yes.
15  BY MR. BUSBY:
16       Q.   Okay.  From whom?
17       A.   I don't recall names or individuals
18  specifically.  I do know that some of the clinical
19  dieticians had escalated some concerns, various Food
20  and Nutrition support staff, so I mean, it could have
21  been dietary aids or, you know, Cokes.  I -- I -- I
22  don't remember their exact titles, but I do know people
23  had escalated some concerns.
24       Q.   Okay.  Do you recall the nature of those
25  concerns?
```

Page 11

1    A.   Specific details, no, but essentially that
2 there were concerns with Ms. Vargas's approach and kind
3 of just her communication style and her not being
4 overly friendly.
5    Q.   Okay.  Did you receive a report from Kathy
6 West that Ms. Vargas stated, "I hate fucking
7 Mexicans."?
8    A.   I did not.  So initially when I first
9 supported Food and Nutrition Services, this is the best
10 of my recollection, I was over Food and Nutrition at
11 Renown Regional Medical Center, supported that area.
12 There were other business partners that supported South
13 Meadows Rehab, things of that nature.  So Kathy was
14 over those other areas and so she would have worked
15 with her business partner, but that was -- that was not
16 me, so that did not come to me.
17    Q.   Okay, I'd like to show you what I'd like to
18 be marked as Exhibit number 1.  Okay.  Ms. Cohen, I'd
19 like to direct your attention to Paragraphs 10, 11 and
20 12.  Ms. Cohen, tell me when you're ready.
21    A.   Okay.
22    Q.   Do you see there where Ms. West states in the
23 Affidavit in Exhibit 1 that she said she made a
24 complaint to you in or around November of '14 about
25 Christine Vargas's behavior --

Page 15

```
 1      Q.   Okay.  Do you recall whether there was any
 2   discussion about my client at that meeting, Ms.
 3   Sanchez?
 4      A.   I believe -- I'm trying to think, hold on.  I
 5   honestly -- in that meeting, I can't recall if we
 6   discussed anything about her in that meeting.  I think
 7   we met with him a couple of times.  If I remember
 8   correctly, I think we met with him about the concerns
 9   suspended pending investigation, and then -- but -- and
10   then would have concluded our investigation, then met
11   with him again, so I can't recall exactly if we talked
12   about that.
13      Q.   Okay.  By your investigation, you mean your
14   investigation into Mr. -- the allegations against Mr.
15   --
16      A.   Herman.  Yeah.
17      Q.   -- Pineda, related to that there was a
18   discrepancy in the amount of food that was being
19   ordered [inaudible].
20      A.   So is that, and then also his treatment of
21   his employees.
22      Q.   Okay.
23      A.   So both of those things were -- were being
24   addressed.
25      Q.   Okay.  Did any of the reports you received
```

Page 16

 1  about Ms. Vargas allege that she acted with hostility

 2  towards her employees?

 3              MS. KETNER:  Object to form.

 4              THE WITNESS:  Yes.

 5  BY MR. BUSBY:

 6       Q.   Okay.  Can you describe, you know, just in

 7  general, why that's the case, how she was hostile

 8  towards her employees?

 9              MS. KETNER:  Object to form.

10              THE WITNESS:  Like I said earlier, it was

11  just her communication style, her approach.  I would

12  say that she was described as very forward, which is

13  fine, but done so in a way that came off as, I would

14  say, rude and condescending, and it was she kind of

15  treated and did that to all.  I mean, it wasn't -- that

16  was just kind of her personality, what we learned.

17  BY MR. BUSBY:

18       Q.   Did you ever hear that -- are you aware that

19  Ms. -- Mr. Pineda alleged that Ms. Vargas said that

20  Mexicans were lazy?

21       A.   No.

22       Q.   Are -- are you aware that Mr. Pineda reported

23  that Ms. Vargas said my client was lazy?

24       A.   Not that I can recall, no.

25       Q.   Okay.  All right.  I'm going to go ahead and

1     Q.   Okay.  All right.  Okay.  So can you tell me
2  about your knowledge of what an FNS coordinator
3  Renown's duties were?
4     A.   They would be responsible for catering
5  events, setting up the room, the food, things of that
6  nature, anything that would be involved with that.  I
7  know that they also regularly would assist in
8  cashiering, helping out in that area.
9     Q.   Okay.  Did the FNS coordinator have an
10 office?
11    A.   I -- I later did find out that she held an
12 office, but to my understanding, I don't think it would
13 require the individual to have their own office, but I
14 did find out that she had one.
15    Q.   And by "she" you mean my client?
16    A.   Yes.  Sorry.
17    Q.   Ms. Sanchez?
18    A.   Yeah.  Sorry.
19    Q.   No problem.  Are you aware of whether the FNS
20 coordinator generated financial reports and menus,
21 things of that sort?
22    A.   Yes.  I mean, they would -- aware that they
23 would be involved in the process.  What their exact
24 role in it would be, I'm not sure.
25    Q.   Okay.  Do you think it's fair to describe the

Page 27

1  only becomes involved in that if there's some sort of
2  collateral HR issue that comes up during the workers'
3  comp process.  Is that fair?
4      A.   Yes.
5      Q.   Okay.  All right.  I'm trying to figure out
6  where -- oh, thank you.  So are you aware of whether
7  Kristen Foley or Rhonda Tu ever told Sanchez that she
8  -- that Renown would not comply with the restrictions
9  that Sanchez's doctor placed on her because of staffing
10 issues?
11           MS. KETNER:  Object to form.
12           THE WITNESS:  Because of staffing issues?
13 BY MR. BUSBY:
14      Q.   Yeah.
15      A.   No.
16      Q.   Okay.  How about for any other reason?
17      A.   To my knowledge, towards the end of her
18 moving from FNS to the unit clerk position, I believe
19 that was done because the restrictions that were put in
20 place at that time were not able to be accommodated in
21 a food and nutrition service environment.
22      Q.   Okay.  What was your understanding as to why
23 that was the case?
24      A.   If I remember correctly, I think it required
25 her to be immobile 75 percent of the time or something

 1  like that, and that would not -- that work environment

 2  is not like a desk job, so it requires frequent, you

 3  know, walking around, moving, whatnot.  And so if I

 4  recall, I think that that is the reason why.

 5       Q.   Okay.  I request that this be marked as

 6  Exhibit 3.  Ms. Cohen, have you seen this document

 7  before?

 8       A.   Yep, I created it.

 9       Q.   Okay.  So -- and do you think it's -- well,

10  can you describe what it is?

11       A.   This is called a Personnel Action Form, and

12  so anytime there's change in employment, whether it be

13  actually leaving the organization, change in pay,

14  change in position, change in like FTE status, anything

15  like that, we would complete this form.

16       Q.   Okay.  Do you see at the top where it says,

17  "Transaction Type Compensation Changes."?  Over here.

18       A.   Oh, sorry.

19       Q.   Okay.

20       A.   Yes, I do see that.

21       Q.   Okay.  And do you see under the job

22  information box where it says her previous job, "FNS

23  coordinator", new job, "FNS services cashier."?

24       A.   I do.

25       Q.   Okay.  When you just described before that it

```
 1  Renown typically interview the person against whom the
 2  accusation is made?
 3       A.   Yeah.
 4       Q.   Okay.  All right.  Were you aware of whether
 5  or not my client's workers' comp claim was still open
 6  at the time that there was a change in her position and
 7  pay, as indicated in Exhibit 3?
 8       A.   It was my understanding it was closed and she
 9  was released to full duty.
10       Q.   Okay.  Is that your understanding now?
11       A.   Not now.  I realize that it was still -- it
12  was still going.
13       Q.   Okay.  So at the time you did this --
14       A.   Uh-huh.
15       Q.   -- you believed the workers' compensation
16  claim was closed.
17       A.   And she was released to full duty, yes.
18       Q.   Okay, meaning she no longer had any injury.
19       A.   No longer had any restrictions.
20       Q.   Had, okay, any restrictions that were placed
21  on her by her doctor?
22       A.   Correct.
23       Q.   Okay.  Okay.  Did you have any personal
24  knowledge of -- of whether my client was still injured
25  or not?
```

```
 1  meeting occurred?
 2      A.   I do not.
 3      Q.   Okay.  Do you recall whether anybody took
 4  notes?
 5      A.   I do not.
 6      Q.   Okay.  Does it -- would it have been your
 7  standard of routine or practice to take notes at such a
 8  meeting?
 9      A.   This type of a meeting, I believe, would be
10  more owned and focused by workers' comp.
11      Q.   Okay.
12      A.   So I would imagine that notes or things of
13  that nature would have been, you know, taken by Shawn,
14  if there was any.
15      Q.   Okay.  So you're not aware or just --
16      A.   I'm not aware.
17      Q.   Okay.  So you're -- you're not aware if any
18  notes were taken, but you believe if notes exist, Shawn
19  Lavac would've been the person to take those notes?
20      A.   I did not take notes during this meeting.
21      Q.   Okay.  But you believe it's possible that
22  Shawn Lavac did?
23      A.   I can't speak to what she did.
24      Q.   Okay.  Do you recall the nature of the
25  meeting?
```

Page 38

1    A.    I believe it was to discuss the fact that we
2 had changed her pay --
3    **Q.    Okay.**
4    A.    -- while there was still an open workers'
5 comp claim, which I'm not aware of, and that to discuss
6 the information she had learned from this seminar and
7 what we were going to do to correct it and make it
8 right.
9    **Q.    Okay. And what did you guys do to make --**
10 **correct it and make it right?**
11    A.    I believe we offered her back pay --
12    **Q.    Okay.**
13    A.    -- based on the amount that she was at, what
14 is it, the $16.95 from the time that the workers' comp
15 claim was opened, that we provided her back pay.
16    **Q.    Did you also bump her -- her current pay rate**
17 **up to that level?**
18    A.    I don't recall.
19    **Q.    Okay. And this occurred -- the meeting**
20 **occurred presumably sometime after August 31st, which**
21 **is the date of this e-mail, correct?**
22    A.    Correct.
23    **Q.    So -- and that's eight paid or so months**
24 **after this pay cut and job change, right?**
25    A.    Correct.

Page 43

1  A.  Okay.  Yes, I do.

2  Q.  Okay.  Do you recall earlier when we were

3  discussing the conclusions made in the confidential

4  report in Exhibit 2?

5  A.  I recall that exhibit, yes.

6  Q.  Do you recall where it states that, "Multiple

7  witnesses from FNS staff will confirm that vocal

8  outbursts, use of unprofessional and/or condescending

9  language by Ms. Vargas was common."?

10  A.  I do.

11  Q.  Okay.  All right.  So when we look at the

12  definition in Exhibit 6 of harassment, do you -- are --

13  was there any discussion that you recall of whether Ms.

14  Vargas' conduct, as described in the confidential

15  report, met the definition of harassment according to

16  Renown's policy in Exhibit 6?

17        MS. KETNER:  Object to form.

18        THE WITNESS:  I believe that her behavior

19  definitely did not create a welcomed work environment.

20  Each thing reported, I would not have defined it as

21  harassment.  I more defined it as inappropriate

22  communication that was, you know, could come off as

23  offensive, rude, kind of really rough around the edges

24  is, I guess, a good way to put it.

25  BY MR. BUSBY:

 1        THE WITNESS:  Okay.

 2        MR. BUSBY:  -- thank you so much.

 3   CROSS EXAMINATION

 4   BY MS. KETNER:

 5        Q.   I have a couple follow-up questions, okay?

 6   Ms. Cohen, you testified that you received reports

 7   about concerns of Ms. Vargas's conduct.

 8        A.   Uh-huh.

 9        Q.   Did any of those allegations brought forward

10   by employees relate to any employee's race?

11        A.   No.

12        Q.   Did any of the allegations regarding concerns

13   of Ms. Vargas's conduct relate to any employee's

14   national origin?

15        A.   No.

16        Q.   Did any of the allegations brought forward

17   regarding concerns of Ms. Vargas's conduct relate to

18   any employee's disability?

19        A.   No.

20        Q.   Did any allegations related to concerns about

21   Ms. Vargas's conduct relate to any employee's

22   membership in any protected class?

23        A.   No.

24        Q.   You testified that you had a conversation

25   with Eric Olson about Ms. Vargas's behavior at work.

 1  Is that yes?
 2      A.   Yes.  I'm sorry.
 3      Q.   Okay.  Were -- the conversations that you had
 4  with Mr. Olson, were they by e-mail or in person or by
 5  some other method of communication?
 6      A.   We would have discussed this level in person.
 7      Q.   When you say, "We," who do you mean?
 8      A.   Suzanne.  Suzanne and/or I.
 9      Q.   Okay.
10      A.   Yes.
11      Q.   So you're referring to Suzanne Oetjen?
12      A.   Correct.
13      Q.   Okay.  You also testified that you had
14  discussions with Ms. Sanchez's leaders about the
15  placement of a chair behind the cashier register.
16      A.   Uh-huh.
17      Q.   Is that yes?
18      A.   Yes.
19      Q.   Okay.  Were those discussions with leaders in
20  person, by e-mail, over the phone, or by some other
21  method of communication?
22      A.   It most likely would have been in person or
23  over the phone.
24      Q.   Okay.  You also testified that the FNS
25  coordinator position was an administrative position,

Page 50

1  an administrative task?

2      A.   Both.  I think ordering the food, getting it
3  ready, knowing the count, how many supplies, would be
4  administrative.  I think actually setting up the room,
5  getting the food ready, delivering it, that would be
6  physical.

7      Q.   Okay.  So if you had to attribute a
8  percentage to the administrative piece of it and
9  attribute a percentage to the physical piece of it,
10 including the cashier -- oh actually, just to talk
11 about the catering piece of it, --

12     A.   Uh-huh.

13     Q.   -- which percentage was administrative and
14 which percentage was physical?

15     A.   I honestly don't know if I -- if I know it
16 well enough to give that assessment.

17     Q.   Who in the FNS department would know the
18 position at that time well enough to provide an
19 assessment regarding the percentage of administrative
20 tasks versus the percentage of more physical tasks?

21     A.   I think Justin Bart.

22          MS. KETNER:  Okay.  Those are all the
23 questions that I have.

24          DEPOSITION OFFICER:  Do you have anything
25 further?

Page 52

```
 1                    CERTIFICATE OF RECORDER

 2   STATE OF NEVADA      )

 3                        )

 4                        )

 5

 6   NAME OF CASE: LUCERO SANCHEZ, PLAINTIFF VS

 7   RENOWN HEALTH, DEFENDANT

 8

 9        I, Rachael Brown, a duly commissioned Notary Public,

10   authorized to administer oaths or affirmations in the State of

11   Nevada, do hereby certify: That I recorded the foregoing

12   deposition of the witness, Jessi Cohen on September 14, 2022.

13        That prior to being examined, the witness was duly sworn to

14   testify to the truth. That deposition was recorded via audio and

15   video pursuant to NRCP30(b)(3) and said deposition recording is a

16   complete, true, and accurate recording of deposition testimony.

17   A transcript was created by E-Depositions LLC to aid the audio video

18   recording. A review of the deposition [ ] was [X] was not

19   requested by the deponent and [ ] was [X] was not requested by a

20   party of the action. If a review was requested, any changes

21   communicated to me by the deponent during the period allowed are

22   appended hereto.

23        I further certify that I am not a relative or employee of

24   an attorney or counsel of any of the parties, nor a relative or

25   employee of an attorney or counsel involved in said action, nor
```

Page 53

1  a person financially interested in the action.

2      IN WITNESS WHEREOF, I have hereunto set my hand in the City

3  of Reno.

4

5  *[signature: Rachael Brown]*

6

7  Rachael Brown

8  Notary Public

9  Appointment No. 22-1620-02

10