# EXHIBIT H

# EXHIBIT H

```
 1                    UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF NEVADA

 3

 4

 5

 6  LUCERO SANCHEZ,                    )

 7          Plaintiff,                 )

 8      vs.                            ) Case No.: 3:21-cv-00352-MMD-WGC

 9  RENOWN HEALTH, a Nevada Non-Profit )

10  Corporation, and DOES 1-20, inclusive,  )

11          Defendant.                 )

12_____  )

13

14

15

16

17            RECORDED DEPOSITION OF SUZANNE OETJEN

18               Taken on September 12, 2022

19                    At 9:36 a.m.

20              750 Sandhill Road, Suite 120

21                  Reno, Nevada 89521

22

23

24

25
```

LUCERO SANCHEZ vs RENOWN HEALTH
OETJEN, SUZANNE on 09/12/2022                                              Page 15

Page 15

 1        Q.   Okay.  Do you recall who made a complaint

 2   about Ms. Vargas?

 3        A.   I don't recall who.

 4        Q.   No.  Okay.  Do you recall what the complaint

 5   was about?

 6        A.   I recall that they've felt that Christina was

 7   unkind and just not a very nice leader.

 8        Q.   Okay.  So that was the first complaint you

 9   received about her?

10             MS. KETNER:  Object to -- object to form.

11             THE WITNESS:  I -- I can't recall.  That's

12   what I remember.

13   BY MR. BUSBY:

14        Q.   Okay.  Did you ever receive any complaints

15   about Ms. Vargas from my client?

16             MS. KETNER:  Object to form.

17             THE WITNESS:  Yes.  I received a concern from

18   your client about Ms. Vargas.

19   BY MR. BUSBY:

20        Q.   Do you recall approximately when you received

21   that?

22        A.   It was about 2015, I believe.

23        Q.   Do you recall what the substance of her

24   complaint was?

25             MS. KETNER:  Object to form.

Page 16

```
 1              THE WITNESS:  She was concerned because we

 2   had to terminate a leader at South Meadows and

 3   Christina was working to get the situation under

 4   control at South Meadows following the leader's

 5   departure, and she felt that she was not kind to Lucero

 6   in her interactions.

 7   BY MR. BUSBY:

 8       Q.   Do you recall the specific facts my client

 9   conveyed to you about the complaint?

10       A.   From what I can recall, she was concerned

11   about how she requested her keys to the office.

12       Q.   Okay.  Did -- do you recall whether my client

13   described any physical contact between Ms. Vargas and

14   my client?

15       A.   I believe she said something about pointing

16   to her hand about her getting the keys back.

17       Q.   Okay.  Did my client convey to you that she

18   felt intimidated by Ms. Vargas?

19       A.   I believe she -- she's -- I don't know if she

20   used the word intimidated, but that she did not feel

21   how she interacted with her was appropriate.

22       Q.   So it was -- is it fair to say it was your

23   impression that my client conveyed to you in some

24   manner that she felt intimidated by Ms. Vargas?

25       A.   I believe so, yes.
```

LUCERO SANCHEZ vs RENOWN HEALTH
OETJEN, SUZANNE on 09/12/2022

1   it states that after reporting the incident to Jessi

2   Russell, Ms. West reported it to you?

3       A.   Yes.

4       Q.   Do you recall that she did that?

5       A.   No, I don't recall that.

6       Q.   Okay.  Did you ever discuss any issues with

7   Kathy West about Christina Vargas?

8       A.   I don't recall specifically ever talking to

9   Kathy.

10      Q.   Okay.  So what did you do in response to my

11  client's complaint about Ms. Vargas with the key

12  incident at hand?

13           MS. KETNER:  Object to form.

14           THE WITNESS:  So it was a very complicated

15  situation.  Upon her mom's departure, we did need the

16  keys to the office and so I asked that Lucero provide

17  Christina Vargas keys to the office so that we could

18  continue operations and Food Nutrition Services.  I

19  did, from my recollection, did follow up with Christina

20  regarding how she -- how her behavior made Lucero feel

21  and -- and she -- and asked that she maintain

22  professional behaviors toward her employees.

23  BY MR. BUSBY:

24      Q.   Okay.  Did you create a written record of

25  Lucero's complaint?

Page 22

1   made these complaints against Ms. Vargas?

2           MS. KETNER:  Object to form.

3           THE WITNESS:  They -- I had some concerns

4   escalated to me from clinical dieticians and then what

5   we now call Food Service Workers or some of the

6   frontline employees.

7   BY MR. BUSBY:

8       Q.   How would clinical dietician work with Ms.

9   Vargas?

10      A.   She oversaw the full department, so our

11  dietician would report through her.

12      Q.   Okay.  So if Ms. Vargas oversaw the FNS

13  Department as well as this other department?

14      A.   Yes.

15      Q.   Right?  Okay.  Okay, did these two

16  departments interact?

17      A.   Yes.

18      Q.   Okay.

19      A.   Frequently.

20      Q.   So the dietician would request meals, I

21  assume, for patients from the FNS Department.

22      A.   Yes.

23      Q.   The FNS Department would prepare them.

24      A.   Yes.

25      Q.   So all right, do you recall the nature of the

Page 23

1   complaints that were made against Ms. Vargas by the

2   dieticians?

3           MS. KETNER:   Object to form.

4           THE WITNESS:   The complaints were that she

5   was not a nice boss.  She was mean.  She did not treat

6   them nicely.

7   BY MR. BUSBY:

8       Q.   Did you ever receive any complaints of any

9   sort where there was any indication that there was a

10  racial component to any of the complaints made against

11  Ms. Vargas?

12      A.   Not that I can recall, no.

13      Q.   Okay.  All right, do you have a centralized

14  file, investigatory file of all these incidents against

15  Ms. Vargas or are there multiple investigatory files?

16      A.   In this case, I did a centralized file on Ms.

17  Vargas.

18      Q.   Okay.  Does Renown still have that file?

19      A.   I believe so, yes.

20      Q.   Okay.  All right.  Do you recall when or if

21  Renown started to do the investigation that eventually

22  led to Ms. Vargas' leaving Renown?

23      A.   I'm sorry, can you say that question one more

24  time?

25      Q.   Yeah, it's kind of complicated.  So it sounds

Page 24

1  like there were multiple investigations into

2  allegations against Ms. Vargas that, you know, she was

3  behaving in some way that was inappropriate at Renown,

4  right?  Okay.  And, eventually, there was an

5  investigation that led to Ms. Vargas leaving Renown,

6  right?

7      A.   Yes.

8      Q.   I'm wondering if there were multiple

9  investigations or a single investigation that led to

10 her leaving Renown?

11     A.   The investigations built upon the

12 determination of Ms. Vargas leaving Renown.  So we had,

13 like I said before, complaints about her and they

14 continued.  So we did not see a change in her behavior

15 despite addressing the concerns, which led to her

16 termination.

17     Q.   Okay.  Did you ever discuss Ms. Vargas'

18 conduct with Herman Pineda?

19     A.   No.

20     Q.   Do you know who that is?

21     A.   I do.

22     Q.   Okay.  Can you describe just who he is

23 briefly?

24     A.   He was the former supervisor at South

25 Meadows.

1      Q.   Okay.  And he worked under Ms. Vargas as

2   well, right?

3      A.   He worked for Kathy West --

4      Q.   Okay.

5      A.   -- was my recollection.

6      Q.   Okay.  So we'll get back to this, but I want

7   to discuss some stuff related to my client's ADA claim,

8   against Renown before.

9      A.   Okay.  Okay.

10     Q.   All right.  Can you tell me what your

11  knowledge is of what the FNS coordinator did at Renown?

12     A.   The position was a combination role, so it

13  did some cashiering as well as setting up catering

14  events at the location.

15     Q.   Okay.  Did the FNS coordinator have a

16  personal office?

17     A.   I believe it was either her personal office

18  or she may have shared it.  I'm not sure, but there was

19  an office space for the FNS position.

20     Q.   And I just want to be fair in that.  How

21  familiar were -- were you with the various positions

22  that existed within the FNS Department Renown?

23     A.   I'm familiar enough.  I interacted with them,

24  so.

25     Q.   Okay.  All right.  So would a FNS coordinator

Page 26

1    generate financial reports?

2         A.   I believe there was some reporting done,

3    reconciling the spend for the catering events at the

4    location.

5         Q.   Okay.  Would they coordinate events?

6         A.   Yes.

7         Q.   Would they handle cash?

8         A.   Yes.

9         Q.   They have access to a safe?

10        A.   Yes.

11        Q.   Okay.  Would they make daily bank deposits?

12        A.   I don't know if it was daily.  I do believe

13   they made bank deposits.

14        Q.   Okay.  Do you think it's fair to describe the

15   FNS coordinator position as having certain attributes

16   of that were managerial?

17        A.   I don't know if I would call it managerial,

18   no.  Administrative, yes.

19        Q.   Okay.  Administrative, I mean, would you --

20   would it be fair to describe it as mostly a desk job?

21        A.   No, I wouldn't call it a desk job.

22        Q.   Okay.  Were they required to provide backup

23   if other people needed help?

24        A.   Yes.

25        Q.   At Department.  Okay, was that their primary

Page 27

1   job?

2       A.   I think it would depend on how many catering

3   events there were in a given day would dictate how many

4   hours were spent doing what action.

5       **Q.   Okay.  Do you know how long my client held**

6   **her position as FNS coordinator at Renown?**

7       A.   Several years.  I'm not sure exact dates,

8   though.

9       **Q.   Okay.  Are you familiar with the injury that**

10  **my client suffered to her knees on July 26, 2016?**

11      A.   I heard about the injury, yes.

12      **Q.   Okay.  Who told you about it?**

13      A.   I believe our Workers' Comp Department may

14  have.

15      **Q.   Okay.  I -- I'm sorry, I realized this is**

16  **stuff that happened months ago.**

17      A.   Thank you.

18      **Q.   Your workers' comp department, would that**

19  **have been Shawn Lavac?**

20      A.   Yes.

21      **Q.   Okay.  Were you -- so when someone got**

22  **injured, say an FNS employee at Renown, what was your**

23  **role in coordinating comp issues or employment issues**

24  **or anything that -- that goes as a result of that?**

25      A.   Only if they were in the areas that I helped

Page 30

1        Q.    That was somebody else?

2        A.    Yes.

3        Q.    Okay.  All right, so when my client got

4    injured in July 26, 2016, do you know who her direct

5    supervisor was?

6        A.    What was the date again?

7        Q.    July 26, 2016.

8        A.    I believe it may have been Kristin Foley, but

9    I'm not 100 percent confident on that.

10       Q.    Okay.  And Kristin Foley worked under

11   Christina Vargas.  Is that right?

12       A.    I believe so, yes.

13       Q.    Okay.  Are you aware of whether Kristin Foley

14   ever told my client that she wouldn't comply with any

15   restrictions imposed by my client's doctor?

16       A.    No, I'm not aware of that.

17       Q.    Okay.  You've never been made aware of that

18   allegation?

19       A.    No.

20       Q.    Okay.  Are you aware of any accommodations

21   that were provided to my client as a result of her

22   injuries?

23       A.    I am aware that there was a stool placed by

24   the cashiering area.

25       Q.    Okay.  All right.  Are you aware that my

LUCERO SANCHEZ vs RENOWN HEALTH
OETJEN, SUZANNE on 09/12/2022                                              Page 31

Page 31

1   client's status at Renown changed as of December 29,

2   2016?

3        A.   Yes.

4        Q.   Okay.  What do you recall about that status

5   change?

6        A.   For what I can recall, it was a review of the

7   positions within Food Nutrition Services, and there

8   were not as many catering events that had been

9   occurring at the time, so the decision was made to

10  eliminate the FNS coordinator role at the time.

11       Q.   Okay.  Who made that decision?

12       A.   It would have been the leadership of Food

13  Nutrition Services that would have made the decision of

14  the position not made -- being needed anymore.

15       Q.   Okay.  I'd like to show you -- mark this as

16  Exhibit 2 and show you this.  And if you can place --

17  actually, took this from your exhibits from the other

18  deposition, just mark over that.  All right, and if you

19  could just take a minute to review this?  Tell me when

20  you're ready.

21       A.   I'm familiar with this form.

22       Q.   Okay.  You've seen this before?

23       A.   I've -- I'm familiar with the form.

24       Q.   Okay.

25       A.   Yes.

LUCERO SANCHEZ vs RENOWN HEALTH
OETJEN, SUZANNE on 09/12/2022                                             Page 33

Page 33

1    A.   We wouldn't have had input, but typically

2  when there's a change in compensation, the HR business

3  partner completes the form just to be sure that

4  everything is accurate.

5    **Q.   Okay.  Do you see where it says approval**

6  **levels?**

7    A.   Yes.

8    **Q.   At the bottom?  Did you approve this change?**

9    A.   It was an automatic route because Jessi is my

10  -- was my direct subordinate at the time.  It would

11  have routed up to me automatically.

12   **Q.   Okay.  So do you recall reviewing those?**

13   A.   I recall reviewing the form, yes.

14   **Q.   Okay.  And do you see there under Job**

15  **Information where it says previous FNS coordinator?**

16   A.   Yes.

17   **Q.   And the wage is $16.95, correct?**

18   A.   Yes.

19   **Q.   And the new position is FNS services cashier,**

20  **and the new wage is $14.48.  Is that correct?**

21   A.   Yes.

22   **Q.   Okay.  Okay.  Okay.  Are you aware the**

23  **substance of the job change indicated in Exhibit 2?**

24   A.   My understanding was that the number of

25  catering items in South Meadows was down to barely any.

Page 34

1    The administrative work was moved to a leadership role

2   and the -- the position we need filled was a cashier.

3         Q.   So who was the administrative work moved to?

4         A.   I don't know who specifically.

5         Q.   Okay.  Would that have been my client's

6   supervisor, Kristin Foley?

7         A.   It could have been.

8         Q.   Okay.

9         A.   Most likely a leader.

10        Q.   Okay.  And do you think it would have been

11  Christina Vargas who made that decision to move that

12  work to Kristin Foley?

13        A.   Yeah, either Christina Vargas or Justin Bart.

14        Q.   Okay.  But Justin Bart's name isn't on

15  exhibits here, right?

16        A.   No, it wasn't.

17        Q.   How do you know that Justin Bart was involved

18  in that decision?

19        A.   Because he was in charge of the kitchen at

20  the time.

21        Q.   Okay.  So Justin Bart worked under Christina

22  Vargas?

23        A.   Yes.

24        Q.   Okay.  But he wasn't -- Justin Bart wasn't my

25  client's direct supervisor, correct?

1      A.   Not that I can recall, no.

2      Q.   **So if he's overseeing the kitchen, I mean,**

3   **typically in restaurants, there's kind of a front-end,**

4   **back-end thing, right?**

5      A.   Uh-huh.

6      Q.   **Okay.**

7      A.   Because Justin had been there.  He's been

8   there longer than I have as well.  He was very involved

9   in all the operations of Food Nutrition Services at

10  both facilities or all facilities.

11     Q.   **Okay.  Okay, but the buck stopped at**

12  **Christina Vargas?**

13     A.   She was the director, yes.

14     Q.   **Okay.  All right.  Did it concern you at all**

15  **that my client was suffering a pay cut or was -- I**

16  **don't want to say suffering -- that this indicated that**

17  **her -- her pay would be cut?  Do you recall thinking**

18  **about that when this happened?**

19     A.   It always -- whenever we have to change

20  someone's pay, I -- I take that into consideration,

21  yes.  I don't take that lightly.

22     Q.   **Do you recall discussing the issue with**

23  **anybody?**

24     A.   I recall discussing it with Jessi Cohen, yes.

25     Q.   **Okay.  All right.  Were you aware at the time**

Page 36

1   that whether my client had any injuries when this

2   occurred?

3        A.   I did not associate the -- the change in her

4   position to her workplace injury.

5        Q.   Okay.  Were you seeing her day-to-day during

6   that time period?

7        A.   No.

8        Q.   Okay.  Did you work at Renown South Meadows?

9        A.   No.  My office was at Regional.

10       Q.   Okay.  So you didn't go into the cafe and eat

11  and see her --

12       A.   On occasion, yeah.  On occasion.

13       Q.   You would, too?

14       A.   Yeah.

15       Q.   Oh, okay.  How -- how often?

16       A.   Once a month maybe I would be down at South

17  Meadows.

18       Q.   Okay.  So not -- not like on a weekly basis?

19       A.   No.

20       Q.   Do you re -- I mean, this is a long time ago.

21   Do you recall seeing my client wearing brace or

22  anything like that during that time period?

23       A.   No, I don't recall.  No.

24       Q.   Okay.  So you wouldn't be in a position where

25  you were observing her work?

Page 40

 1  department?

 2      A.    Just down the hall.

 3      Q.    Okay.  So do you see there on the second

 4  paragraph of the August 28, 2017 e-mail where it says

 5  it was unanimous, everyone stated ethically, especially

 6  on an open work comp case, we should not have reduced

 7  her pay and changed her job with no options to keep her

 8  back pay -- to keep her pay, I'm sorry.  So this

 9  indicates that she wasn't provided with any options to

10  having her status changed, is that right?

11      A.    That's how I read this, yes.

12      Q.    And do you have any knowledge as to whether

13  or not that's true?

14      A.    No.

15      Q.    Okay.  What did you do in response to the

16  concerns that were raised in this e-mail?

17      A.    So we educated ourselves related to the

18  workers' comp issue.  I'm not a workers' comp

19  professional, so I'm not familiar with it.  We had

20  notified workers' comp at the time we made the change.

21  My understanding was our workers' comp department

22  became familiar with a regulation of something around

23  workers' choice and so we just -- we compensated Luce

24  with back pay.

25      Q.    Okay.  So did you compensate her from the

Page 41

1  date of the change in her status as indicated in

2  Exhibit 2?

3      A.   We would have followed whatever the statute

4  required us to do.

5      Q.   Okay.  Did you change her pay back to what it

6  was prior to the status change?

7      A.   I believe we paid her at $16.95 for the

8  period of time that we needed to change her pay.  I'm

9  not sure of the specifics.

10     Q.   Are you aware of whether or not on a going

11  forward basis after the back pay was provided, whether

12  she was -- her -- her wage was changed or was it still

13  reduced?

14     A.   I -- my understanding is that she actually

15  transferred into a job that accommodated the $16.95

16  pay.

17     Q.   Okay.  Is that the unit clerk position?

18     A.   Yes.  Yes.

19     Q.   Okay.  Do you -- do you recall exactly when

20  that occurred?

21     A.   I don't.  It was right around the time.

22     Q.   Does January 2018 sound --

23     A.   Sounds about right.

24     Q.   -- about that time period?

25     A.   Yeah.

Page 42

```
 1        Q.   Okay.  So that would have been a couple

 2   months after this e-mail exchange occurred in August --

 3        A.   Yes.

 4        Q.   -- of 2017, correct?

 5        A.   Uh-huh.

 6        Q.   Okay.  All right.  So why did you provide her

 7   with back pay?

 8        A.   Because we were educated on the

 9   recommendation from workers' choice or workers' comp,

10   excuse me, and compensated her.

11        Q.   Was it your understanding that Renown had

12   violated the ADA by reducing your pay and changing your

13   position while the workers' comp case -- case was open?

14             MS. KETNER:  Object to form.

15             THE WITNESS:  That was not my understanding,

16   no.

17   BY MR. BUSBY:

18        Q.   Okay.  So what rule did you believe Renown

19   had violated that prompted you to provide my client

20   with back pay?

21        A.   My understanding it was a workers' comp

22   issue.

23        Q.   Okay.  Do you see above in the first

24   paragraph of the August 28, 2017 e-mail?

25        A.   Yes.
```

Page 48

1      Q.    Okay.  Did you describe her as behaving this

2  way?

3      A.    I don't know if I used those terms, but I do

4  recall indicating that she was mean to her employees.

5      Q.    So it says also, "Multiple witnesses from FNS

6  staff level confirmed that vocal outbursts, use of

7  unprofessional and/or condescending language by Ms.

8  Vargas was common." So FNS staff level, that wouldn't

9  have been you obviously?

10     A.    Correct.

11     Q.    Okay.  Do you recall reports from FNS staff

12  that reported to you that she, Ms. Vargas, engaged in

13  vocal outbursts, the use of unprofessional and/or

14  condescending language?

15     A.    I recall talking to the dietician

16  specifically regarding the condescending language.

17     Q.    Do you recall the nature of the vocal

18  outbursts described here?

19     A.    I do not recall.

20     Q.    Do you recall the nature of the

21  unprofessional and/or condescending language?

22     A.    I just remember, in general, people did not

23  like her and she was just not a nice leader.

24     Q.    So you don't recall anything specific that --

25     A.    I remember there was offensive behavior or

Page 51

1  you what you and Ms. Ketner or any other attorney

2  talked about.  Just asking if you participated in that

3  process.

4       A.   Just through the statement.

5       Q.   Just this?

6       A.   That I can recall.  I remember I would have

7  reviewed my statement, obviously, if it was being used

8  to reply to the Nevada Equal Rights Commission.

9       Q.   Okay.  Did you ever review a NERC file or

10 anything like that?

11      A.   I don't remember.

12      Q.   Written statements that were provided to NERC

13 or anything?

14      A.   I don't remember.

15      Q.   Okay.  Okay.  So do you see on the top of

16 page three there where there's a discussion of my

17 client's pay change?

18      A.   Yes.

19      Q.   There's a discussion there in paragraph three

20 of a search of her vehicle.

21      A.   Yes.

22      Q.   My client's vehicle.  Okay.

23      A.   Uh-huh.

24      Q.   Can you describe the facts and circumstances

25 surrounding that search in so far as you -- you know,

Page 52

1  **what happened?**

2       A.    From my memory, the aforementioned Herman

3  Pineda had been recently terminated from employment

4  based on his behavior toward his staff as well as a

5  concern of theft of food items from our organization.

6  There was -- we became aware of Herman being seen on

7  campus entering this vehicle that was parked in front

8  of the -- the area in front of South Meadows, there's a

9  parking space area for patients and visitors.

10      **Q.    Okay.**

11      A.    And so security director was notified as was

12 I.   I happened to be down at South Meadows at the time.

13  There was a keep on the lookout for Herman because of

14 the concern of his theft.  And so when he was seen on

15 campus entering this vehicle, we, through our Security

16 Department identified it as Ms. Sanchez's, and so we

17 did ask to look in the vehicle, which she consented,

18 and we did not find anything of concern.

19      **Q.    Okay.  Did she object to the search of her**

20 **vehicle?**

21      A.    No.

22      **Q.    Okay.  Did she indicate that she felt**

23 **uncomfortable with her vehicle being searched?**

24      A.    She was worried that somebody was in her

25 vehicle, yes.  Or there was --

1      Q.    She was worried someone was in it?

2      A.    So that there was -- Herman had been seen

3   there and there was concern that there's somebody close

4   by her vehicle.

5      Q.    At the time of the search, did you inform her

6   or are you aware whether she was informed that there

7   was this allegation that Mr. Pineda had been putting

8   stuff in her car?

9      A.    I don't recall how we communicated to her,

10  but we did indicate that there was a concern that

11  something may be in her vehicle and that we wanted to

12  search it based on the situation related to Herman.

13     Q.    Do you recall who reported that Mr. Pineda --

14     A.    I don't.

15     Q.    -- was on campus?

16     A.    I don't.  I -- I do recall being notified by

17  Ryan Clarke, who was our Director of Security.

18     Q.    Okay.  Ryan Clarke.  Okay.  So it wasn't

19  someone that had anything to do with the FNS department

20  who was reporting that they had seen Mr. Pineda?

21     A.    My understanding, it came through security.

22     Q.    And they kind of were on the lookout for Mr.

23  Pineda.

24     A.    Yes.

25     Q.    Okay.  Did Renown ever report to the police

LUCERO SANCHEZ vs RENOWN HEALTH
OETJEN, SUZANNE on 09/12/2022                                                Page 64

```
                                                                  Page 64
 1                     CERTIFICATE OF RECORDER

 2   STATE OF NEVADA      )

 3                        )

 4                        )

 5

 6   NAME OF CASE: LUCERO SANCHEZ, PLAINTIFF VS

 7   RENOWN HEALTH, DEFENDANT

 8

 9       I, Rachael Brown, a duly commissioned Notary Public,

10   authorized to administer oaths or affirmations in the State of

11   Nevada, do hereby certify: That I recorded the foregoing

12   deposition of the witness, Suzanne Oetjen on September 12, 2022.

13       That prior to being examined, the witness was duly sworn to

14   testify to the truth. That deposition was recorded via audio and

15   video pursuant to NRCP30(b)(3) and said deposition recording is a

16   complete, true, and accurate recording of deposition testimony.

17   A transcript was created by E-Depositions LLC to aid the audio video

18   recording. A review of the deposition [ ] was [X] was not

19   requested by the deponent and [ ] was [X] was not requested by a

20   party of the action. If a review was requested, any changes

21   communicated to me by the deponent during the period allowed are

22   appended hereto.

23       I further certify that I am not a relative or employee of

24   an attorney or counsel of any of the parties, nor a relative or

25   employee of an attorney or counsel involved in said action, nor
```

LUCERO SANCHEZ vs RENOWN HEALTH
OETJEN, SUZANNE on 09/12/2022                                              Page 65

                                                                          Page 65

 1  a person financially interested in the action.

 2      IN WITNESS WHEREOF, I have hereunto set my hand in the City

 3  of Reno.

 4

 5

 6

 7  Rachael Brown

 8  Notary Public

 9  Appointment No. 22-1620-02

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25