# EXHIBIT I

# EXHIBIT I

```
 1                  UNITED STATES DISTRICT COURT

 2               IN AND FOR THE DISTRICT OF NEVADA

 3

 4

 5

 6  LUCERO SANCHEZ,                          )

 7          Plaintiff,                       )

 8      vs.                                  ) Case No.: 3:21-cv-00352-MMD-WGC

 9  RENOWN HEALTH, a Nevada Non-Profit       )

10  Corporation, and DOES 1-20, inclusive,   )

11          Defendant.                       )

12  _____   )

13

14

15

16

17            RECORDED DEPOSITION OF JULIE MACALUSO

18                 Taken on September 12, 2022

19                       At 2:55 p.m.

20                750 Sandhill Road, Suite 120

21                     Reno, Nevada 89521

22

23

24

25
```

Page 9

 1     Q.   Okay.  And can you describe the time period
 2  that she worked in that department with you?
 3     A.   She was there before I was.  She was there
 4  probably when they first opened out there.  We were
 5  called Washoe Village at the time, and she was there,
 6  and I came in like two years later.  It was only open
 7  for two years before I started.
 8     Q.   Okay.
 9     A.   And she was already there.
10     Q.   Can you describe what my -- what Lucero's job
11  was?
12     A.   Well, she was my -- she did all the catering.
13   She did the billing.  She also cashiered for the
14  little restaurant that we have.
15     Q.   Okay.  Do you know what her duties consisted
16  of in -- in those times?
17     A.   Well, she was -- yeah, she -- she took care
18  of all the catering, the billing, and she even set
19  everything up sometimes, and she paid the bills.
20     Q.   Okay.  Would you describe her job as an
21  administrative job?
22     A.   Yeah, kind of.  She was like my boss's at the
23  time right-hand person.
24     Q.   Okay.  And when you say at the time, what --
25  what time?

Page 17

1      Q.   Okay.  Did my client ever say anything
2  specifically about racial discrimination that she
3  believed she was suffering from Ms. Vargas?
4      A.   Yeah, I -- I vaguely kind of remember
5  something, that she did feel discriminated against.
6      Q.   Okay.
7      A.   And I don't know if it was due to she was,
8  you know, Latino or because she was Herman's right-hand
9  woman.
10     Q.   Okay.  Did you ever hear anybody else make
11 any allegations of racial discrimination against Ms.
12 Vargas?
13     A.   Uh-uh.
14     Q.   Okay.  All right.  Did you ever hear any --
15 Ms. Vargas say anything that would indicate that she
16 was judging someone on the basis of race or anything
17 like that?
18     A.   Could you say that one more time?
19     Q.   Did you -- I'm -- I'm sorry to be repetitive
20 here, but --
21     A.   That's okay.
22     Q.   -- I basically just want to make sure I get
23 past this before we move on.  Did you ever hear Ms.
24 Vargas say anything that was racially charged or
25 anything like that?

```
 1     A.   And then she was demoted to just a cashier.
 2     Q.   Okay.
 3     A.   And they wouldn't even give her a stool to
 4  sit down on.  She had to stand.
 5     Q.   Okay.  So when you say she was demoted, was
 6  that just your impression based on what you saw and the
 7  change in her job?
 8     A.   Uh-huh.  Yeah.
 9     Q.   Okay.
10     A.   Yeah, because she -- she did all the bills.
11  She did everything, all the paperwork, everything.  And
12  the catering, and she -- that was all gone.
13     Q.   Okay.  Do you -- were you aware of any change
14  in demand for those types of services that would've
15  been some --
16     A.   No.
17     Q.   -- kind of reason for her to be demoted like
18  that?
19     A.   No.
20     Q.   Okay.  What was your impression as to why she
21  was demoted?
22     A.   My impression was because she was Herman's
23  right-hand man and they didn't want -- they didn't let
24  her in, so they -- I just felt like they just wanted
25  get rid of her.
```

```
 1      Q.   Did you see his picture up in the security
 2  office?
 3      A.   No.  No, I did not.
 4      Q.   You just heard?
 5      A.   Yeah.
 6      Q.   Okay.
 7      A.   Yes.
 8      Q.   Did anybody tell you why his picture was up
 9  in the security department?
10      A.   No.
11      Q.   You testified that Ms. -- I think you
12  described Ms. Sanchez as Herman's right-hand woman.
13      A.   Yes.
14      Q.   Why do you describe her in that fashion?
15      A.   Because she did all his billing and, you know
16  -- and all the ordering and -- and catering.  He cooked
17  and she'd set everything up.
18      Q.   Okay.  So when you say that she did all his
19  billing, what do you mean?
20      A.   Just the bills.  You know, the -- from --
21  with the vendors and -- and that kind of stuff.
22      Q.   Okay.  So if Mr. Pineda was ordering food,
23  Ms. Sanchez would process the invoice to get it paid?
24      A.   Uh-huh.
25      Q.   Is that what you're talking --
```

```
 1     A.   Yes.  Yes.
 2     Q.   Okay.
 3     A.   Uh-huh.  Yes.
 4     Q.   And you said that she did all the catering.
 5  What do you mean by all the catering?
 6     A.   Well, she set everything up and, you know,
 7  she was bring all the food to wherever it was going.
 8     Q.   When you say she set everything up, you mean
 9  she physically took out, like, the catering equipment
10  that the food was going to be served in?
11     A.   Yes.
12     Q.   Okay.
13     A.   And she would set the tables up and --
14     Q.   Okay.  Have you ever seen the FNS coordinator
15  job description?
16     A.   No.
17     Q.   Okay.  So you testified that Ms. Sanchez did
18  all the billing?
19     A.   All the paperwork.
20     Q.   All the paperwork.  Do you know how many
21  minutes or hours each week it took her to do that work?
22     A.   I don't.
23     Q.   Okay.  And you've testified that you never
24  saw the FNS catering coordinator job description?
25     A.   No.  Not that I can recall, no.
```

Page 46

1  Q. Okay. Were you ever told to report any
2  sightings of Mr. Pineda on the campus?
3  A. No.
4  Q. After Mr. Pineda was terminated, who took
5  over his job responsibilities?
6  A. I believe it was Kristen.
7  Q. Kristen.
8  A. Well, no, I'm sorry. I take that back. It
9  was Rhonda.
10  Q. Okay.
11  A. And then it was Kristen.
12  Q. Okay.
13  A. I've had a lot of supervisors.
14  Q. And you testified earlier that Mr. Pineda did
15  the cooking?
16  A. He did some cooking, yes.
17  Q. Okay. Did Rhonda Tu do cooking as well?
18  A. No.
19  Q. Okay. So who did the cooking for the
20  catering events after Mr. Pineda was terminated?
21  A. Well, we didn't really have that many
22  caterings after that.
23  Q. Okay.
24  A. So just -- just whoever the cook was at the
25  time, I -- I -- I suppose.

Page 47

1    Q.   Okay.  So how many catering events do you
2 think that you would've had when Mr. Pineda was there
3 versus after he was terminated?  Like, can you
4 estimate?
5    A.   Oh.  Oh gosh, we -- they -- they did a lot of
6 caterings when Herman was there, and then it just
7 dwindled to nothing.
8    Q.   Okay.  So when the catering events dwindled
9 to nothing, there was no need to do paperwork about the
10 catering, correct?
11   A.   Correct.
12   Q.   Okay.  So if Ms. Sanchez was not doing the
13 paperwork for catering events that weren't happening,
14 do you know where she spent the rest of her job duties?
15   A.   Cashiering.
16   Q.   Okay.  And had she cashiered before Mr.
17 Pineda was terminated?
18   A.   Uh-huh.
19   Q.   Oh.  Is that a yes?
20   A.   Yes.
21   Q.   Okay.
22   A.   Yes, yes.  Yes.
23   Q.   Yes.
24   A.   I'm so sorry.
25   Q.   That's okay.  What schedule did you work back

 1  well they're called food server workers now.  They were
 2  diet aides, but they just changed their names so they
 3  can do -- they can multitask.  They can do dishes and
 4  whatever else they need to do.
 5      Q.  So when you testified that you would see Ms.
 6  Sanchez in the cafe, was that when you were performing
 7  job duties or was that when you were on a break?
 8      A.  Breaks, and when I was having lunch.  Or I
 9  would go out there and say, "Hey, can I -- can I get a
10  Coke or -- or a cookie," or something, you know, for a
11  patient.
12      Q.  At the time Ms. Sanchez was transferred from
13  the FNS coordinator position to the cashier position,
14  had those catering jobs dwindled?
15      A.  Well, they dwindled after Herman left, so I'm
16  going to have to say yes.
17      Q.  Okay.  Approximately how long after Herman
18  left?
19      A.  Not very long, I don't think.  I mean, we
20  still had a few that were already booked, but yeah, I
21  -- I haven't really seen a catering in there in quite
22  some time.
23      Q.  Okay.
24      A.  I don't think we have any now, I mean, that I
25  can recall.

Page 58

 1     A.   Depending on the order and how much stuff we
 2  got in.
 3     Q.   Okay.  And you -- do you have any information
 4  -- do you know whether or not Ms. Sanchez objected to
 5  doing that job duty?
 6     A.   I don't know.
 7     Q.   Did you ever advise Ms. Sanchez to talk to
 8  her supervisor about not lifting heavy boxes?
 9          MR. BUSBY:  Object to the form.  Go ahead.
10          THE WITNESS:  Not that I can remember.
11  BY MS. KETNER:
12     Q.   Okay.  Did you ever have any communication
13  with any supervisor about Ms. Sanchez having to lift
14  heavy boxes?
15     A.   No.
16          MR. BUSBY:  Same objection.
17  BY MS. KETNER:
18     Q.   Did you ever hear Ms. Vargas make any
19  unfavorable comments about Ms. Sanchez?
20     A.   No.
21     Q.   Did you ever hear Ms. Vargas make any
22  comments about Mexicans?
23     A.   No.
24     Q.   Did you ever hear Ms. Vargas make any
25  comments about Hispanics?

Page 61

```
 1      A.   No.
 2      Q.   Have you ever heard Ms. Foley make any
 3   comments about Hispanics?
 4      A.   No.
 5      Q.   Do you have any information that would lead
 6   you to believe that Ms. Foley does not like Ms. Sanchez
 7   because she is Mexican or Hispanic?
 8      A.   No.
 9      Q.   Do you know Jessi Russell?  She -- her now --
10   her name is now Jessi Cohen, but she was formerly known
11   as Jesse Russell in the human resources department.
12      A.   No, I don't know her.
13      Q.   Have you ever heard anyone from the human
14   resources department make any unfavorable comments
15   about Ms. Sanchez?
16      A.   No.
17      Q.   Have you ever heard anyone from the human
18   resources department make any comments about Mexicans?
19      A.   No.
20      Q.   Have you ever heard anyone from the human
21   resources department make any comments about Hispanics?
22      A.   No.
23      Q.   All right.  Did -- regarding the search of
24   Ms. Sanchez's vehicle, did Ms. Sanchez tell you that --
25   do you know who Suzanne Oetjen is?
```

Page 67

1                CERTIFICATE OF RECORDER

2  STATE OF NEVADA    )

3                     )

4                     )

5

6  NAME OF CASE: LUCERO SANCHEZ, PLAINTIFF VS

7  RENOWN HEALTH, DEFENDANT

8

9       I, Rachael Brown, a duly commissioned Notary Public,

10 authorized to administer oaths or affirmations in the State of

11 Nevada, do hereby certify: That I recorded the foregoing

12 deposition of the witness, Julie Macaluso on September 12, 2022.

13      That prior to being examined, the witness was duly sworn to

14 testify to the truth. That deposition was recorded via audio and

15 video pursuant to NRCP30(b)(3) and said deposition recording is a

16 complete, true, and accurate recording of deposition testimony.

17 A transcript was created by E-Depositions LLC to aid the audio video

18 recording. A review of the deposition [ ] was [X] was not

19 requested by the deponent and [ ] was [X] was not requested by a

20 party of the action. If a review was requested, any changes

21 communicated to me by the deponent during the period allowed are

22 appended hereto.

23      I further certify that I am not a relative or employee of

24 an attorney or counsel of any of the parties, nor a relative or

25 employee of an attorney or counsel involved in said action, nor

Page 68

1  a person financially interested in the action.

2    IN WITNESS WHEREOF, I have hereunto set my hand in the City

3  of Reno.

4

5  *[signature: Rachael Brown]*

6

7  Rachael Brown

8  Notary Public

9  Appointment No. 22-1620-02

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25