# EXHIBIT L

# EXHIBIT L

# AFFIDAVIT OF CHRISTINA VARGAS

STATE OF NEVADA      )
                     )ss.
COUNTY OF WASHOE     )

I, Christina Vargas, being first duly sworn, depose and state under penalty of perjury as follows:

1. I was previously employed by Renown Health ("Renown") as the Director of the Food and Nutrition Services ("FNS") Department from September 16, 2013 to May 25, 2017.

2. My ethnicity is Hispanic Latina. My father was born in Costa Rica. My mother was born in Mexico. I hold dual citizenship in the United States as well as Costa Rica. I am fluent speaking, writing and reading in Spanish.

3. When I began my employment with Renown, I oversaw the FNS Department at Renown Regional Medical Center ("RRMC") while the FNS Departments of Renown's other facilities (Renown South Meadows, Renown Skilled Nursing, and Renown Rehabilitation Hospital) were supervised by Kathy West, who held the position of FNS Manager. Even though I was the Director, Ms. West did not report to me but instead reported to the Chief Nursing Officer at South Meadows.

4. Each of the four Renown facility locations had a dedicated FNS Supervisor. The FNS Supervisor for RRMC reported to me and the other FNS Supervisors reported to Ms. West.

5. In early 2015, I was promoted to Director of Food and Nutrition Services overseeing all of the Renown facilities. Justin Bart was promoted to the Manager of Food and Nutrition Services assuming oversight over the FNS Departments at South Meadows, Skilled Nursing and Rehab.

6. Justin Bart brought to my attention that he noticed South Meadows' FNS Department's nutrition costs were suspiciously high. He then began an investigation with

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

RENOWN008149

1  the assistance of our vendor and obtained invoices that showed specific items that were
2  ordered, such as large quantities of shrimp, prime rib, salmon, and other higher priced items.

3      7.    South Meadows' FNS Department was supervised by German Pineda, FNS
4  Supervisor. Mr. Pineda was responsible for the preparation and presentation of all food
5  items at the South Meadows location and was responsible for supervising approximately
6  twenty employees (dietary aides, dishwashers, cooks, food prep workers, and café
7  workers). Mr. Pineda was a chef by trade and performed the majority of the cooking for the
8  catering and other special events held at South Meadows.

9      8.    Mr. Pineda also supervised Plaintiff Lucero Sanchez, who held the position of
10 FNS Coordinator at the South Meadows location. I am not aware of such a position that
11 was an actual position at South Meadows. No other Renown location had a position entitled
12 FNS Coordinator. It is my understanding that Ms. Sanchez and Mr. Pineda were very close.

13     9.    It was my understanding that Ms. Sanchez did not hold a supervisor position
14 but was permitted to have her own office on the second floor of the South Meadows hospital,
15 where she reportedly handled invoices for the catering and special events held at South
16 Meadows. Ms. Sanchez had a safe in her office where cash for the café was kept and the
17 responsibility was given to her by either Mr. Pineda or Ms. West in order to be in charge of
18 bank deposits, providing money to the cashiers in the café, as well as other duties that were
19 assigned by Mr. Pineda to Ms. Sanchez that she would complete on his behalf. These other
20 duties include payroll, employee evaluations, employee changes, pay schedules and input
21 of the employees' time for payroll. she was responsible for making bank deposits. However,
22 the bulk of Ms. Sanchez's duties entailed setting up catering and special events, delivering
23 the food trays to the events, and cleaning up following the events. Ms. Sanchez also
24 relieved the cashiers assigned to the café.

25     10.    Upon investigation, it was discovered that Mr. Pineda made an inordinately
26 high number of "will call" orders from Renown's food vendors, which are orders placed
27 outside of the standard order schedule. Many of the will call orders placed by Mr. Pineda
28 were for expensive and unusual items like meat and seafood. It was also discovered that

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

RENOWN008150

Mr. Pineda operated a personal catering business outside of his employment with Renown. Based upon Mr. Pineda's questionable orders, Mr. Bart and Jessi Russell in Human Resources suspected that Mr. Pineda was ordering food items through Renown's vendor accounts but using the items for his personal catering business.

11. In light of the suspicions regarding Mr. Pineda's ordering habits as well as other performance issues regarding his leadership and communication style, Justin Bart and Jessi Russell made the decision to terminate Mr. Pineda's employment in June 2015.

12. While Mr. Bart and Ms. Russell believed that Ms. Sanchez helped Mr. Pineda cover up his suspected embezzlement by processing the invoices for the questionable food orders he placed, the organization decided not to terminate Ms. Sanchez's employment at the time it terminated Mr. Pineda. Instead, the organization continued its investigation following Mr. Pineda's termination to determine whether Ms. Sanchez was indeed involved and if so, to what extent.

13. During the continued investigation into Mr. Pineda's actions, it was necessary to access the invoices and reports that Ms. Sanchez had been preparing under Mr. Pineda's direction and supervision. Therefore, the office that Ms. Sanchez was utilizing to process invoices was returned to Justin Bart for him to assume the responsibilities and role overseeing the FNS Department at South Meadows. This way, Mr. Bart could get control of the situation and gather the necessary documentation to determine whether to pursue criminal charges against Mr. Pineda.

14. While Mr. Bart and Ms. Russell continued to exam Mr. Pineda's activities, they identified a number of duties that Ms. Sanchez had been performing at Mr. Pineda's direction and decided that such duties were more properly performed at a leadership or supervisor level. Therefore, the invoicing and other reporting duties (such as cash handling and deposits for the safe) were removed from Ms. Sanchez and reassigned to Justin Bart as well as the FNS Supervisor position for South Meadows.

15. Following Mr. Pineda's termination, the number of catering and special events at South Meadows drastically declined. Responsibility for the few catering and special

events that took place at South Meadows were handled primarily by the FNS Supervisor. As a result, Ms. Sanchez did not have regular catering or special event responsibilities to carry out.

16. Even though Ms. Sanchez had very few, if any, responsibilities related to catering and special events, the organization did not reduce her hours. Instead, Ms. Sanchez was directed to perform much needed duties in the café.

17. After about a year of Ms. Sanchez primarily performing the duties of cashier in the café as well as the realization that there was no need or desire to increase the number of catering and special events due to budget cuts at South Meadows, Justin Bart and Jessi Russell decided to eliminate the position of FNS Coordinator.

18. Although the organization decided to eliminate the FNS Coordinator position that Ms. Sanchez had held, we did not terminate her employment. Instead, we decided to transfer Ms. Sanchez to the cashier position, which she had been primarily performing for over a year since Mr. Pineda's termination. The decisions to eliminate the FNS Coordinator position and transfer Ms. Sanchez to the cashier position were based purely upon legitimate business and operational needs.

19. I was aware that Ms. Sanchez sustained a work-related injury to her knees in 2016 but not aware of any details of her injury.

20. I was not specifically aware of any physical restrictions that were imposed by Ms. Sanchez's health care provider. Ms. Sanchez never told me or indicated in any way that she was being asked to work outside of the physical restrictions imposed by her health care providers. Likewise, Ms. Sanchez never told me or indicated in any way that she was having difficulty or was unable to perform the essential functions of her position.

21. Contrary to Ms. West's representations, I never said "I hate fucking Mexicans" or "I fucking hate Mexicans." I have never had a one on one conversation with Ms. West that was not supervised by Human Resources. In fact, Ms. West was required to apologize to me for her unprofessional behavior after her conversation was overheard where she was personally degrading me and my efforts to improve the services of the FNS Department,

1  which lead to her having to sit down with Human Resources and myself and issue an
2  apology to me for her unprofessional and rude behavior.

3      22.    I have never, nor would I ever say I do not like Mexicans to Ms. Sanchez or
4  anyone throughout the organization.

5      23.    Contrary to Mr. Pineda's representations, I never called Mexicans "lazy" and
6  never told Mr. Pineda not to hire Mexicans. Perhaps this is what Mr. Pineda was thinking
7  or what his conversation was with someone else as Mr. Pineda's main complaint from the
8  employees who he supervised was that he would yell at them in Spanish and tell them they
9  were lazy and he should never hire additional Mexicans.

10     24.    I never threw a radio playing Mexican music in the trash nor was I aware that
11 there was Mexican music being played.

12     25.    I never treated Mexican or Hispanic employees poorly or differently because
13 of their race or national origin. In fact, I would ask them if they felt comfortable speaking in
14 Spanish as opposed to struggling in English as a form of communication since I am fluent
15 in Spanish as well.

16     26.    I never treated Ms. Sanchez differently because of her race or national origin.

17     27.    Ms. Sanchez never reported to me that she was allegedly experiencing
18 harassment, discrimination or retaliation.

19     28.    I was aware of Renown's policies prohibiting unlawful harassment,
20 discrimination and retaliation and I fully complied with those policies during my employment
21 with Renown.

22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

RENOWN008153

29. Other than Ms. Sanchez's current baseless allegations, no one has ever accused me of unlawful harassment, discrimination or retaliation. I worked to improve the department's working conditions as well as being respectful towards the staff members, including providing specialty days and celebrations for employees as well as employee of the month program, which was never in place in the FNS Department.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Dated this __08__ day of December 2022.

_____
Christina Vargas

STATE OF NEVADA        )
                       )ss.
COUNTY OF WASHOE       )

Subscribed and sworn to before me on this __8th__ day of December 2022.

_____
NOTARY PUBLIC

MISSY CELMER
Notary Public-State of Nevada
APPT. NO. 21-4609-02
My Appt. Expires 09-03-2025

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

Page 6 of 6

RENOWN008154