Luke Busby, Esq.
Nevada Bar No. 10319
316 California Ave. #82
Reno, Nevada 89509
(775) 453-0112
(775) 403-2192 (Fax)
luke@lukeandrewbusbyltd.com

*Attorneys for the Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

LUCERO SANCHEZ,

    Plaintiff,

    vs.

RENOWN HEALTH, a Nevada Non-Profit
Corporation, and DOES 1-20, inclusive,

    Defendant.

_____/

Case No. 3:21-cv-00352-MMD-CSD

**PLAINTIFF'S RESPONSE IN
OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT**

    COMES NOW, Plaintiff Lucero Sanchez (hereinafter "Sanchez" or "Plaintiff") by and through the undersigned counsel, and hereby files the following Response in Opposition to the Motion for Summary Judgment [ECF #69] filed by Defendant RENOWN HEALTH, a Nevada Non-Profit Corporation on August 11, 2023.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    Background**

    Sanchez has worked at Renown for over 28 years, starting on August 18, 1993, when she was 19 years old.  See Conf. Confidential Exhibit 1[1] Transcript of Sanchez's Deposition at 19:8. Sanchez was born in Durango Mexico and first moved to the

_____

[1] This Motion is accompanied by a motion for leave to file multiple exhibits under seal per LR-10-5 and the Qualified Protective Order issued in this matter at [ECF # 16].

1

United States in 1981.  Id. at 14:12. Sanchez did not complete the third grade (Id. at 16:22), because she returned to Mexico and worked on a farm.  Id. at 17:22. Sanchez returned to the United States around the age of 15 and started working in housekeeping. Id. at 7.

In the Amended Complaint [ECF #5], Plaintiff states four causes of action related to her employment at Renown: (1) A Title VII racial discrimination/hostile work environment claim; (2) a Americans with Disabilities Act ("ADA") disability discrimination claim; (3) a Title VII retaliation claim; and (4) a state-law claim for intentional infliction of emotional distress.

**II.      Disputed Issues of Fact**

After working in various positions at Renown, in 2014, Sanchez held the position of Food and Nutrition Services (FNS) Coordinator and was paid $16.95 an hour. Sanchez took pride in her work, and in Renown's greater mission.  Her performance reviews show she consistently performed well, handling tasks like creating financial reports, organizing events, and managing cash.  See Exhibit 2. When in this position, Sanchez had an office with a safe for storing money and other valuables and used her own car for daily bank deposits. See Confidential Exhibit 1 at 60:1.

Although Renown disputes this fact, when in the FNS position, most of Sanchez's tasks were desk-based, with minimal physical exertion required.  Julie Macaluso, who worked as a Nutrition Representative at all relevant times with Sanchez when Sanchez was FNS Coordinator (See Exhibit 3 at 7:9), testified that she agreed that Sanchez's job was "administrative." Id. at 9:20. Sanchez also testified that her position as FNS Coordinator was mostly administrative.  Confidential Exhibit 1 at 258:20.

In October 2014, during a meeting about event planning at which the Plaintiff was present, the Plaintiff's immediate boss, Christina Vargas, said, "I hate fucking Mexicans" in front of FNS Manager Justin Bart, who found it amusing. Kathy West

executed the Declaration in Exhibit 4 describing the comment. As described in West's Declaration, West reported this incident to Jesse Cohen, a Senior HR Partner at Renown, and to Suzanne Oejten, the then Director of HR Business Partners. West described in her Declaration that after she made this complaint, she was never treated the same, and that she was terminated by Renown because an employee she supervised falsified records. Renown, in its Motion, describes this act as "forgery of company records." Mot. at 4.

At her deposition, Cohen acknowledged receiving complaints about Vargas in 2014-2015, time period but she could not recall from who.  Exhibit 5 at 10:16. Cohen denied receiving any complaint from Ms. West. Id. at 12. Ms. Cohen admitted that the complaints about Ms. Vargas involved her acting with hostility towards her employees.  Id. at 15:25.

Ather deposition, Oetjen testified that she first received a complaint about Ms. Vargas in 2014, but she could not recall from who. Exhibit 6 at 13:22. Oetjen testified that she received a complaint from Sanchez about Vargas.  Id. at 15:14. Oetjen testified that she could not recall whether Sanchez described any physical contact between her and Sanchez and did not recall whether Sanchez told her she felt intimidated by Vargas.  Id. at 16:12. Ms. Oetjen also did not recall the complaint described by Kathy West in West's declaration. Id. at 18:4. Oetjen did not recall whether she created an official report of Sanchez's complaint.  Id. at 19:2.

Ms. Sanchez's complaint to Ms. Oetjen described above, was made in late in 2015 about an incident where Ms. Sanchez was assaulted by Vargas in June of 2015. At her deposition, Sanchez described Vargas physically "poking" her hand (Confidential Exhibit 1 at 243:4 and 130:13).  Sanchez stated that she reported the incident to Oetjen – and the record is lacking any evidence that Oetjen did nothing about Sanchez's complaint - despite knowing that Vargas had made an egregious discriminatory comment about Mexicans.   In Sanchez's diary, attached to Defendant's Motion at Exhibit P [ECF 69-16 at page 10, Sanchez states that when

she met with Oetjen on July 10, 2015, "in no way she wanted to listen to me. She was very distracted and said to me that the way the keys were taken from me was not harassment nor intimidation that they were the new bosses and they cloud [sec] do what they thought it was the best for the company." Despite Renown's protestations about Sanchez's lack of complaints, Oetjen was the highest person in her chain of command who Sanchez could complain to.  Renown's Motion at page 15, states that under Renown's "Open Door" policy, Sanchez was to "keep going up to the director until you actually go to Human Resources." This is exactly what she did when she spoke to Oetjen, who was Director of HR Business Partners.

A few days after making the complaint to Ms. Oetjen about the hand poking incident with Ms. Vargas, an incident occurred where Sanchez's car was searched by Ms. Oetjen and Renown's head of security.  Confidential Exhibit 1 at 243:18. Sanchez interpreted this incident as a shakedown, essentially sending a message to Sanchez that if she complained there would be consequences.  In Sanchez's diary, attached to Defendant's Motion at Exhibit P [ECF 69-16 at page 14, Sanchez, recording an incident on July 14, 2015, stated, "I called Jessy Russel and she said to me "Luz since you reached out to Suzanne [Oetjen] on Friday 7/10/15 she needed to talked [sic] to me in my office…"  In that same entry, Sanchez records the incident where her car was searched. Knowing what had occurred with Ms. West and Pineda i.e., they were fired under dubious circumstances, Ms. Sanchez reasonably believed that she would be similarly fired. Id at 244:18.

In Sanchez's diary, attached to Defendant's Motion at Exhibit P [ECF 69-16 at page 10, Sanchez states that on August 16, 2015, Sanchez had a meeting with Renown South Meadows CEO Mark Behl, and that she, "brought all her concerns to him and the as I was being treated…"  In this diary entry, Sanchez also describes the incident where Oetjen required Sanchez to be escorted to her car. *Id.*

In its Motion, Renown spends a great deal of time attempting to discredit German Pineda, former FNS Supervisor at Renown South Meadows, who

supervised Sanchez for years, and who is Hispanic from Guatemala. See Exhibit 7 at 34.  On June 29, 2015, Renown terminated Pineda's employment, and argues that Pineda testified that his termination was due to suspected theft in which Plaintiff was believed to have some involvement, which Pineda denied. Mot. at 5. Renown also implies that the Plaintiff was implicated in Mr. Pineda's alleged theft, but provides no evidence supporting this allegation, other than the allegation that Plaintiff was close and loyal to Pineda.  Mot. at 5.  At his deposition, Mr. Pineda testified that Vargas called Sanchez lazy. See Exhibit 7 at 746.  Pineda testified that he was told by Vargas to refrain from hiring Hispanics because, "She said Hispanics to lazy." See Id. at 53:11. Mr. Pineda also testified that he witnessed an incident where Vargas, when visiting the kitchen at Renown, threw a radio playing Hispanic music into the garbage:

> ..in that time the music was Hispanic – in Spanish because most of the cooks was Spanish people.· So when she come in, she took the radio, the one, said, no more radio in the kitchen, and, boom, into the garbage. So that's it, no say, no more comment.· I no ask nothing. I say, okay.· Follow instructions.

Id. at 75:10.

In June of 2016, Sanchez was removed from the office she had used at Renown in carrying out her FNS Coordinator duties for years. Confidential Exhibit 1 at 130:18. Macaluso described the circumstances surrounding Sanchez losing her office as follows:

> Q.· ·Okay.· So one day, she has an office, she's doing administrative work --
> A.· ·And the next day, she didn't. · And they didn't tell her.· She just walked into all her stuff gone.
> Q.· ·Okay. · What did you think about that?
> A.· ·I thought it was pretty sad.· I thought it was very -- not very nice.
> Q.· ·Okay.
> A.· ·I mean, they could at least told her, you know, warned her

Exhibit 3 at 27:12.

On July 26, 2016, Sanchez stumbled over cables and severely injured both her knees. According to the C-4 form filled out by Sanchez, she reported the incident the next day, July 27, 2016, and received treatment for her knees. Sanchez's completed C-4 form is attached hereto as Confidential Exhibit 8. Macaluso testified that she was there when Sanchez was injured and that her knee was, "…out to here, I mean, it was so swollen." Exhibit 3 at 12:16.

As described in the Occupational Health Network Progress Report in Confidential Exhibit 9, after receiving treatment on July 27, 2016, Sanchez was released to restricted duty and was advised by occupational health to take regular breaks every two hours to rest, apply ice to her knees, and elevate her legs.  She was also directed not to lift more than 10 pounds. *Id.*

In the Occupational Health Network Progress Report in Confidential Exhibit 10, after receiving treatment on August 4, 2016, Sanchez was again released to restricted duty with standing limited to or less than 2 hours/day and walking: limited to or less than 2 hours/day. The weight limit of 10 pounds or less was also imposed. The person should remain seated 75% of the time.

In the Occupational Health Network Progress Report in Confidential Exhibit 11, after receiving treatment on August 11, 2016, she was released without restrictions to allow Ms. Sanchez to attempt a trial of full duty with appropriate accommodations for her knee braces. A follow-up was scheduled in 2 weeks for reevaluation.

In the Occupational Health Network Progress Report in Confidential Exhibit 12, after receiving treatment on August 18, 2016, Ms. Sanchez was again released to restricted duty. Standing was restricted to or less than 2 hours/day.  Walking was also restricted to or less than 2 hours/day.

In the Occupational Health Network Progress Report in Confidential Exhibit 13, after receiving treatment on October 4, 2016, Ms. Sanchez was released to restricted duty and if she should be seated around 90% of her working time, to elevate her legs

1   intermittently throughout the day, and that she should be allowed to alternate between
2   sitting and standing positions for her comfort.

3        In the Occupational Health Network Progress Report in Confidential Exhibit 14,
4   after receiving treatment on October 25, 2016, Ms. Sanchez was released to restricted
5   duty and advised that she should predominantly be seated, with sitting advised for
6   50% of her working hours, her standing activities should be restricted to or less than
7   4 hours/day, and walking is restricted to or less than 4 hours/day.

8        In November of 2016, Sanchez began to receive treatment for her knee injuries
9   from Dr. Sobiek.  See Confidential Exhibit 15.  Deposition of James Sobiek at 75:25.
10  Dr. Sobiek testified that he imposed work restrictions on Sanchez in March of 2017,
11  that she do 50% sedentary work. *Id.* at 77.  Dr. Sobiek then testified that he imposed
12  lifting restrictions in April of 2017, and continued this restriction through May of 2017.
13  Id. at 37 and 41.  In November of 2017, Dr. Sobiek testified that he imposed permanent
14  restrictions on lifting more than 20 pounds and, "75 percent sedentary and no stooping
15  and no climbing" and stated that at that point he believed that Sanchez was
16  permanently disabled with respect to her left knee."

17       At the time of and after her injury in July of 2016, since she no longer had her
18  FNS Coordinator office, Sanchez was essentially working as a cashier full time. A role
19  was physically challenging, involving stocking items like heavy drink cases, bulky
20  boxes, cans, and other goods. Confidential Exhibit 1 at 187:10. In her diary in Exhibit
21  P to the Defendant's Motion, Sanches describes working from 6:00 a.m. to 10:00 a.m.
22  by herself when she could barely walk. Macaluso testified to this fact.

23       A.·  ·Well, when she -- when she fell, she was put on light duty and, well,
24       Herman was not the supervisor at that time.·  We had another supervisor
         named Rhonda, and she made her go into the storeroom and put away
25       heavy boxes and -- and just all -- all of our stock that -- that would come
         in food-wise.·  And I -- I would go in and help her because I knew she
26       shouldn't be doing that.
27       Q.·  ·Okay.·  Are you talking about when my client suffered an injury to
         her knees?
28       A.·  ·Uh-huh.·  Yes.

7

Exhibit 3 at 11:13.

Sanchez was routinely required to cover other duties that were significantly beyond the scope of her doctor prescribed "light duty" work limitations. Macaluso testified that this was the case:

> Q.· ·Okay.· All right.· Did you see Renown take any measures to help my client do her job despite the fact she was injured?
> MS. KETNER:· Object to form.
> BY MR. BUSBY:
> Q.· ·Go ahead.
> A.· ·No.
> Q.· ·Okay.· What did you think about that?
> A.· ·I just thought it was wrong.
> ·Q.· ·Okay.· Why?
> A.· ·Because she was hurt and she shouldn't -- shouldn't have been doing what she was doing.
> Q.· ·Okay.· Was that obvious to you that she was hurt?· Okay.· How was that obvious?
> A.· ·The pain and the look in her face and the way she walked, her swollen knee.

Exhibit 3 at 24.

At her deposition, Sanchez testified that after her injury every time she received forms from her doctor restricting her work activities, she would provide the form to her supervisor, Rhonda Tu or Kristin Foley. Confidential Exhibit 1 at 260:8. At her deposition, Sanchez's supervisor at the time she was first injured, Rhonda Tu, also confirmed that she was aware of Sanchez's injury and that Sanchez would provide information from her doctors to Ms. Tu. See Confidential Exhibit 16 at 10:12 and 11:10:

> Q.· ·Okay.· So my client would receive things from her doctor, and she would provide them directly to you?
> ·A.· ·If I remember correctly, yes.
> Q.· ·Okay.· And would you discuss with my client what the records meant?
> A.· ·I -- I think we understood what it was supposed to be doing, like, what she was supposed to be doing and not doing.

*Id.* at 13:9

On December 30, 2016, Sanchez was officially demoted to the Food Service Cashier role, which she had already been fulfilling. Attached hereto as Confidential Exhibit 17 is a "Compensation Changes" document showing that Sanches was demoted from FNS Coordinator at $16.95 per hour to FNS Services Cashier at $14.48 per hour on December 29, 2016.  Confidential Exhibit 17 states that the document was created by Jessi Russell (now Cohen) and was approved by Oetjen.  Vargas' name also appears on the document as Sanchez's Second Supervisor. *Id.* As of January 16, 2017, the rate of Plaintiff's pay was reduced to $14.48 an hour.

When Macaluso was asked about whether she had any knowledge of any allegation of racial discrimination by Ms. Vargas against the Plaintiff, Macaluso testified as follows:

> ·Q.· ·Okay.· Do you have any knowledge of any allegations of racial discrimination by Ms. Vargas against my client?
> ·A.· ·Well, just that she came to work one day, and her office was taken away from her and she was demoted down to just a cashier.

Exhibit 3 at 14:19.

Sanchez's workers compensation claim related to her injuries was administered Shawl Levac, Workers Compensation Manager at Renown. At her deposition, LeVac testified that she communicates with a person's supervisor regarding their injuries, and LeVac recalled specifically communicating with Sanchez's leaders about her injuries.  Confidential Exhibit 18 at 14:3. LeVac testified that Workers Comp. reaches out directly to the department where an employee works to identify a job that meets the employees' current restrictions. *Id.* at 16:8. LeVac testified that she believed that Sanchez was working as FNS Coordinator at the time of her injury in July of 2016, not as a cashier. Id. at 29:15.

LeVac also testified about an August 28, 2017 email from her to Jessi Russell (attached hereto as Confidential Exhibit 19), in which LeVac states that she attended a seminar regarding the intersection of Workers Comp. and ADA issues. See

Confidential Exhibit 18 at 38. In the email in Confidential Exhibit 19, LaVac informs Jessi Russell that the experts and lawyers, in answering a hypothetical question, unanimously agreed that an employer should not reduce injured workers' pay, especially when there is an active worker's comp case. LeVac confirmed that she was referring to Sanchez in the hypothetical she presented at the conference.  Id. at 42:17.

At her deposition, LeVac also testified that the Worker's Comp. team, after receiving a complaint that Sanchez's accommodations were not being met, did an observation on September 29, 2017.  Confidential Exhibit 18 at 58.  LeVac testified that the observation was conducted by Britney Hinojosa.  Attached hereto as Exhibit 20 is the email from LeVac to Jessi Russell, Justin Bart, and Kristin Foley dated October 12, 2017, entitled "Lucero Sanchez restrictions." Hinohosa described her observation as follows:

> 9/29, we observed Lucero doing her daily work at the South Meadows location, starting at 7:00 am we sat in the Cafeteria. It was observed that she was currently working alone up front at the register; working the cafe line. We noticed her Supervisor once at 7:40 am, she stopped at the register to speak with Lucero. Lucero did leave on two separate occasions (about 2 minutes each) we believe it be, use of the restroom. She didn't have anyone to cover her during that time. We were told she had a stool available, but it was not noted. However she is constantly on her feet; didn't have any time to sit down, rest or take micro breaks. From 8:00 am to 9:00 am hour she appeared to be the busiest at the cafe. Lucero comes across very friendly, greets all the guests; recognizes staff, appears very well liked, does her job well & is constantly restocking items, cleaning up; appears to work hard. She was alone from 7:00 am until 10:00 am, when we left the area. Right as she was taking breakfast items down; setting up for lunch.

Exhibit 20.

Shortly after this observation, on October 4, 2017, Dr. Sobiek testified that he imposed restrictions on Sanchez to 75% sedentary and no stooping and no climbing. Confidential Exhibit 15 at 58:13.

After reviewing several emails between Jessi Russell and Christina Vargas related to "reclassifying" Sanchez as a Cashier, LeVac testified that she was not

included in the discussion about whether Sanchez was to be demoted. Id. at 36:1. LeVac testified that when she found out that Sanchez had been demoted and that had her pay cut on September 29, 2017, she emailed Sanchez and stated, "I'm very sorry that this happened to you." Confidential Exhibit 18 at 51.  LeVac then testified as follows:

> Q.· ·Okay.· So are you're essentially saying that Renown made a mistake?
> MS. KETNER:· Object to form.
> BY MR. BUSBY:
> Q.· ·Is that fair?
> A.· ·I would agree, I guess.· Yes.
> Q.· ·Okay.· So she was hurt, they knew that, right?· They were asking you via e-mail, whether she was still injured before they did -- demoted her.
> MS. KETNER:· Object to form.
> BY MR. BUSBY:
> Q.· ·Right?
> A.· ·Correct.
> Q.· ·Okay.· They kept you out of the conversation when they were talking about demoting her in the emails we reviewed earlier, right?
> A.· ·Correct.
> Q.· ·Okay.· And if they had told you what they were going to do, you would've told them not to do it, right?
> A.· ·I would've told them not to reduce her pay.

Id. at 53.

Also, at LeVac's deposition, LeVac testified that on October 13, 2017, LeVac stepped in via email and essentially directed Jessi Cohen to address Sanchez's issues:

> Q.· ·Do you see your e-mail there on Friday, October 13, 2017 at 9:54 a.m. at the top.· Okay.· Where you say, "Jessi, if we're not able to accommodate her current restrictions, we cannot in good faith leave her in that position all day.· Do you want to meet a bit earlier?"· Okay.· What did you mean by, "We can't, in good faith, leave her in that position all day?"
> A.· ·If they cannot accommodate her restrictions, we cannot just leave her in the position. · So I just usually remove them from work.
> Q.· ·Okay.
> A.· ·Until they can show that they can accommodate.

Confidential Exhibit 18:19

LeVac then testified as follows:

Q.· ·Okay.· And do you see Jessi Russell's response to you at the top.·
"No, I need us to hold please until 2:30 when we're able to meet today
with Sandy, our legal counsel.· Today, we are accommodating it, so let's
hang tight making any changes until after our meeting today, please."·
So it seems that she's disagreeing with you that the accommodation is
taking place.· Is that right?
MS. KETNER:· Object to form.
THE WITNESS:· I don't know what Jessi was thinking, but she felt she
knew what she was doing. And unfortunately, you know, that's not her
area of expertise.· So I believe we removed her.

Id. at 67:22.

Shortly after LeVac became aware of Sanchez's predicament on September
29, 2017, within a few weeks Sanchez was removed from her cashier position.  As
indicated in Renown's Motion at 18:23. October 13, 2017, the date LeVac (heroically)
intervened and stood up to Cohen on Sanchez's behalf, was Sanchez's last day in
the FNS department.

On January 8, 2018, the Plaintiff submitted a complaint to the Equal
Employment Commission ("EEOC") under Charge No. 34B-2017-01343, Nevada
Equal Rights Commission ("NERC") 0112-18-0007-R, alleging racial discrimination,
disability discrimination, harassment, and retaliation. See Exhibit 21.

In a January 11, 2018, Confidential Investigation Report, attached hereto as
Confidential Exhibit 22, Renown addresses allegations made by Sanchez against
Vargas.  The investigation found that while Ms. Sanchez was the only non-exempt
employee who felt targeted or harassed due to age/tenure, disability, or other
protected class, the general sentiment amongst staff and supervisors at Renown was
that they were mistreated by Vargas and that Vargas was a bully and would frequently
lash out with unprofessional language. This created an atmosphere where staff and
leaders avoided confronting or reporting on her. The report also addresses Ms.
Sanchez's pay, which was reduced, and she claimed it was discriminatory. The report

1   claims that the reason given for this change was a shift in job position. The report
2   concludes that Vargas resigned in lieu of termination months prior with the
3   recommendation that all members of the department undergo training in harassment
4   and discrimination. Additionally, it was recommended that leaders should ensure that
5   employee restrictions related to medical needs are upheld.

6        Despite Renown's denials regarding its knowledge of Vargas' animus towards
7   Mexicans, and no mention of such in the Confidential Investigation Report, Renown
8   disclosed "Investigation documents regarding Christina Vargas" attached hereto as
9   Exhibit 23. Included therein is an interview of Kathy West conducted by Renown HR
10  in August of 2014 in which West makes a report that Vargas stated to another Renown
11  employee, "I hate Mexicans."   See Exhibit 23 on page 53 RENOWN008104. The
12  Investigation documents detail a pattern of abusive and hostile behavior by Vargas
13  dating back to 2013.

14       Exhibit 23 at RENOWN 008140 proves that for years, Renown had been aware
15  of significant concerns regarding Vargas. The allegations against paint a picture of a
16  consistently hostile and intimidating work environment under her leadership. As early
17  as December 2013, complaints arose highlighting her "hostile behaviors." The
18  following year, in March 2014, further concerns emerged, with staff accusing Vargas
19  of bullying and creating a hostile work environment. A Clinical Nutrition Supervisor
20  even resigned, citing "Differences in management style" due to Vargas's behavior. A
21  particularly contentious incident occurred in June 2014 when Vargas interacted with
22  a US Foods Representative. She reportedly became irate, using language such as
23  "fucking bullshit," which left the representative feeling intimidated. In April 2017, her
24  demeanor reached an alarming level when, in the presence of other staff members,
25  Vargas referred to a colleague named Margo as a "fucking cunt." The list of complaints
26  continued, with staff describing her leadership as intimidating and bullying, and
27  expressing fears about being on Vargas's "bad side." Reports from May 2017
28  underlined the long-standing concerns, indicating that her leadership style was

perceived as so intimidating that staff felt they were constantly at risk of retribution if they complained, a trend that had been evident for years. Conspicuously absent from the document in Exhibit 23 at RENOWN 008140 are Sanchez's complaints about Vargas made to Oetjen.

Also included in Exhibit 23 at RENOWN008142, is a Notice of Corrective Action for Christina Vargas, dated May 25, 2017, and authored by Jessi Russell. It reiterates many of the concerns, such as her intimidating approach, direct confrontations, and inappropriate language. The document concludes that, based on feedback and her failure to make necessary changes, Vargas' employment was to be terminated effective immediately.

NERC determined there was "Probable Cause" for Sanchez's claim of disability discrimination, as referenced in Exhibit 24. Particularly concerning to NERC was Renown's failure to accommodate Sanchez's disability. The investigation could not find sufficient evidence of adverse actions based on employment terms, age, demotion, or retaliation. However, NERC emphasized a strained relationship between Sanchez and her supervisor, Vargas. Although there was evidence of a strained relationship, the Commission couldn't ascertain discrimination based on Sanchez's national origin. NERC did find that Sanchez, despite needing light-duty accommodations due to her disability, was often required to work outside of these accommodations, lifting weights beyond her restrictions for over a year. NERC found that while Renown claims to have been accommodating, evidence shows Sanchez was made to work outside her restrictions. She was eventually placed in a position that would still not fully accommodate her, causing her to feel pressured. The Commission emphasized a strained relationship between Renown and Sanchez, noting Sanchez's disability needs were often overlooked.  On June 2, 2021, the EEOC issued a Notice of Right to Sue to Sanchez. See Exhibit 25.  "An EEOC letter is a 'highly probative evaluation of an individual's discrimination complaint.'" *Coleman v.*

*Quaker Oats Co.*, 232 F.3d 1271, 1283 (9th Cir. 2000) quoting *Plummer v. Western Int'l Hotels Co., Inc.*, 656 F.2d 502, 505 (9th Cir. 1981).

On December 7, 2022, the NERC Investigator assigned to Sanchez's case, Richard Brown, was deposed for this case.  Brown testified that he has been at NERC for nine years and had specialized training to do his job.  Confidential Exhibit 26 76:11.  Brown testified that although he did the investigation at NERC, NERC's determination in Exhibit 24 was not authored or signed by him, but rather by Karen Jenkens.  *Id.* at 78:8. Brown testified that Renown did not contest that Sanchez was disabled.  *Id.* at 79:16, or that it was aware of Sanchez's disability. *Id.* at 79:24.  Brown also testified that he received medical records indicating that Sanchez was subject to weight restrictions of not more than 10 pounds, and that he received evidence that she was required to life more than 10 pounds during the time periods where her doctor prohibited as much. *Id.* at 80:5. Brown also agreed that NERC was concerned about violations of the imposition of light duty accommodations on Sanchez, not just weight restrictions. *Id.* at 90:12.

Since her injury Sanchez's health continually worsened, with her knees remaining inflamed and unsteady, primarily because the defendant did not adhere to the medical recommendations for light-duty work.  At her deposition taken on August 17, 2022, Sanchez testified as follows about the work she was required to do while injured:

> Q·  · Okay.·  Do you think that -- so there is allegations in this case that Renown caused further injuries to your knees by failing to accommodate your requests for light duty work?
> A·  · Yes.
> Q·  · Are you aware of that?
> A·  · Yes.
> Q·  · Okay.·  Can you describe how that happened on a day-to-day basis at Renown?
> A·  · My work, so I would come to work and start doing·the cashier position.·  They would have me like lift the boxes.·  Some of them were like 60, 70 pounds.
> Q·  · Okay.·  Were you wearing devices to assist you with your knee issues at the time you were doing this work?
> A·  · I had knee braces.

Okay.· And just so I can get a picture of your working environment, would your, your -- would the management team at Renown under whom you worked see you performing your job on a day-to-day basis?

MS. KETNER:· Objection; leading --

THE WITNESS:· Yes.

MS. KETNER:· -- and form.

BY MR. BUSBY:

Q· · Okay.· So who was around you when you were performing your work at Renown A· · So --

Q· · -- after your injury?

A· · -- after my injury, Rhonda was always walking in and out of the cafeteria, so she will see me perform my job. Kristin Foley, even though she held the position at the main, she continued to be at South Meadows.· She will walk back in, out, in, in and out of the, the kitchen.

Confidential Exhibit 1 at 263:1.

Eventually, in January of 2019, Sanchez obtained a position at Renown as a Unit Clerk in the Surgery Department at Renown, a position that she holds to this day. Confidential Exhibit 1 at 27.

The report of the Plaintiff's expert, Dr. James Rappaport, is attached hereto as Confidential Exhibit 26. Dr. Rappaport is a highly qualified surgeon, as shown in his curriculum vitae in Confidential Exhibit 26.  Dr. Rappaport opined in his report, that Sanchez underwent total knee arthroplasty (complete knee replacement); Subsequent to the knee replacement, she required manipulation under anesthesia; After the manipulation, she experienced a partial tear of the quadriceps which necessitated a revision arthroplasty and repair; Lucero received extensive physical therapy and medications; She was provided a femoral nerve block for chronic pain syndrome in her right leg; Pain management specialty treatment was suggested for her ongoing pain; She also received psychiatric services for stress and harassment experienced at work. Dr. Rappaport opined that Sanchez's medical record shows an industrial injury to both her knees, with both osteoarthritis and chondromalacia being identified as causes of her pain due to this injury; That the medical record demonstrates that after the initial closure of the case, complications arose after Lucero underwent a knee replacement; These complications included the need for manipulation under anesthesia, a partial tear of the quadriceps, and subsequently, a

1   revision arthroplasty; and, despite various treatments, Lucero continues to suffer from

2   a chronic pain syndrome in her right leg, which Dr. Rappaport indicates may be

3   considered a chronic regional pain syndrome. Dr. Rappaport emphasizes that

4   Sanchez's medical record indicates the need for specialized pain management and

5   highlights the significant psychiatric impacts she experienced due to stress and

6   harassment at work. The psychiatric diagnosis provided is major depressive disorder

7   and situational anxiety disorder. *Id.*

8       Although Renown argues that Sanchez's injuries are the result of her

9   preexisting arthritis, citing Dr. Sobiek and Dr. Shukla, Dr. Rappaport opines in his

10  rebuttal report, attached hereto as Confidential Exhibit 28, that Sanchez had

11  osteoarthritis in her knees due to the industrial accident while working at Renown.

12  This condition required a total knee replacement and led to various complications,

13  including the need for manipulation under anesthesia, a partial tear of the quadriceps

14  muscle, and chronic pain syndrome. Dr. Rappaport acknowledges that obesity can

15  contribute to osteoarthritis but emphasizes that Lucero had undergone bariatric

16  surgery before the injury, and at the time of the injury, she weighed around 171

17  pounds. Therefore, her weight is not a significant factor in her current condition. *Id.*

18  Dr. Rappaport also emphasized that Sanchez had gone beyond the restrictions placed

19  on her after her treatments, that that this would cause her condition to worsen, "Any

20  activity above and beyond restrictions placed by her doctors would be expected to

21  exacerbate this natural progression." *Id.* page 4.

22      At her deposition taken on August 17, 2022, Sanchez testified as follows about

23  the condition of her knees:

24          Q· · Okay.· How does your right knee feel right now?
            A· · It's really painful.· I --
25          Q· · Okay.
            A· · -- have no range of motion.· It's really difficult to walk.
26

27  Confidential Exhibit 1 at 261:16.

28

In response to the Plaintiff's First Requests for Admission (Attached hereto as Exhibit 29), Renown Admitted that it has over 500 employees (RFA 1); Sanchez internally transferred to the position of unit clerk on January 15, 2018 (RFA 37); Christina Vargas resigned from her employment with Renown Health in lieu of termination on May 25, 2017 (RFA 40).

## III.   Argument

### a. *Standard of Review*

The Seventh Amendment of the U.S. Constitution prohibits the denial of the right to a jury trial. Juries, rather than judges, determine the outcome of factual disagreements. FRCP 56 permits summary judgment only where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  When the evidence is of a nature that a reasonable jury could potentially reach a decision in favor of the party not seeking summary judgment, there exists a bona fide factual dispute. *Sierra Medical Services Alliance v. Kent*, 883 F.3d 1216, 1222 (9th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248).  In deciding a summary judgment motion, the evidence must be construed "'in the light most favorable to the opposing party,'" and the court must also "draw inferences in favor of the nonmovant." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014); accord. *Holley v. Techtronic Indus. N. Am*., 812 F. App'x 517, 517 (9th Cir. 2020).  In a motion for summary judgment, all reasonable factual inferences must be construed in favor of the party opposing the motion. This includes considering both direct and circumstantial evidence. *Coghlan v. Am. Seafoods Co. LLC*., 413 F.3d 1090, 1095 (9th Cir. 2005); cf. *Baker v. Roman Catholic Archdiocese*, 725 F. App'x 531, 532 (9th Cir. 2018) (failure to "properly consider various pieces of circumstantial evidence" warrants reversal).

///

### b. A genuine issue of material fact exists as to Sanchez Title VII claim because she was subject to a hostile work environment and adverse employment actions because of her race

In order to establish a Title VII claim based on a racially hostile work environment, the Plaintiff must prove each of the following elements by a preponderance of the evidence: (1) Sanchez was subjected to physical contact or intimidation of a racial nature; (2) the conduct was unwelcome; (3) the conduct was sufficiently severe or pervasive to alter the conditions of the Sanchez employment and create a racially abusive or hostile work environment; (4) Sanchez  perceived the working environment to be abusive or hostile; and (5) a reasonable woman in Sanchez's circumstances would consider the working environment to be abusive or hostile. Hostility must be measured based on the totality of the circumstances. *Fuller v. City of Oakland, California*, 47 F.3d 1522, 1527 (9th Cir. 1995).

"A plaintiff must show that the work environment was both subjectively and objectively hostile."  *McGinest v. GTE Service Corp*., 360 F.3d 1103, 1113 (9th Cir. 2004); see also Fuller, 47 F.3d at 1527 (citing Harris, 510 U.S. at 21-22).

Sanchez was subjected to intimidation of a racial nature. Vargas's repeated derogatory comments about Mexicans, including "I hate fucking Mexicans" and "I hate Mexicans," directly express racial animus. Vargas's explicit instruction, as recounted by Mr. Pineda, to refrain from hiring Hispanics because they are "lazy" constitutes a clear racial prejudice. The act of Vargas throwing away a radio playing Hispanic music further shows Vargas' racial bias.

Vargas' conduct towards Sanchez was unwelcome. Sanchez's complaint to Ms. Oetjen about the physical altercation with Vargas signifies that she found Vargas's actions unwelcome and distressing. The broader context of racial prejudice paints all of Vargas's acts as inherently unwelcome to any employee of Mexican or Hispanic descent The reported physical assault by Vargas on Sanchez was racially motivated intimidation, given the context of Vargas's aforementioned discriminatory behavior.

The conduct was sufficiently severe or pervasive to alter the conditions of Sanchez's employment and create a racially abusive or hostile work environment. Sanchez's position was eliminated, leading to a demotion and a pay cut, a tangible and severe alteration in her employment conditions. The physical altercation, combined with the racial comments and other discriminatory behaviors, presents a continuous pattern of abuse that created a hostile work environment for Sanchez. Vargas's influence reached beyond just Sanchez, with her advising Mr. Pineda against hiring Hispanics.

Sanchez perceived the working environment to be abusive or hostile. Sanchez's medical records indicate that she was diagnosed with major depressive disorder and situational anxiety disorder, directly attributed to her experiences at Renown. This serves as a testament to the negative impact the hostile work environment had on her well-being. The fact that Sanchez felt the need to report the physical altercation to Ms. Oetjen further confirms her perception of an abusive environment. A reasonable woman in Sanchez's circumstances would consider the working environment to be abusive or hostile.   Being subjected to open racial prejudice, discriminatory employment decisions, physical altercations, and derogatory name-calling would make any reasonable individual, especially one from the targeted racial group, perceive the work environment as hostile. The fact that Vargas's negative behavior was well known by Renown management, as evident in the investigation report and Mr. Pineda's testimony, further supports that any reasonable individual in Sanchez's situation would feel the same way.

### c. A genuine issue of material fact exists to each element of Sanchez ADA claim because she was demoted because of her disability and her workplace restrictions were not followed by Renown

Sanchez's is a qualified individual, that Renown had sufficient notice of her disability and required accommodations, and reasonable accommodations were feasible but not provided.

The ADA forbids discrimination against disabled individuals in major areas of public life, among them employment.  See 42 U.S.C. §§ 12111–12117.  Renown admits that it has over 500 employees, and as such, it is subject to the ADA.  Under the ADA, a "disability" is defined as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. §12102(2).

In the employment context, a qualified individual with a disability may show an ADA discrimination in either of two ways: by presenting evidence of disparate treatment or by showing a failure to accommodate. *Dunlap v. Liberty Natural Prods*., Inc., 878 F.3d 794, 798 (9th Cir. 2017) ("We have recognized that a failure-to-accommodate claim is 'analytically distinct from a claim of disparate treatment or impact under the ADA.'") (quoting *Johnson v. Bd. of Trustees of Boundary Cty. Sch. Dist*., 666 F.3d 561, 567 (9th Cir. 2011)).

To establish Sanchez's claim that Renown discriminated against her in violation of the ADA by failing to provide a reasonable accommodation, Sanchez must show three elements: (1) the plaintiff is a "qualified individual"; (2) the defendant received adequate notice of the plaintiff's disability and desire for a reasonable accommodation; and (3) a reasonable accommodation was available that would have enabled the plaintiff to perform the essential functions of the job. *Nunes v. Wal-Mart Stores, Inc*., 164 F.3d 1243, 1246 (9th Cir. 1999). *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018)

The plaintiff is a "qualified individual." Sanchez, despite her disability, was competent to perform her duties. Before her injury, she held the position of FNS Coordinator and even after her injury, she effectively carried out her responsibilities as a cashier. The repeated mentions in the medical records, such as Exhibits 9 through 14, affirm that she was released to perform her job with certain restrictions, which implies that she was capable of working. Moreover, the observation by Britney

1   Hinojosa (Exhibit 20) emphasized that Sanchez is diligent, competent, and popular
2   among the staff and customers.

3           If an employer is aware or should reasonably be aware of an employee's
4   request for a reasonable accommodation, it initiates the employer's responsibility to
5   begin the interactive process. *Dunlap v. Liberty Natural Prods., Inc*., 878 F.3d 794,
6   798 (9th Cir. 2017).  See also See *Snapp*, 889 F.3d at 1095, notifying an employer of
7   a need for an accommodation triggers a duty to engage in an interactive process for
8   accommodating the employee. Renown received adequate notice of Sanchez's
9   disability and desire for a reasonable accommodation This is made abundantly clear
10  by multiple points: Following each medical appointment, as evidenced by Exhibits 9
11  through 14, Sanchez received recommendations regarding her work limitations. She
12  consistently communicated these restrictions to her supervisors, as confirmed by her
13  own deposition and that of her initial supervisor, Rhonda Tu. Dr. Sobiek's deposition
14  and recommendations (Confidential Exhibit 16, etc.) provided specific guidelines and
15  restrictions for Sanchez's work. This, along with Sanchez's and Tu's testimony, proves
16  that the management, particularly Vargas, was aware of Sanchez's condition and the
17  necessity for accommodations. The email detailed in Exhibit 20 from LeVac shows
18  that there was an observation done in September of 2017 to determine whether the
19  conditions of Sanchez's work were in line with her medical restrictions, again
20  highlighting that Renown was not only aware of her condition but also aware that her
21  conditions were not being met.  Renown provided no evidence that it engaged in the
22  interactive process of accommodation for Sanchez.

23          Under the ADA, an accommodation by the defendant may include, but is not
24  limited to: (a) Modifying or adjusting a job application process to enable a qualified
25  applicant with a disability to be considered for the position; (b) Making existing facilities
26  used by employees readily accessible to and usable by individuals with disabilities;
27  (c) Job restructuring; (d) Part-time or modified work schedule; (e) Reassignment to a
28  vacant position; (f) Acquisition or modifications of examinations, training materials, or

policies; (g) Provision of qualified readers and interpreters; and (h) Other similar accommodations for individuals with plaintiff's disabilities. See *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) ("The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a 'qualified individual,' the employer receives adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business.").   Reasonable accommodation was more than available that would have enabled the plaintiff to perform the essential functions of the job.  The key here is "reasonable accommodation."

While Renown did provide Sanchez with a chair, this was hardly an appropriate or sufficient accommodation, given the specific restrictions outlined by her medical advisors at varying times: The recommendations (in Exhibits 9 to 14) show that Sanchez needed significant time seated, limited walking, and limited standing. Yet, based on the observation (Exhibit 20), Sanchez was mostly on her feet, continuously working without adequate breaks, and lacked assistance despite being busy. Dr. Sobiek's instructions were clear about Sanchez requiring a predominantly sedentary position, along with lifting, stooping, and climbing restrictions. The mere provision of a chair does not meet these requirements. Notably, NERC's findings (Exhibit 24) indicate that Renown did not appropriately accommodate Sanchez's needs and that she often had to work outside her medical restrictions.

It was only in January of 2018, long after Sanchez's injury and numerous notifications to Renown, and Shawn LeVac sticking up for Sanchez, that she transferred her to a role that truly accommodated her disability. This delay in proper action proves that suitable accommodation was available much earlier, Renown is a massive institution with well over 500 employees.

///

///

### d. A reasonable jury could find for Sanchez on her Title VII retaliation claim

In order to prevail on her Title VII retaliation claim, Sanchez mush show: (1) she participated in an activity protected under Federal law, that is complained about the discrimination she faced; (2) that Renown subjected the Sanchez to an adverse employment action, and (3) that Sanchez was subjected to the adverse employment action because of her participation in a protected activity. See *Hutton v. Elf Atochem N. Am., Inc.,* 273 F.3d 884, 891 (9th Cir. 2001). *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987).

A plaintiff is subjected to an adverse employment action because of participation in a protected activity if the adverse employment action would not have occurred but for that participation. *Kortan v. Cal. Youth Auth*., 217 F.3d 1104, 1113 (9th Cir. 2000). An action is an adverse employment action if a reasonable employee would have found the action materially adverse, which means it might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006).

Terminating or demoting an employee is considered an adverse employment action.  Additionally, even measures that aren't as severe as termination or demotion, like shifting an employee to a different position at the same level, giving an unfavorable reference that didn't influence a hiring decision, or assigning a more challenging work schedule, can also be seen as negative actions in this scenario. Such actions might discourage a typical employee from raising or backing a discrimination complaint. See *White*, 548 U.S. at 68; *Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir. 2000).

Sanchez's actions clearly align with activities that federal law protects: Sanchez made requests for ADA accommodations following her injury in 2016. Requesting accommodations under the Americans with Disabilities Act (ADA) is a recognized protected activity.  She reported a hostile work environment that she faced at Renown, particularly from Vargas. Reporting discriminatory or harassing behavior, such as a hostile work environment or ADA disability discrimination, are protected activities

under federal law. See 42 U.S.C.S. § 1981 and 42 U.S.C. § 12203(a) "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act…."  As a matter of law, reports of racial or disability discrimination are protected activity. *Brown v. Simpson Strong-Tie Co.*, No. 2:19-CV-01921-KJM-AC, 2021 U.S. Dist. LEXIS 247776, at *1 (E.D. Cal. Dec. 29, 2021).

Furthermore, Sanchez's complaint to Ms. Oetjen about being physically "poked" by Vargas indicate she voiced concerns about discrimination and unfair treatment. Reporting discriminatory behavior is an activity protected under federal law.

Renown subjected Sanchez to an adverse employment action.  Despite her many years of service and excellent employment reviews, Vargas eliminated Sanchez's FNS position and demoted her to a lower-paying role in December 2016. As a result of this demotion, her pay was reduced from $16.95 per hour as an FNS Coordinator to $14.48 per hour as an FNS Services Cashier. Even after her injury in July of 2016, instead of accommodating her disability, she was given a physically challenging role, stocking heavy items without any assistance during early hours.

The chronological sequence of events, combined with contextual evidence, shows a causal link between Sanchez's protected activities and the adverse actions she faced: After Sanchez's injury and subsequent requests for ADA accommodations, she was demoted and given a more physically demanding role, rather than being provided with the necessary adjustments to cater to her disability. Renown's inadequate response to Sanchez's complaint to Ms. Oetjen about Vargas's physical assault indicates a failure to address the discriminatory behavior she reported. Notably, there are testimonies regarding Vargas's discriminatory attitudes, such as Mr. Pineda's deposition where he mentioned Vargas's derogatory remarks about Hispanics and her act of throwing away a radio playing Hispanic music. Such discriminatory behaviors, combined with the adverse actions Sanchez faced, proves that Sanchez's participation in protected activities provoked Vargas's decisions against her.

Additionally, Vargas's resignation and the investigation report from January 11, 2018, which painted her as a bully and highlighted a hostile work environment, further cement the fact that Sanchez's complaints and Vargas's subsequent actions against her were connected. The evidence shows that Sanchez engaged in protected activities by reporting discriminatory behaviors and requesting ADA accommodations. In response to these actions, she faced adverse employment measures, because of her engagement in these protected activities.

### e. A genuine issue of fact exists for each element of Plaintiff's Intentional Infliction of Emotional Distress claim

To establish a claim for Intentional Infliction of Emotional Distress, the Sanchez must show (1) Renown engaged in extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) Sanchez having suffered severe or extreme emotional distress and (3) actual or proximate causation. *Barmettler v. Reno Air, Inc.*, 114 Nev. 441, 447, 956 P.2d 1382, 1386 (1998) citing *Star v. Rabello*, 97 Nev. 124, 125, 625 P.2d 90, 91-92 (1981) (citations omitted).

Renown engaged in extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress to Sanchez. Sanchez's many years of commendable service and superior employment reviews, Vargas, representing Renown, eliminated her FNS position and demoted her. The consequential pay cut further exacerbated the financial and emotional strain on Sanchez. After Sanchez's workplace injury in July 2016, her requests for reasonable accommodations, in line with multiple medical recommendations, were frequently ignored or inadequately addressed. The sole provision of a chair is evidence of Renown's insufficient accommodation efforts. Several incidents point to an environment of racial discrimination. Notably, Vargas's derogatory comments about Mexicans in 2014, her instruction to Mr. Pineda not to hire Hispanics due to their alleged laziness, and her act of throwing away a radio playing Hispanic music are

clear indicators of this. Furthermore, Renown's knowledge of these incidents and the lack of decisive action implies complicity. Vargas's act of physically "poking" Sanchez and the subsequent failure of Renown to take any noticeable action on Sanchez's complaint, especially in the context of Vargas's known discriminatory behavior, further illustrates Renown's disregard for Sanchez's well-being.

Sanchez's medical records as described by Dr. Rappaport document a psychiatric diagnosis of major depressive disorder and situational anxiety disorder. This diagnosis directly correlates with her adverse experiences at Renown, indicating significant emotional turmoil.

The sequence of events, from Sanchez's injury, her demotion, the inadequate accommodations, the racial discrimination, and the harassment, leads directly to her emotional distress claim. The consistent portrayal of Vargas's behavior, combined with Renown's inaction, establishes a clear causal link between Renown's behavior and Sanchez's emotional distress.

In sum, the facts highlight a pattern of egregious conduct by Renown, specifically through Vargas, leading to severe emotional distress for Sanchez. Given the extent of the adverse actions, the overt racial discrimination, the medical testimony on her physical and emotional condition, and the temporal link between these incidents and her emotional distress, Sanchez meets the standard for jury to hear her claim of intentional infliction of emotional distress.

### f. A genuine issue of fact exists as to Renown's preferred rationale for eliminating Sanchez's FNS Position

Renown argues that once this burden of production is met, i.e. to show a legitimate non-retaliatory basis for the alleged adverse employment action, the burden shifts back to Plaintiff to demonstrate pretext. *Miller v. Fairchild Industries, Inc*., 797 F.2d 727, 730-31 (9th Cir. 1986) (applying the burden shifting structure of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

While Renown has presented a series of statements and deposition excerpts to support the assertion that their decision to eliminate the FNS Coordinator position and transfer Sanchez to a cashier position was based on legitimate and non-discriminatory reasons, these rationales emerged only after the filing of Sanchez's Charge of Discrimination on January 8, 2018.

The evidence presented in defense of Renown's actions comes from depositions and affidavits dated after the filing of Sanchez's Charge of Discrimination. This timing raises suspicions regarding the retrospective crafting of a narrative to justify actions that had already taken place.

Confidential Exhibit 17, the document provided to Sanchez explaining her demotion, simply states, "no job req needed. change in title due to alignment of duties being performed by employee. change in hourly rate only to bring to the top of the max of FNS-02 range. no change in eval date."

Further, Sanchez's diary indicates she continued with her catering duties after her demotion and pay cut and at the December 30, 2016 meeting when Jessi Russell demoted Sanchez Russell did not say that the position of FNS Coordinator was being eliminated. See Exhibit P to Defendant's Motion at ECF #69-16 page 34.   At ECF #69-16 page 33, Sanchez states that Russell told her that, "since I've been doing the cashiers position for a while that they were going to bring my pay to the top of the Cashier's 14.48."

The assertion that the number of catering events significantly declined, leading to the elimination of the FNS Coordinator position, appears "post-textual," if not pretextual.  There is no documented evidence prior to January 8, 2018, that clearly indicates a decline in catering events. In the Motion, Renown relies solely on post-charge depositions without concrete statistical evidence from before the charge. This is especially relevant if there was no documentation or correspondence before January 8, 2018, that discussed the decline of catering events or the redundancy of the FNS Coordinator position.   If the FNS Coordinator position was genuinely

1  rendered redundant due to a decline in catering events, it stands to reason that there
2  would be memos, emails, or internal documentation prior to January 8, 2018,
3  discussing this development.

4       While Renown argues that in 2010, the job title of "Catering
5  Coordinator/Cashier" was modified to "FNS Coordinator" and there was no alteration
6  to the Plaintiff's responsibilities or salary. Comparing the job descriptions for these two
7  positions belies this assertion.  See Exhibit D [ECF #69-4] and Exhibit F [ECF #69-6]
8  to Defendant's Motion.  There was a distinct separation in primary responsibilities and
9  focus areas of the two roles, with the "Catering Coordinator/Cashier" role emphasizing
10  catering coordination and cash handling, while the "FNS Coordinator" role has a
11  broader scope involving cafe coordination, financial management, and event
12  handling. In sum, while Renown claims their decisions, namely Vargas' decisions,
13  were based on legitimate, non-discriminatory reasons, the timing and nature of the
14  evidence they've presented shows these reasons have been contrived post-hoc.

15  **IV.**    Conclusion

16       For each of the claims above, a genuine issue of material fact exists as to each
17  element of each claim.  Summary judgment under Rule 56 is not warranted, so the
18  Plaintiff requests that the Defendant's motion be denied.

19       RESPECTFULLY SUBMITTED this Thursday, October 5, 2023

20

21                                    By:___/s/ Luke Busby, Esq. _____
                                       Luke Busby, Esq.
22                                     Nevada Bar No. 10319
                                       316 California Ave. #82
23                                     Reno, Nevada 89509
                                       (775) 453-0112
24                                     (775) 403-2192 (Fax)
25                                     luke@lukeandrewbusbyltd.com
                                       *Attorneys for the Plaintiff*
26

27

28

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to FRCP 5(b), I certify that on the date shown below, I caused service to be completed of a true and correct copy of the foregoing document by:

_____        personally delivering;

_____        delivery via Reno/Carson Messenger Service;

_____        sending via Federal Express (or other overnight delivery service);

\_\_x\_\_\_\_        depositing for mailing in the U.S. mail, with sufficient postage affixed
                thereto; or,

\_\_\_\_\_        delivery via electronic means (fax, eflex, NEF, etc.) to:


Sandra Ketner
Of Counsel
SIMONS HALL JOHNSTON PC
690 Sierra Rose Dr. Reno, NV 89511
T: 775.785.0088 | F: 775.785.0087


By: _____ /s/ Luke Busby, Esq. _____          Dated: \_\_10/5/2023\_\_\_
LUKE A. BUSBY, ESQ.
SBN 10319
316 California Ave.
Reno, NV 89509
775-453-0112
luke@lukeandrewbusbyltd.com
Attorney for the Plaintiff