1

2

3            UNITED STATES DISTRICT COURT

4                  DISTRICT OF NEVADA

5                        * * *

6  LUCERO SANCHEZ,                    Case No. 3:21-cv-00352-MMD-CSD

7                        Plaintiff,         ORDER

8        v.

   RENOWN HEALTH,

9
                        Defendant.
10

11  **I.    SUMMARY**

12       Plaintiff Lucero Sanchez sued her employer, Defendant Renown Health, under

13  Title VII of the Federal Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 1981, 2000e,

14  *et seq.* ("Title VII") and the Americans With Disabilities Act of 1990, 42 U.S.C. § 12131,

15  *et seq.* ("ADA") for allegedly discriminating against her and subjecting her to a hostile

16  work environment based on her national origin, failing to adequately accommodate her

17  after she injured both knees at work, and retaliating against her when she complained

18  about the way Defendant treated her—inflicting emotional distress in the process. (ECF

19  No. 5.) Before the Court is Defendant's motion for summary judgment (ECF No. 69

20  ("Motion")),[1] along with two related motions to seal exhibits the parties submitted with their

21  briefing on the Motion (ECF Nos. 67, 78).[2] The Court grants the motions to seal. And as

22

23       [1]Plaintiff responded (ECF No. 77) and Defendant replied (ECF No. 80).

24       [2]Both parties seek to seal exhibits attached to their briefing on the Motion
     containing Plaintiff's medical records and sensitive medical information. (ECF Nos. 67,
25   78.) Plaintiff does not oppose Defendant's motion to seal. (ECF No. 71.) Defendant did
     not file a response to Plaintiff's motion to seal, and granting that motion would be
26   consistent with granting Defendant's motion to seal. The Court finds that compelling
     reasons exist to support maintaining Plaintiff's medical records and sensitive medical
27   information under seal, and accordingly grants both motions. *See, e.g.*, *Nall v. Adamson*,
     Case No. 3:19-cv-00054-MMD-CLB, 2021 WL 2301912, at *1 (D. Nev. June 4, 2021)
28   (granting motion to seal medical records attached as exhibits to a motion for summary
     judgment after noting that "[t]his court, and others within the Ninth Circuit, have

1  further explained below, the Court grants in part, and denies in part, the Motion. To

2  preview, the Court will deny the Motion as to the hostile work environment theory of

3  Plaintiff's Title VII claim, Plaintiff's ADA claim, and Plaintiff's Title VII retaliation claim, but

4  grant the Motion as to the disparate treatment discrimination theory of Plaintiff's Title VII

5  claim and Plaintiff's claim for intentional infliction of emotional distress ("IIED").

6  **II.   BACKGROUND**

7      The following facts are undisputed unless otherwise noted. The Court also only

8  describes facts that are pertinent to its discussion of the Motion. Plaintiff still works for

9  Defendant, and has been working for Defendant since 1993. (ECF Nos. 69 at 2, 77 at 1-

10  2.) She began working at Defendant's South Meadows hospital in 1998. (ECF No. 69 at

11  2.) She currently works at the same facility as a unit clerk in the surgery department. (*Id.*)

12  But this case focuses on her tenure working as a catering coordinator and cashier in the

13  café of the South Meadows hospital.

14      Plaintiff started working as a catering coordinator at South Meadows in 2005. (*Id.*

15  at 3.) By 2010, her job title was FNS (Food and Nutrition Services) Coordinator. (*Id.*) The

16  parties dispute the precise job duties she performed, and whether they were primarily

17  desk-based or primarily involved moving and serving food, but agree that her job duties

18  included catering events, serving food, cleaning up, ordering food, keeping track of

19  expenses, and depositing cash at the bank. (*Id.* at 3-4; *see also* ECF No. 77 at 2.) Plaintiff

20  was the only employee at South Meadows with the job title FNS Coordinator. (ECF No.

21  69 at 4.)

22      In 2014, Plaintiff reported to German Pineda, the FNS Supervisor at South

23  Meadows. (*Id.* at 4.) Pineda supervised more than 20 employees. (*Id.*) Pineda, in turn,

24  reported to Cathleen West. (*Id.*) West oversaw the FNS department for two other facilities

25

26  recognized that the need to protect medical privacy qualifies as a 'compelling reason' for
    sealing records, since medical records contain sensitive and private information about a
27  person's health.") (citations omitted).

28

2

1    in addition to South Meadows. (*Id.*) In addition, Christina Vargas, Director of the FNS

2    Department, and Justin Bart, FNS Supervisor, oversaw the FNS department at

3    Defendant's flagship Renown Regional Medical Center—and their job duties periodically

4    brought them to South Meadows. (*Id.*) Suzanne Oetjen was Defendant's Director of

5    Human Resources Business Partners at the time. (*Id.* at 7.) Jessi Cohen (f/k/a Russell)

6    worked with Oetjen as a Senior Human Resources Business Partner. (*Id.* at 4-5.)

7          In November 2014, West was at a meeting with Plaintiff, Pineda, Vargas, and Bart,

8    among other people. (ECF No. 77-4.) As they were all leaving that meeting, West heard

9    Vargas tell Bart, "I hate fucking Mexicans." (*Id.*) West complained to Russell and then

10    Oetjen about Vargas' comment after this meeting, and she contends neither of them ever

11    followed up with her. (*Id.*) Defendant fired West in February 2015. West contends it was

12    because she complained about Vargas' comment and an employee she supervised

13    falsified records regarding refrigerator temperatures (*id.*); Defendant contends it was "due

14    to the forgery of company records" (ECF No. 69 at 4).

15          After West was fired, Vargas was promoted to the Director position overseeing the

16    FNS departments at all of Defendant's facilities. (*Id.*) Shortly thereafter, Bart and Vargas

17    noticed that Pineda was perhaps spending too much on food at the South Meadows

18    facility, so they opened an investigation into him with Russell's help. (*Id.* at 4-5.) They

19    finished their investigation convinced that Pineda had been ordering expensive items and

20    using them for his personal catering business. (*Id.* at 5.) They accordingly fired him in

21    June 2015. (*Id.*)

22          That same month, Vargas cornered Plaintiff in Plaintiff's office and demanded the

23    keys to Plaintiff's safe, and poked her hand in taking Plaintiff's keys from her. (ECF No.

24    77 at 3.) Plaintiff complained to Oetjen about this incident. (*Id.*) Oetjen recalls receiving

25    this and other complaints about Vargas in 2014 and 2015. (*Id.*) Plaintiff contends that

26    Vargas continued harassing her until Vargas resigned in lieu of being fired in May 2017.

27    (ECF No. 69 at 9.)

28    ///

In July 2016, Plaintiff tripped over a cord at work and fell on both of her knees. (*Id.* at 14.) Her knees were very swollen, and she was treated at Defendant's occupational health department the next day. (ECF No. 77 at 6.) She was released to light duty work, with restrictions on how much she could carry and how long she should stand before sitting again, on August 4, 2016. (*Id.*) The occupational health department then released her to full duty on August 11, 2016, but again placed Plaintiff on light duty on August 18, 2016. (*Id.*) Because her knees were still bothering her in November 2016, she went to see Dr. James Sobiek. (*Id.* at 7.) Dr. Sobiek imposed lifting restrictions on Plaintiff in April and May of 2017, and by November 2017, he determined that Plaintiff was permanently disabled in her left knee. (*Id.*) In the intervening months, he had also operated on Plaintiff's right knee. (ECF No. 69 at 17.)

Meanwhile, in August 2016, Defendant gave Plaintiff a chair to sit in as an accommodation for her knee injury. (ECF No. 68-1 (sealed) at 8.) And in January 2017, Defendant "decided to eliminate the FNS Coordinator position [and] formally transferred Plaintiff to the [C]ashier position [.]" (ECF No. 69 at 12.) This change in job title came with a lower rate of hourly pay. (ECF No. 77-17 at 2.) But in September 2017, some of Defendant's other employees observed Plaintiff working, and noted that she was on her feet a lot, and either was not using—or was not able to use—the chair. (ECF No. 78-11 at 3.)

In October 2017, Plaintiff's counsel notified Defendant that Plaintiff was working outside the restrictions imposed on her by Dr. Sobiek. (ECF No. 69 at 18-19.) Defendant determined at this time that it could not accommodate Plaintiff's restrictions in the Cashier position. (*Id.* at 19.) In November 2017, to accommodate her restrictions, Defendant offered Plaintiff the unit clerk position in the surgery department she currently holds—a sedentary job—and Plaintiff accepted. (*Id.*) Plaintiff has been working that job ever since. (*Id.*)

"In January 2018, Plaintiff filed a Charge of Discrimination with the Nevada Equal Rights Commission ("NERC") alleging that she was discriminated against on the basis of

4

1  her national origin (Hispanic), age, and disability, denied a reasonable accommodation,

2  and subjected to retaliation." (ECF No. 69 at 20; *see also* ECF No. 69-25 (the "Charge").)

3  On June 2, 2021, the United States Equal Employment Opportunity Commission

4  ("EEOC") issued Plaintiff a 'right to sue' letter. (ECF No. 77-25.)

5       Plaintiff filed this case in August 2021. (ECF No. 1.) In her operative, amended

6  complaint, she alleges four claims: (1) racial discrimination/hostile work environment

7  under Title VII; (2) violation of the ADA; (3) retaliation; and (4) IIED. (ECF No. 5.)

8  **III.   DISCUSSION**

9       Defendant moves for summary judgment on each of Plaintiff's four claims. The

10  Court addresses the Motion as to each claim, in turn, below.

11         **A.   Discrimination and Hostile Work Environment Claim**

12       As to the discrimination theory of Plaintiff's Title VII claim, Defendant argues that

13  Plaintiff cannot meet her initial burden to show that similarly situated employees were

14  treated more favorably than her when she was demoted to Cashier from FNS Coordinator

15  because no other employees held the FNS Coordinator position. (ECF No. 69 at 22.)

16  Plaintiff does not directly respond to this argument, instead focusing on the hostile work

17  environment theory of her Title VII claim (ECF No. 77 at 19-20), later arguing that her

18  demotion establishes one element of her Title VII retaliation claim (*id.* at 24-26), and

19  arguing that she was not demoted for legitimate reasons because Defendant's evidence

20  proffered to explain the demotion tends to show nothing more than post-hoc

21  rationalization of a retaliatory demotion (*id.* at 27-29). Defendant highlights in reply that

22  Plaintiff does not point to any similarly situated employees who were treated more

23  favorably than her. (ECF No. 80 at 10.)

24       Plaintiff not only does not point to any evidence that similarly situated employees

25  were treated more favorably than her; she does not even respond to Defendant's

26  argument about it. Defendant is accordingly entitled to summary judgment on Plaintiff's

27  Title VII claim to the extent it is based on a disparate treatment discrimination claim

28  premised on her demotion. *See Weil v. Citizens Telecom Servs. Co.*, LLC, 922 F.3d 993,

1004 (9th Cir. 2019) (affirming the district court's grant of summary judgment to the defendant on a Title VII claim based on the defendant's termination in part because the plaintiff "failed to produce evidence of a similarly situated employee who displayed similar conduct"); *Leong v. Potter*, 347 F.3d 1117, 1124 (9th Cir. 2003) (affirming the district court's finding that the plaintiff "failed to establish a prima facie case of discrimination because he could not provide evidence that similarly situated employees were treated more favorably than [he] was treated"); *Rutenschroer v. Starr Seigle Commc'ns, Inc.*, 484 F. Supp. 2d 1144, 1157 (D. Haw. 2006) (granting the defendant's summary judgment claim as to the plaintiff's disparate treatment claim where she "failed to meet the minimal burden of establishing that she was treated differently than other similarly-situated employees from outside her protected class"); *Harris v. City of Fresno*, 625 F. Supp. 2d 983, 1003 (E.D. Cal. 2009) ("Plaintiff has not demonstrated, nor even made any attempt to show, that he was similarly situated in material respects to the candidate selected[.]").

As to the hostile work environment aspect of Plaintiff's Title VII claim, Defendant argues that none of the alleged harassment Plaintiff was subjected to was related to her race, and the alleged harassment was insufficiently severe or pervasive to constitute a cognizable claim for harassment. (ECF No. 69 at 22-24.) Plaintiff counters that her former supervisor, Vargas, was hostile to her and told other employees in meetings that she 'hated Mexicans.'[3] (ECF No. 77 at 19.) Plaintiff further argues that another one of her supervisors who also reported to Vargas, Pineda, told her that Vargas told him not to hire Hispanics because they are 'lazy,' and another time threw a radio playing Spanish-language music into the trash. (*Id.*) Plaintiff accordingly argues that these details tinged all of Vargas' hostile behavior towards Plaintiff with racial animus, most notably an incident where Vargas poked Plaintiff's hand while demanding and then taking the keys

---

[3]Plaintiff's pertinent portion of her response does not comply with LR IA 7-3(e), which provides, "References to exhibits or attachments to documents must include citations to the specific page(s) being referenced." Indeed, Plaintiff's response describes evidence in general terms without providing any citations to the record. (ECF No. 77 at 19-20.) The Court admonishes Plaintiff's counsel regarding the need to comply with the local rules.

1  to a safe that Plaintiff used at work. (*Id.* at 19-20.) On balance, the Court agrees with

2  Plaintiff.

3      "An employer is liable under Title VII for conduct giving rise to a hostile environment

4  where the employee proves (1) that [s]he was subjected to verbal or physical conduct of

5  a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was

6  sufficiently severe or pervasive to alter the conditions of the victim's employment and

7  create an abusive working environment." *Arizona ex rel. Horne v. Geo Grp., Inc.*, 816 F.3d

8  1189, 1206 (9th Cir. 2016) (citations omitted). "In evaluating motions for summary

9  judgment in the context of employment discrimination, [the United States Court of Appeals

10  for the Ninth Circuit has] emphasized the importance of zealously guarding an employee's

11  right to a full trial, since discrimination claims are frequently difficult to prove without a full

12  airing of the evidence and an opportunity to evaluate the credibility of the witnesses."

13  *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004).

14      Moreover, "if racial hostility pervades a workplace, a plaintiff may establish a

15  violation of Title VII, even if such hostility was not directly targeted at the plaintiff." *Id.* at

16  1117. Plaintiff accordingly does not need to establish that Vargas told her she 'hated

17  Mexicans.' *See id.* And Plaintiff has proffered West's declaration, who swears that she

18  was at a meeting with Plaintiff, Vargas, Justin Bart, and others in approximately

19  November 2014. (ECF No. 77-4.) As they were all leaving that meeting, West heard

20  Vargas tell Bart, "I hate fucking Mexicans." (*Id.*) This tends to show that Vargas subjected

21  Plaintiff to a hostile workplace based on her national origin, because—particularly drawing

22  all inferences in Plaintiff's favor, *see Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793

23  F.2d 1100, 1103 (9th Cir. 1986)—the Court can reasonably infer that Vargas made other

24  comments of a national origin-harassing nature around Plaintiff if she felt comfortable

25  making such a comment leaving a meeting that Plaintiff attended. Additionally, Plaintiff

26  testified at her deposition that she heard Vargas say that she did not like Mexicans at

27  some point. (ECF No. 69-2 at 80.) It is accordingly reasonable to infer that any hostility

28  directed at Plaintiff by Vargas was based on Plaintiff's national origin.

1    Defendant also does not dispute that "it received reports of Vargas being mean,

2    unkind, and condescending to others with whom she worked[,]" and notes that Vargas

3    resigned from her employment in lieu of termination because she did not correct her

4    behavior. (ECF No. 80 at 3-4; *see also* ECF No. 78-12 (sealed) at 4 (finding that other

5    employees felt harassed by Vargas as well).) Taken together, Defendant's concession

6    that Vargas harassed others and West's declaration to the effect that Vargas said she

7    'hated Mexicans,' show there is at least a genuine factual dispute precluding summary

8    judgment that Vargas subjected Plaintiff to a hostile working environment based on her

9    national origin.

10    Plaintiff also proffers evidence tending to show that Vargas subjected her to

11    unwelcome verbal or physical conduct of a harassing nature. Plaintiff specifically

12    highlights the incident where Vargas demanded Plaintiff's keys from her and poked her

13    on the hand. (ECF Nos. 77 at 20, 78-1 (sealed) at 34-35, 63.) And Plaintiff testified that

14    she believes Vargas was one of the employees who harassed and discriminated against

15    her. (*Id.* (sealed) at 23.) Thus, Plaintiff has presented evidence going to the elements of

16    her prima facie hostile environment claim.

17    In addition, the evidence that Defendant points to in the pertinent section of its

18    Motion does not tell quite as clean a story as Defendant suggests it does. For example,

19    Defendant points to Plaintiff's 'admission' that she has 'no evidence' connecting her

20    mistreatment to her race or national origin. (ECF No. 69 at 23.) But in the pages of

21    testimony preceding the 'no evidence' statement, Plaintiff consistently testifies that she

22    felt Vargas and Bart harassed her based on her national origin. (ECF No. 69-2 at 80-85.)

23    Drawing all inferences in Plaintiff's favor, the best read of the 'no evidence' testimony is

24    that Plaintiff does not have some written documentation to support her view that Vargas

25    and Bart were harassing her based on her national origin. And while Defendant offers

26    several excerpts of deposition testimony to support its contention that 'no other witnesses'

27    offered evidence to support Plaintiff's national origin hostile work environment claim,

28    Defendant does not discuss West's declaration the Court discussed above. Genuine

1   disputes of material fact therefore remain, precluding summary judgment on this theory

2   of Plaintiff's Title VII claim.

3        In sum, the Court denies Defendant's Motion as to Plaintiff's hostile work

4   environment theory of her Title VII claim, but grants it as to Plaintiff's disparate treatment

5   discrimination theory of her Title VII claim.

6        **B.   ADA Claim**

7        The Court now turns to Defendant's Motion as to Plaintiff's ADA claim. Defendant

8   first argues that Plaintiff's ADA claim fails to the extent it is based on a ten-pound lifting

9   restriction imposed by her doctor for only three months because that temporary restriction

10   does not amount to a substantial limitation under the ADA, as clarified by governing law.

11   (ECF No. 69 at 24.) To the extent Plaintiff's ADA claim is based on restrictions on

12   Plaintiff's ability to stand and walk, Defendant alternatively argues an ADA claim based

13   on that theory is barred because Plaintiff failed to exhaust it and her standing and walking

14   restrictions were both temporary and not substantially limiting. (ECF No. 69 at 24-26.)

15   Plaintiff does not directly respond to either of these arguments, but argues she

16   nonetheless satisfies the elements of her prima facie ADA claim because the chair that

17   Defendant gave Plaintiff to sit in while working was not an appropriate or sufficient

18   modification and NERC issued a finding of probable cause as to her disability-

19   discrimination claim. (ECF No. 77 at 23.) Defendant replies that the undisputed fact

20   Defendant gave Plaintiff a chair to sit in while working after she was injured is evidence

21   of Defendant having participated in the reasonable accommodation process required by

22   the ADA, Plaintiff did not notify her supervisors that she was working outside restrictions

23   imposed on her by her doctors (and when she did, Defendant promptly accommodated

24   her), and NERC's probable-cause determination is not admissible to establish liability in

25   this case. (ECF No. 80 at 12-14.)

26        Defendant has not shown it is entitled to summary judgment on its argument that

27   Plaintiff's lifting restriction was not substantially limiting under the ADA because *Shields*

28   *v. Credit One Bank, N.A.*, 32 F.4th 1218 (9th Cir. 2022) does not support its argument.

(ECF No. 69 at 24.) And *Shields* is the only basis that Defendant proffers for its argument. (*Id.*) In *Shields*, the Ninth Circuit held (in reversing an order granting a motion to dismiss) that a substantial inability to perform certain major life tasks for more than two months was "of sufficient duration and impact to qualify" as substantially limiting under the ADA. 32 F.4th at 1227. But Defendant attempts to use *Shields* to argue that a lifting restriction imposed initially for two weeks and then later for three months was not long enough in duration to qualify as substantially limiting. (ECF No. 69 at 24.) Because three months is longer than two months, and even a two month restriction could qualify as substantially limiting under *Shields*, Defendant's argument based on *Shields* is unpersuasive. And as noted, Defendant presents no other argument to support this portion of its Motion. Plaintiff's ADA claim may accordingly proceed against Defendant to the extent it is based on Defendant's alleged violation of the 10 pound lifting restrictions Plaintiff's Dr. Sobiek imposed on her—and Defendant's Motion is correspondingly denied to the same extent.

This brings the Court to Plaintiff's ADA claim to the extent it is based on restrictions on Plaintiff's ability to stand or walk following her knee injury. As an initial matter, the Court rejects Defendant's argument that this theory of Plaintiff's ADA claim is barred for failure to exhaust administrative remedies. (*Id.* at 24-25.) While it is true that, the "jurisdictional scope of the plaintiff's court action depends on the scope of the EEOC charge and investigation[,]" *Leong*, 347 F.3d at 1122, it is also true that the Court has jurisdiction over charges that are "like or reasonably related to" the allegations presented to the EEOC or its state equivalent—and indeed, the Court should consider whether they are. *See id.* In addition to alleging that she was not to lift more than ten pounds, Plaintiff more generally alleged to the NERC that following her injury, her care provider requested that she be placed on light duty, but Defendant did not accommodate those light duty restrictions. (ECF No. 69-25 at 3.) And both sets of restrictions stem from the same workplace knee injury that Plaintiff suffered. (ECF No. 5 at 8 (alleging that both sets of restrictions came in response to the knee injury).) Thus, the Court finds that Plaintiff's argument that Defendant violated the ADA by not allowing her to sit enough is reasonably

1   related to the allegations in her NERC Charge.[4] Said otherwise, this theory of this claim

2   is not barred by the administrative exhaustion requirement.

3         In response to the rest of Defendant's arguments regarding Plaintiff's standing and

4   walking restrictions, Plaintiff primarily counters that the chair Defendant provided her to

5   sit in while she was working was not an appropriate or sufficient accommodation.[5] (ECF

6   No. 77 at 23.) On the one hand, Defendant presents Dr. Sobiek's testimony that

7   placement of the chair was an acceptable accommodation to comply with the sedentary

8   restrictions he imposed on her. (ECF Nos. 69 at 25 (citing the testimony), 68-9 (sealed)

9   at 13 (testifying as such).) But on the other hand, Plaintiff testified that the chair was not

10  an adequate accommodation. (ECF No. 68-1 (sealed) at 21-22.) Plaintiff also points in

11  response to an observation of Plaintiff conducted by Defendant's employees noting that

12  they did not see a chair when they went to observe her working, and they did not see her

13  sit down or take breaks during the several hours they observed her. (ECF Nos. 77 at 23

14  (pointing to the observation exhibit), 78-11 (sealed) at 3 (noting they did not see a chair

15  nor did they see Plaintiff take breaks during their observation).)

16        This conflicting evidence creates a genuine dispute of material fact precluding

17  summary judgment as to whether the chair Defendant gave to Plaintiff to accommodate

18  her standing and walking restrictions was a reasonable accommodation that complied

19  with the ADA. Defendant's Motion is accordingly denied as to the sitting and walking

20  restrictions portion of Plaintiff's ADA claim as well. In sum, Defendant's Motion is denied

21  in its entirety as to Plaintiff's ADA claim.

22  ///

23

---

24        [4]Defendant also proffers deposition testimony of NERC investigator Richard Brown
    to support its argument that Plaintiff did not properly exhaust her claim to the extent
25  premised on standing and walking restrictions, but he only testified that she did not specify
    any other restrictions beyond lifting more than ten pounds in her Charge. (*Compare* ECF
26  No. 80 at 13 (citing ECF No. 68-11 (sealed) at 22-23) *with* ECF No. 68-11 at 22-23.)
    Brown did not offer any opinion as to whether Plaintiff's standing and walking restrictions
27  were reasonably related to her lifting restrictions. (*Id.*)

28        [5]There is no dispute that Defendant gave Plaintiff a chair to use. (ECF No. 68-1
    (sealed) at 8, 16; *see also* ECF No. 68-5 (sealed) (containing a picture of the chair).)

1

### C.    Retaliation Claim

2          That brings the Court to Defendant's Motion as to Plaintiff's retaliation claim.

3    Defendant alternatively argues this claim fails because Defendant did not engage in any

4    activity protected under Title VII, nor can she establish a causal connection between her

5    July 2015 complaint and her demotion nearly 18 months later, nor can she present any

6    evidence of pretext to respond to Defendant's proffered nondiscriminatory reason for her

7    demotion, which is that catering jobs declined following Pineda's termination, so there

8    was only cashier work for Plaintiff to do. (ECF No. 69 at 27.) In response, Plaintiff points

9    to either her request to accommodate her disability in 2016 or her notification to Oetjen

10   that Vargas poked her in July 2015 as her protected activity, and while she does not really

11   address the argument that her demotion was too far in time from the complaint she made

12   in 2015, she does argue it is causally connected based on chronology because she was

13   demoted after complaining to Oetjen that Vargas poked her. (ECF No. 77 at 24-26.) As

14   to pretext, Plaintiff argues that Defendant's evidence proffered to show the legitimate,

15   non-discriminatory reasons for her demotion is not reliable because it all post-dates

16   Plaintiff's filing of her Charge. (*Id.* at 27-29.)

17         A prima facie case of retaliation requires a showing that: (1) the plaintiff engaged

18   in a protected activity; (2) she suffered an adverse employment action; and (3) a causal

19   link exists between these two events. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d

20   1054, 1064 (9th Cir. 2002). Thereafter, the burden of production shifts to the employer to

21   present legitimate reasons for the adverse employment action. Once the employer carries

22   this burden, the plaintiff must demonstrate a genuine issue of material fact as to whether

23   the reason advanced by the employer was a pretext for retaliation. *See Stegall v. Citadel*

24   *Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003), *as amended* (Jan. 6, 2004). A plaintiff

25   can show pretext in two ways: either "directly by persuading the court that a discriminatory

26   reason more likely motivated the employer or indirectly by showing that the employer's

27   proffered explanation is unworthy of credence." *Id.* at 1068 (quoting *Texas Dep't of Cmty.*

28

1    *Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). A plaintiff must present "very little evidence"

2    of pretext to survive summary judgment. *Id.* at 1072.

3        Given that Plaintiff need only present very little evidence of pretext, the Court will

4    deny Defendant's Motion as to Plaintiff's retaliation claim. The Court begins the pertinent

5    analysis with Plaintiff's prima facie case. To reiterate, Plaintiff points to either her report

6    to Oetjen about Vargas poking her, or her requests to accommodate her disability, as the

7    protected activity she engaged in. (ECF No. 77 at 24-25.) But Plaintiff cannot point to

8    requests to accommodate her disability because she does not allege this as a basis for

9    her retaliation claim in her Complaint. (ECF No. 5 at 11-12 (explicitly basing this claim on

10   Title VII and describing the poking incident as the primary factual basis for it without

11   mentioning requests to accommodate her disability at all).) *See also Trishan Air, Inc. v.*

12   *Fed. Ins. Co.*, 635 F.3d 422, 435 & n.19 (9th Cir. 2011) (finding that a claim not raised in

13   the operative complaint, but instead for the first time in response to a motion for summary

14   judgment "was not properly before the district court"). That said, and again drawing all

15   inferences in Plaintiff's favor, Plaintiff's complaint to Oetjen about Vargas poking her

16   constitutes protected activity because Plaintiff believed Vargas was discriminating against

17   her based on her national origin (ECF No. 78-1 (sealed) at 23)—so Plaintiff's report about

18   the poking incident was a report about harassment based on her national origin.

19       As to the second prong, a demotion constitutes an adverse employment action.

20   *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1031 (9th Cir. 2006). And

21   there is no genuine dispute that Plaintiff was demoted. (ECF Nos. 69 at 12 (stating that

22   Defendant "decided to eliminate the FNS Coordinator position [and] formally transferred

23   Plaintiff to the cashier position effective January 16, 2017"), 77 at 9 (arguing she was

24   demoted because her pay dropped when her job classification changed), 77-17 (noting

25   Plaintiff's pay decreased when her job was changed from FNS Coordinator to FNS

26   Services Cashier).) *See also Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d

27   840, 847 (9th Cir. 2004) ("We have recognized that an adverse employment action exists

28   where an employer's action negatively affects its employee's compensation."). And again

13

drawing all inferences in Plaintiff's favor, her demotion was causally connected to her complaint to Oetjen about Vargas' behavior because the demotion came after the complaint and Plaintiff generally received good performance reviews, even though the gap in time between the complaint and the demotion was long. (ECF Nos. 69 at 10, 12 (asserting that the complaint came before the change in job title), 77-2 (containing generally positive performance evaluations).) Viewing this evidence in the light most favorable to Plaintiff, a rational trier of fact could reasonably find a causal connection to support Plaintiff's retaliation claim.

The Court accordingly finds that Plaintiff has presented sufficient evidence to make out a prima facie case of Title VII retaliation. But Defendant also presents a legitimate, nondiscriminatory reason for her demotion, which is that the number of catering jobs declined and Plaintiff was mostly performing cashier duties anyway, so Defendant merely changed her job description to match the work she was already doing. (ECF No. 69 at 22, 27 (proffering reason).) The burden accordingly shifts back to Plaintiff to present very little evidence of pretext to survive summary judgment. *See Stegall*, 350 F.3d at 1068, 1072.

Plaintiff has presented the requisite very little evidence of pretext to survive summary judgment. For example, Plaintiff noted in the typewritten version of her diary that she was still being referred to as the 'catering coordinator' and being asked to perform catering tasks in 2017 (ECF No. 69-17 at 12), or after her demotion at the end of 2016 (ECF No. 77-17 at 2 (noting a 'date prepared' as December 29, 2016)). This is at least very little evidence that there was still catering work to be done, suggesting that Defendant's explanation for the demotion could be pretextual.

In sum, Defendant's Motion is denied as to Plaintiff's Title VII retaliation claim.

**D.    IIED Claim**

Defendant finally argues that Plaintiff's IIED claim fails because the incidents upon which it is based do not rise to the requisite level of extreme or outrageous conduct. (ECF No. 69 at 28.) Plaintiff counters that the factual elements of her Title VII and ADA claims—

14

1   plus the fact that Vargas poked her—constitute extreme or outrageous conduct making

2   her IIED claim viable. (ECF No. 77 at 26-27.) The Court agrees with Defendant.

3       "The elements of a cause of action for intentional infliction of emotional distress

4   are '(1) extreme and outrageous conduct with either the intention of, or reckless disregard

5   for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme

6   emotional distress and (3) actual or proximate causation.'" *Dillard Dep't Stores, Inc. v.*

7   *Beckwith*, 989 P.2d 882, 886 (Nev. 1999). Conduct is extreme or outrageous if it is

8   atrocious, beyond all possible bounds of decency, and utterly intolerable. *See Churchill*

9   *v. Barach*, 863 F. Supp. 1266, 1275 (D. Nev. 1994).

10      To start, Plaintiff cannot prevail on her IIED claim to the extent it is based upon the

11  same factual contentions supporting her Title VII and ADA claims—and according to her

12  response to the Motion, it mostly is. (ECF No. 77 at 26-27.) This is for at least two reasons.

13  First, an IIED claim must be based on something more than, "actions [such] as hiring and

14  firing, project assignments, promotion and demotions, performance evaluations and other

15  similar acts[.]" *Welder v. Univ. of S. Nevada*, 833 F. Supp. 2d 1240, 1245 (D. Nev. 2011);

16  *see also id.* at 1245-46 (dismissing IIED claim because conduct upon which it was based

17  fell under the category of normal employment relations); *Robinson v. Renown Reg'l Med.*

18  *Ctr.*, Case No. 3:16-cv-00372-MMD-WGC, 2017 WL 2945727, at *3 (D. Nev. July 10,

19  2017) (same). Second, and alternatively, the "Supreme Court of Nevada has held that

20  NRS 613.330 *et seq.* provides 'the exclusive remedy for tort claims premised on illegal

21  employment practice.'" *Salehian v. Nevada State Treasurer's Off.*, 618 F. Supp. 3d 995,

22  1014 (D. Nev. 2022) (citations omitted) (dismissing IIED claim as well).

23      That leaves only the poking incident. While the poking incident may have been

24  humiliating or distressing for Plaintiff, it is not beyond all possible bounds of decency or

25  utterly intolerable. And "it is only when reasonable minds could differ in determining

26  whether conduct is sufficiently extreme or outrageous that an IIED claim should survive

27  summary judgment." *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195,

28  1209 (9th Cir. 2016) (citation omitted). Reasonable minds could not differ in finding that

1  being poked on the hand while your supervisor demands some keys from you once in a

2  30-year (so far) tenure at an employer is not extreme or outrageous conduct. *See id.*

3  (finding under Arizona law that "touching A.G.'s legs in an effort to restrain her, escorting

4  A.G. to the Intervention Room, attempting to seat A.G., and enlisting Officer Welsh's

5  assistance—was not 'so outrageous in character and so extreme in degree, as to go

6  beyond all possible bounds of decency,'" in affirming summary judgment for certain

7  defendants on the plaintiff's IIED claim). Plaintiff cites no caselaw to the contrary. (ECF

8  No. 77 at 26-27.) Indeed, the only case Plaintiff cites to provide the elements of her IIED

9  claim—not even to support her argument that the poking incident constituted outrageous

10  conduct—actually affirmed the district court's grant of summary judgment to the

11  defendant employer where the plaintiff alleged an IIED claim against it because his

12  supervisor told his coworkers he was participating in an alcohol treatment program, and

13  they jeered him about it upon his return to work, causing him to experience suicidal

14  ideation. (*Id.* at 26 (citing *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1386 (Nev. 1998).)

15  *See also Barmettler*, 956 P.2d at 1384 (describing factual basis of the plaintiff's claims),

16  1386 (finding the plaintiff "has failed to establish either the first or second elements of this

17  cause of action"). Accordingly, Defendant is entitled to summary judgment on Plaintiff's

18  IIED claim.

19  **IV.   CONCLUSION**

20       The Court notes that the parties made several arguments and cited to several

21  cases not discussed above. The Court has reviewed these arguments and cases and

22  determines that they do not warrant discussion as they do not affect the outcome of the

23  motions before the Court.

24       It is therefore ordered that Defendant's motion to seal (ECF No. 67) is granted.

25       It is further ordered that Defendant's motion for summary judgment (ECF No. 69)

26  is granted in part, and denied in part, as specified herein.

27       It is further ordered that Plaintiff's motion to seal (ECF No. 78) is granted.

28       It is further ordered that the Court finds it appropriate to refer this case to United

States Magistrate Judge Craig S. Denney to conduct a settlement conference under LR 16-5—and the case is so referred. If the parties do not settle at the settlement conference, the Joint Pretrial Order is due within 30 days of the date the settlement conference is held.

DATED THIS 27th Day of February 2024.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE

17